UNITED STATES of America,

v.

ELECTRODYNE SYSTEMS CORP.,
Dennis Nathan and Victor Aron
Lander, Defendants.

Criminal No. 96–127(AJL).

United States District Court,
D. New Jersey.

Aug. 12, 1998.

Faith S. Hochberg, United States Attorney, Noel L. Hillman, Asst. U.S.Atty., Office of the United States Attorney, Newark, NJ, for plaintiff U.S.

Lawrence S. Lustberg, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for defendant Victor Aron Lander.

Michael Critchley, West Orange, NJ, for defendant Dennis Nathan.

J. Barry Cocoziello, Newark, NJ, for defendant Electrodyne Systems Corp.

## OPINION

LECHNER, District Judge.

On 4 March 1996, a United States Grand Jury for the District of New Jersey (the "Grand Jury") returned a thirteen count, thirty-eight page indictment (the "Indictment") against Electrodyne Systems Corporation ("Electrodyne"), Dennis Nathan ("Nathan") and Victor Aron Lander ("Lander") (collectively, the "Defendants").[1] The Indictment charges the Individual Defendants and Electrodyne with conspiracy to commit offenses against the United States, 18 U.S.C. § 371 ("Section 371"), violations of the Arms Export Control Act (the "AECA"), 22 U.S.C. § 2778(b)(2) ("Section 2778(b)(2)") and (c) ("Section 2778(c)"), the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 127.1 and 127.3, unlawful importation of goods into the United States, 18 U.S.C. §§ 545 ("Section 545") and 2 ("Section 2"), and making false statements, 18 U.S.C. § 1001 ("Section 1001") and Section 2.

This opinion addresses the sentencing of the Individual Defendants and the resentencing of Electrodyne.[2]

Electrodyne was a New Jersey corporation formed in 1986 to specialize in providing military components, as a prime contractor, to the United States. See Letter, dated 30 September 1997, and included memorandum from Office of the General Counsel, Department of the Navy (the "30 September

---

1. Nathan and Lander will be referred to collectively as the "Individual Defendants."

2. On 10 June 1998, the Third Circuit vacated the sentence imposed upon Electrodyne at a hearing on 27 May 1997 (the "Electrodyne Sentencing") and remanded the instant matter. See United States v. Electrodyne Sys. Corp., 147 F.3d 250 (3d Cir.1998). On remand, determinations need to be made as to the ability of Electrodyne to pay the $1,000,000 fine which was imposed during the Electrodyne Sentencing and the time period within which any fine must be paid. See id. at ——, 1998 WL 304358, at * 5. Also, on remand, findings pursuant to Rule 32(c)(1) ("Rule 32(c)(1)") of the Federal Rules of Criminal Procedure need to be made regarding the applicable calculation of loss, pursuant to U.S.S.G. § 2F1.1 ("Section 2F1.1"), and the number of employees at Electrodyne for the purpose of determining an appropriate fine. See id. at ——, 1998 WL 304358, at * 6. When relevant, these issues will be discussed in connection with the sentencing of Nathan and Lander. Otherwise, they will be discussed separately.

If a conflict exists between statements made during arguments leading up to or during the Electrodyne Sentencing or during the resentencing of Electrodyne or the sentencing of the Individual Defendants and this Letter–Opinion, this Letter–Opinion will control.

1997 Letter") attached as Exhibit C to Sentencing Memorandum submitted by the Government, dated 5 August 1998, (the "Government Sentencing Memorandum"). Electrodyne manufactured, sold, imported and exported microwave components and electronic power conversion equipment for military application in advanced communications and radar systems in aircraft, warships, satellites, tanks and ground forces defense systems. *See id.* at 3–4. Electrodyne held numerous contracts to provide these electronic components, including some manufactured using classified information, to a number of Government agencies. *See id.* at 4. Its customers included the National Aeronautics and Space Administration ("NASA"), the United States Air Force ("Air Force") and the United States Navy ("Navy"), which included the Naval Research Laboratory ("NRL"). *See id.*

At all times relevant to this action, Nathan was President and Vice–President of Electrodyne. *See* 30 September 1997 Letter attached as Exh. C to Government Sentencing Memorandum at 4. At certain times relevant to this action, Nathan was also the designated security officer for Electrodyne. *See id.*

At all times relevant to this action, Lander was Director of Marketing of Electrodyne. *See* 30 September 1997 Letter attached as Exh. C to Government Sentencing Memorandum at 4. Before Lander emigrated to the United States in 1976, he assisted the military of the former Soviet Union in developing electronic warfare systems. *See id.*

As will be discussed *infra* in more detail, the Indictment describes the AECA[3] and ITAR, which authorize the United States State Department's Office of Defense Trade Controls ("ODTC") to establish and maintain the United States Munitions List (the "Muni-

tions List"). *See* 30 September 1997 Letter attached as Exh. C to Government Sentencing Memorandum at 4; 22 C.F.R. § 121.1. The Munitions List is a catalog of designated "defense articles" subject to export restrictions. *See* 30 September 1997 Letter attached as Exh. C to Government Sentencing Memorandum at 4; 22 C.F.R. § 121.1. Anyone wishing to export from the United States a defense article on the Munitions List must first obtain a license from the ODTC. *See* 30 September 1997 Letter attached as Exh. C to Government Sentencing Memorandum at 4; 22 C.F.R. § 121.1. Included on the Munitions List are certain electronic components designed and manufactured for use by the military for advances communications and radar systems in aircraft, warships, satellites, tanks and ground forces defense systems. *See* 30 September 1997 Letter attached as Exh. C to Government Sentencing Memorandum at 4; 22 C.F.R. § 121.1.

The ODTC also regulates the export of "defense services."[4] *See* 30 September 1997 Letter attached as Exh. C to Government Sentencing Memorandum at 4. As part of the limitations on providing defense services pursuant to ITAR, an individual in the United States may not contract with a foreign person to build an item on the Munitions List outside of the United States without first obtaining a license under the AECA. *See id.*

■ The Indictment charges that from on or about 6 November 1989 to on or about 10 March 1994, Electrodyne entered into six contracts to provide agencies of the United States Government with electronic components for use in research, communications, radar and weapon systems. *See* 30 September 1997 attached as Exh. C to Government Sentencing Memorandum at 4. In order to facilitate the building of the military compo-

---

3. The AECA authorizes the President to control the export of defense articles and services. *See* 22 U.S.C. § 2778(a)(1). The Department of State, exercising this authority for the President, has promulgated ITAR, Title 22, Code of Federal Regulations, Part 120. *See United States v. Fu Chin Chung,* 931 F.2d 43, 45 (11th Cir.1991); *Karn v. United States Dep't of State,* 925 F.Supp. 1, 4 (D.D.C.1996).

4. The export of "defense services" includes:

The furnishing of assistance (including training) to foreign persons, whether in the United States or abroad, in the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles; or ... [t]he furnishing to foreign persons of any technical data controlled under the Munitions List whether in the United States or abroad.
22 C.F.R. § 120.9.

nents contracted for, and contrary to the express terms of the contracts, and in some cases Department of Defense directives, Electrodyne, Nathan and Lander disclosed to foreign manufacturers the drawings, technology and specifications for United States military components. *See id.* Electrodyne, Nathan and Lander also provided the engineering and scientific assistance necessary to build these components. *See id.* The Indictment charges these acts were, *inter alia,* in violation of the AECA, ITAR and the Buy American Act.[5]

On 26 August 1996, Electrodyne entered into a written plea agreement (the "Electrodyne Plea Agreement") with the Government. *See* Electrodyne Plea Agreement. Electrodyne agreed to plead guilty to Count Two of the Indictment which charged Electrodyne with impermissibly exporting defense related items in violation of Sections 2778(b)(2) and (c) and Section 2. *See id.* Electrodyne also agreed to plead guilty to Count Ten of the Indictment which charged Electrodyne with making a false statement in violation of Section 1001 and Section 2. *See id.*

On or about 16 October 1996, Electrodyne pleaded guilty (the "Electrodyne Plea Hearing"), pursuant to the Electrodyne Plea Agreement, to Counts Two and Ten of the Indictment. *See* Transcript from Electrodyne Plea Hearing at 25. On 27 May 1997, Electrodyne was sentenced; a fine of $500,-000 on each of Counts Two and Ten was imposed. *See* Transcript from Electrodyne Sentencing at 10–11. This fine was then due and payable. *See id.* at 11. Restitution of $369,105.70 was also ordered.[6] *See id.* at 4–7.

The Electrodyne sentence was enhanced pursuant to U.S.S.G. § 8C2.5(b)(4) ("Section 8C2.5(b)(4)") because Electrodyne employed fifty or more employees. *See* Transcript from Electrodyne Sentencing at 2–3. The base offense level was also increased by nine points pursuant to Section 2F1.1 based upon a calculation of loss equal to the amount of restitution.

On 22 August 1996, Lander entered into a plea agreement (the "Lander Plea Agreement") with the Government. *See* Lander Plea Agreement. Lander agreed to plead guilty to a one count Information (the "Information") which charged him with the unlawful introduction of merchandise into the commerce of the United States in violation of 18 U.S.C. § 542 ("Section 542")[7] and Section

---

5. The Buy American Act, Pub.L. No. 428, Title III, §§ 1–5, 47 Stat. 1520, 1521 (1933) (codified, as amended, at 41 U.S.C. §§ 10a-d (1988)), was enacted to establish a preference for domestic products purchased for public use so as to protect American workers. *See Allis–Chalmers Corp. Hydro–Turbine Div. v. Friedkin*, 635 F.2d 248, 257 (3d Cir.1980). The Buy American Act provides that "unless the head of the department . . . concerned shall determine it to be inconsistent with the public interest, or the cost to be unreasonable, only . . . materials . . . produced in the United States . . . shall be acquired for public use." 41 U.S.C. § 10a. The Buy American Act is implemented by Executive Order No. 10,582, 3 C.F.R. § 320 (1954–58), reprinted in 41 U.S.C. § 10d App. at 1042 (1982), as amended by Exec. Order No. 12,608, 3 C.F.R. § 245 (1987).

6. The amount ordered to be paid as restitution is as follows:

| Amount | To |
|---|---|
| $ 2,000.00 | Office of General Counsel, NRL |
| $170,660.00 | Air Force, Attorney Advisor |
| $139,200.00 | Stipulated Settlement with Air Force |
| $ 57,245.70 | Office Inspector General of NASA, Lewis Research Center |

Transcript from Electrodyne Sentencing at 4–7.

7. Section 542, in pertinent part, states:

Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties; or

Whoever is guilty of any willful act or omission whereby the United States shall or may be deprived of any lawful duties accruing upon merchandise embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission—

Shall be fined for each offense under this title or imprisoned not more than two years, or both.

2.[8]

On 25 September 1996, Nathan entered into a plea agreement (the "Nathan Plea Agreement") with the Government. *See* Nathan Plea Agreement. Nathan agreed to plead guilty to Count Twelve of the Indictment, which charged him with knowingly importing merchandise into the United States contrary to law and with the intent to defraud the United States, in violation of Sections 545[9] and 2. *See id.*

On 16 October 1996, a plea hearing (the "Nathan Plea Hearing") was held regarding the Nathan Plea Agreement pursuant to Rule 11 ("Rule 11") of the Federal Rules of Criminal Procedure. Nathan affirmatively responded when asked if he was aware that his guilty plea would expose him to a maximum sentence of imprisonment of up to five years. *See* Transcript from Nathan Plea Hearing at 11. Nathan also acknowledged his guilty plea would subject him to a statutory maximum fine of the greatest of $250,-000, or twice the gross amount of any pecuniary gain derived from the offense or twice the gross amount of any pecuniary loss suffered by a victim of the offense. *See id.* At the conclusion of the Nathan Plea Hearing, the plea of guilty offered by Nathan was accepted and he was found guilty of violating Sections 545 and 2. *See id.* at 21–22.

On 31 October 1996, a plea hearing (the "Lander Plea Hearing") was held regarding the Lander Plea Agreement pursuant to Rule 11. Lander affirmatively responded when asked if he was aware that his guilty plea would expose him to a maximum sentence of imprisonment of up to two years. *See* Transcript from Lander Plea Hearing at 12. Lander also acknowledged his guilty plea would subject him to a statutory maximum fine of the greatest of $250,000, or twice the gross amount of any pecuniary gain derived from the offense or twice the gross amount of any pecuniary loss suffered by a victim of the offense. *See id.* At the conclusion of the Lander Plea Hearing, the plea of guilty offered by Lander was accepted and he was found guilty of violating Sections 542 and 2. *See id.* at 22–23.

After the pleas of the Individual Defendants were accepted, the Probation Department ("Probation") conducted presentence investigations for their sentencings. *See* Fed.R.Crim.P. 32(b). The presentence investigation report for Nathan (the "Nathan Presentence Investigation Report") and the presentence investigation report for Lander (the "Lander Presentence Investigation Report") (collectively the "Presentence Investigation Reports") set forth calculations by Probation for the sentencing of the Individual Defendants under the United States Sentencing Guidelines (the "Guidelines").

In the Presentence Investigation Reports, Probation states the appropriate Guideline for the Individual Defendants is Section 2F1.1[10] rather than U.S.S.G. § 2T3.1 ("Sec-

---

18 U.S.C. § 542.

8. Section 2 states:

 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 18 U.S.C. § 2.

9. Section 545, in pertinent part, states:

 Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any

 false, forged, or fraudulent invoice, or other document or paper; or
 Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—
 Shall be fined under this title or imprisoned not more than five years, or both.
 18 U.S.C. § 545.

10. Part F, Chapter 2, of the Guidelines applies to offense involving fraud or deceit. Section 2F1.1 specifically applies to "Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." Section 2F1.1. Section 2F1.1 provides for a base offense level of six with enhancements of the offense level ac-

**222**

tion 2T3.1"),[11] as stipulated by the Government and the Individual Defendants. Probation cites to U.S.S.G. § 1B1.2(c) ("Section 1B1.2") which states: "A plea agreement (written or made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant has been convicted of additional count(s) charging those offenses." Nathan Presentence Investigation Report, ¶ 141; Lander Presentence Investigation Report, ¶ 148. Probation further refers to Application Note One to Section 1B1.2 ("Application Note One to Section 1B1.2") which states:

"Where a stipulation that is set forth in a written plea agreement or made between the parties on the record during a plea proceeding specifically establishes facts that prove a more serious offense or offenses of conviction, the court is to apply the [G]uideline most applicable to the more serious offense or offenses established."

Nathan Presentence Investigation Report, ¶ 141 (quoting Application Note One to Sec-

cording to the size of "the loss" of the victim attributable to the fraudulent conduct.

Section 2F1.1, in pertinent part, states:
(a) Base Offense Level: 6
(b) Specific Offense Characteristics
(1) If the loss exceeded $2,000, increase the offense level as follows:

| Loss | (Apply the Greatest) | Increase in Level |
|---|---|---|
| (A) | $2,000 or less | no increase |
| (B) | More than $2,000 | add 1 |
| (C) | More than $5,000 | add 2 |
| (D) | More than $10,000 | add 3 |
| (I) | More than $200,000 | add 8 |
| (J) | More than $350,000 | add 9 |
| (K) | More than $500,000 | add 10 |

(2) If the offense involved (A) more than minimal planning, or (B) a scheme to defraud more than one victim, increase by 2 levels. . . .
Id.

11. Part T, Chapter 2, of the Guidelines applies to offenses involving taxation. Section 2T3.1 specifically applies to offenses which include "Evading Import Duties or Restrictions (Smuggling); Receiving or Trafficking in Smuggled Property." Section 2T3.1.

Section 2T3.1, in pertinent part, states:
(a) Base Offense Level:
(1) The level from [U.S.S.G.] § 2T4.1 (Tax Table) corresponding to the tax loss, if the tax loss exceeded $1,000; or

tion 1B1.2); Lander Presentence Investigation Report, ¶ 148 (quoting Application Note One to Section 1B1.2).

Probation commented that during their respective plea proceedings, Nathan and Lander were asked, under oath, a series of questions to establish a factual basis for their pleas. See Nathan Presentence Investigation Report, ¶ 141; Lander Presentence Investigation Report, ¶ 148. Probation states: "Those questions [and answers] clearly establish a more serious offense—fraud." Nathan Presentence Investigation Report, ¶ 141; Lander Presentence Investigation Report, ¶ 148.

In the Lander Presentence Investigation Report, Probation observes the verbal admissions by Lander were not "stipulations," but states his verbal admissions "are more persuasive or, at least, as binding as a stipulation to a more serious offense."[12] Lander Presentence Investigation Report, ¶ 148. Probation states:

[T]he nature of the offense [committed by the Individual Defendants] was/is fraud

(2) 5, if the tax loss exceeded $100 but did not exceed $1,000; or
(3) 4, if the tax loss did not exceed $100.
For purposes of this [G]uideline, the "tax loss" is the amount of the duty.
(b) Specific Offense Characteristic
(1) If sophisticated means were used to impede discovery of the nature or existence of the offense, increase by 2 levels.
(c) Cross Reference
(1) If the offense involves a contraband item covered by another offense [G]uideline, apply that offense [G]uideline if the resulting offense level is greater than that determined above.
Id.

12. Similar observation and statement are not made in the Nathan Presentence Investigation Report although the Individual Defendants were asked similar questions and gave similar answers when the Government set forth the factual basis for each plea during the Nathan and Lander Plea Hearings.

Probation, however, does offer its definition of a stipulation in the Nathan Presentence Investigation Report. Probation contends a stipulation "is a voluntary agreement between opposing counsel concerning the disposition of a point." Nathan Presentence Investigation Report at 35. Accordingly, Probation states Nathan also stipulated to a more serious offense by admitting to the elements of a more serious offense during questioning by the Government at the Nathan Plea Hearing.

and that the [G]uideline for Evading Import Duties or Restrictions (Smuggling); Receiving or Trafficking in Smuggled Property, [Section] 2T3.1, is not the most appropriate [G]uideline. Accordingly, [Section] 2F1.1, Fraud, is deemed the most analogous [G]uideline and calls for a base offense level of [six].

Nathan Presentence Investigation Report, ¶ 142; Lander Presentence Investigation Report, ¶ 149.

## I. BACKGROUND

### A. Guideline Calculations

#### 1. Offense Guideline Calculations for Nathan

Probation states the following offense calculations should be used if Section 2F1.1 is used as the base offense level:

| | |
|---|---:|
| Base Offense Level: | 6 |
| Section 2F1.1 | |
| Specific Offense Characteristics: | 9 |
| The loss exceeded $350,000, but was not more than $500,000. Pursuant to Section 2F1.1(b)(1)(M), nine levels are added. | |
| Specific Offense Characteristics: | 2 |
| If the offense involved more than minimal planning (as well as a scheme to defraud more than one victim). Pursuant to Section 2F1.1(b)(2)(A), two levels are added. | |
| Victim Related Adjustments: None | 0 |
| Adjustments for Role in the Offense: | 4 |
| Pursuant to U.S.S.G. § 3B1.1(a) ("Section 3B1.1"), the offense is increased by four levels. | |
| Adjustment for Obstruction of Justice: None | 0 |
| Adjusted Offense Level (Subtotal): | <u>21</u> |
| Adjustment for Acceptance of Responsibility: | −2 |
| Pursuant to U.S.S.G. § 3E1.1(a), the offense is reduced two levels. | |
| Additional Adjustment for Acceptance of Responsibility: | −1 [13] |
| Total Offense Level: | 18 |
| Chapter Four Enhancements: None | 0 |
| Total Offense Level: | <u>18</u> |

*See* Nathan Presentence Investigation Report, ¶¶ 142–153.

#### 2. Offense Guideline Calculations for Lander:

Probation states the following offense calculations should be used if Section 2F1.1 is used as the base offense level for Lander:

| | |
|---|---:|
| Base Offense Level: | 6 |
| Section 2F1.1 | |
| Specific Offense Characteristics: | 9 |
| The loss exceeded $350,000, but was not more than $500,000. Pursuant to Section 2F1.1(b)(1)(M), nine levels are added. | |
| Specific Offense Characteristics: | 2 |
| If the offense involved more than minimal planning (as well as a scheme to defraud more than one victim). Pursuant to Section 2F1.1(b)(2)(A), two levels are added. | |
| Victim Related Adjustments: None | 0 |
| Adjustments for Role in the Offense: None | 0 |

13. Application Note Three to Section 3E1.1 states: "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." *See id.* Probation, however, provides no explanation as to why Nathan does not receive the additional adjustment for acceptance of responsibility pursuant to Section 3E1.1(b) while Lander does. It appears the additional adjustment for acceptance of responsibility pursuant to Section 3E1.1(b) is appropriate and, accordingly, is factored into the Guideline calculations for Nathan.

| | |
|---|---:|
| Adjustment for Obstruction of Justice: None | 0 |
| Adjusted Offense Level (Subtotal): | 17 [14] |
| Adjustment for Acceptance of Responsibility: | −2 |
| Pursuant to U.S.S.G. § 3E1.1(a), the offense is reduced two levels. | |
| Additional Adjustment for Acceptance of Responsibility: | −1 |
| Total Offense Level: | 14 |
| Chapter Four Enhancements: None | 50 |
| Total Offense Level: | 14 [15] |

See Lander Presentence Investigation Report, ¶¶ 149–160.

### B. *The Indictment*

#### 1. *Conspiracy*

Count One of the Indictment charges that from on or about 12 March 1990 through on or about 10 March 1994, the Individual Defendants and Electrodyne knowingly and willfully conspired and agreed with each other, and with others, to commit offenses against the United States in violation of Section 371. Count One specifically charges Section 371 was violated by the Defendants:

(a) by falsely representing to the ... [G]overnment that they would deliver military components manufactured in the United States when, in fact, they intended to manufacture such components in Russia and Ukraine, in violation of [18 U.S.C. § 1001];

(b) by exporting to Russia and Ukraine, without the required export license, defense services [16] relating to defense articles listed on the Munitions List (*i.e.*, the specifications and expertise necessary to manufacture United States Military components) in violation of [the AECA];

(c) by importing into the United States from Russia and Ukraine completed military components without the required markings indicating the country of origin, contrary to [19 U.S.C. § 1304], in violation of [Section 545];

(d) by delivering completed military components made in Russia and Ukraine to the United States [G]overnment and falsely representing that the components conformed to [G]overnment contracts requiring that the goods be manufactured in the United stats, in violation of [Section 1001]; and

(e) by receiving payment from the United States [G]overnment for Russian and Ukrainian-made components by falsely representing that the components conformed to [G]overnment contracts requiring that the goods be manufactured in the United States, in violation of [18 U.S.C. § 287].

Indictment, ¶ 10.

The Indictment charges that on or about 6 November 1989 through on or about 10 March 1994, Electrodyne entered into six contracts (the "Contracts") to provide Government agencies and the United States military with "electronic components for use in research, communications, radar, and weapon systems." Indictment, Count One, ¶ 13. "Each of the Contracts required Electrodyne to comply with the provisions of the Buy

---

14. The Lander Presentence Investigation Report incorrectly calculated the adjusted offense level as twenty. *See* Lander Presentence Investigation Report, ¶ 155. Accordingly, this calculation was adjusted to reflect the proper calculation.

15. Based upon the aforementioned error in calculating the adjusted offense level as twenty, the Lander Presentence Investigation Report also miscalculates the total offense level as seventeen. *See* Lander Presentence Investigation Report, ¶ 160. Accordingly, this calculation was adjusted to reflect the proper total offense level.

16. In addition to certain record keeping requirement, the AECA prohibits 1) the unlicenced export of defense articles, 2) the unlicenced export of technical data relating to a defense articles, and 3) the unlicenced provision of technical services relating to a defense article even if the technical data is in the public domain. *See* Section 2778(b)(2). The Government indicates the instant matter involves a violation of the "defense services prong." *See* Government Sentencing Memorandum at 3 n. 3. The Government also indicates it believes this is the first such prosecution after the defense services prong was added to the arms control regime in 1976. *See id.*

American Act." *Id.*, ¶ 14. The Individual Defendants caused Electrodyne, nevertheless, to enter into agreements with several foreign companies to manufacture the components outside of the United States. *See id.*, ¶ 16. Significantly, in order to facilitate the manufacture of the components, the Individual Defendants disclosed to foreign manufacturers (the "Foreign Manufacturers") [17] "the drawings, technology, and specifications of United States military components and provided engineering and scientific assistance necessary to build [the] components ...." *Id.*, ¶ 18. The Individual Defendants further took "affirmative steps" and made certain omissions to conceal the agreements with the Foreign Manufacturers. *See id.*, ¶¶ 19–20. Count One alleges a number of overt acts taken by the Individual Defendants and Electrodyne in furtherance of the Conspiracy:

a) On or about [29 June 1992] ... Lander instructed the Foreign Manufacturers not to mark the components with any symbol indicating where the item was produced.

b) In or about June of 1993, ... Nathan instructed Electrodyne's employees not to disclose to anyone outside of the company the fact that Electrodyne manufactured components overseas.

c) On or about [26 June 1993], .... Lander traveled to Moscow, Russia.

d) On or about [26 June 1993], ... Nathan traveled to Moscow, Russia.

e) On or about [13 August 1993], ... Nathan signed Contract Number N00014–93–C–2196 with the ... Navy.

f) On or about [12 October 1993], ... Lander sent the specifications of an item on the ... Munitions List to the Research Institute of Long Range Communication in Russia by facsimile transmission.

Indictment, ¶ 21.

### 2. *The Diplexer Contract*

Count Two charges that from on or about 1 October 1993 through on or about 24 February 1994 the Individual Defendants and Electrodyne exported "from the United States a defense service relating to a defense article on the ... Munitions List, *i.e.*, an OE–82/WSC–1(V) Diplexer, without a valid license for such export issued in accordance with the [AECA] and the regulations promulgated thereunder [i]n violation of [Sections 2778(b)(2) and (c), Section 2] and 22 [C.F.R. §§ ] 127.1 and 127.3." Indictment, Count Two, ¶ 11.

### 3. *The Tone Modulator Contract*

Counts Three and Four charge the Individual Defendants and Electrodyne exported "from the United States a defense service relating to a defense article on the ... Munitions List, i.e., an isolator (the 'Isolator') for the APG–63 Fire Control Radar without a valid license for such export issued in accordance with the [AECA] and the regulations promulgated thereunder [i]n violation of [Sections 2778(b)(2) and (c), Section 2] and 22 [C.F.R. §§ ] 127.1 and 127.3." Indictment, Count Three, ¶ 10; Count Four, ¶ 6.

### 4. *The Switchable Amplifier Contract*

Count Five charges the Individual Defendants and Electrodyne exported "from the United States a defense service relating to a defense article on the ... Munitions List i.e., a switchable amplifier for the MK–92 Fire Control System, without a valid license for such export issued in accordance with the [AECA] and the regulations promulgated thereunder [i]n violation of [Sections 2778(b)(2) and (c), Section 2] and 22 [C.F.R. §§ ] 127.1 and 127.3." Indictment, Count Five, ¶ 6.

### 5. *The Phase Shifter Contract*

Counts Six charges the Individual Defendants and Electrodyne exported "from the United States a defense service relating to a defense article on the ... Munitions List, i.e., a phase shifter for the AMRAAM[18] Radio

---

**17.** The Foreign Manufacturers are listed *supra* p. 232.

**18.** AMRAAM is an acronym for the United States Air Force Advanced Medium Range Air to Air Missile.

Frequency Simulator, without a valid license for such export issued in accordance with the [AECA] and the regulations promulgated thereunder [i]n violation of [Sections 2778(b)(2) and (c), Section 2] and 22 [C.F.R. §§ ] 127.1 and 127.3." Indictment, Count Six, ¶ 8.

Count Seven charges the Individual Defendants and Electrodyne imported "five phase shifters" into the United States "from Russia, without markings indicating the country of origin, contrary to the marking requirements of [19 U.S.C. § 1304] ... [and i]n violation of [Sections 545 and 2]." Indictment, Count Seven, ¶ 2.

### 6. *The Pin Diode Switch Contract*

Counts Eight and Nine charge the Individual Defendants and Electrodyne exported "from the United States a defense service relating to a defense article on the ... Munitions List, i.e., a pin diode switch [ ('Pin Diode Switch') ] for the AMRAAM Radio Frequency Simulator, without a valid license for such export issued in accordance with the [AECA] and the regulations promulgated thereunder [i]n violation of [Sections 2778(b)(2) and (c), Section 2] and 22 [C.F.R. §§ ] 127.1 and 127.3." Indictment, Count Eight, ¶ 9; Count Nine, ¶ 6.

Count Ten charges the Individual Defendants and Electrodyne "willfully and knowingly, made and used and caused to be made and used a false writing and document knowing the same to contain a false, fictitious, and fraudulent material statement in that the defendants Electrodyne and Nathan, signed the Pin Diode Switch Contract with the Air Force which stated that the Pin Diode Switches would be manufactured in the United States, whereas in truth and fact, as the [Individual Defendants and Electrodyne] ... knew, the Pin Diode Switches were to be manufactured in ... Russia and Ukraine ... [i]n violation of [Sections 1001 and 2]." Indictment, Count 10, ¶ 2.

### 7. *The Broad Band Amplifier Contract*

Count Eleven charges the Individual Defendants and Electrodyne "made and used and caused to be made and used a false writing and document knowing the same to contain a false, fictitious, and fraudulent material statement in that the defendants Electrodyne and Nathan, signed the Broad Band Amplifier Contract with the [NRL] which stated that the amplifiers would be manufactured in the United States, whereas in truth and fact, [the Individual Defendants and Electrodyne], then and there well knew, the amplifiers were to be manufactured in Ukraine, in violation of [Sections 1001 and 2]." Indictment, Count Eleven, ¶ 10.

Counts Twelve and Thirteen charge the Individual Defendants and Electrodyne brought "into the United States merchandise, contrary to law, in that [D]efendants [on two occasions] imported and brought into the United States ... amplifiers from Ukraine, without markings indicating the country of origin, contrary to the marking requirements of [19 U.S.C. § 1304], in violation of [Sections 545 and 2]." Indictment, Count Twelve, ¶ 2, Count Thirteen, ¶ 2.

### C. *The Pleas* [19]

#### 1. *Lander*

##### a. *The Lander Plea*

As mentioned, on 22 August 1996, Lander signed the Lander Plea Agreement. Lander agreed to plead guilty to a "one count Information, which charged the unlawful introduction of merchandise into the commerce of the United States, in violation of ... [Sections] 542 and 2." Lander Plea Agreement at 1. The Lander Plea Agreement provides:

> The violation of ... [Sections] 542 and 2 to which [Lander] agrees to plead guilty carries a statutory maximum prison sentence of [two] years.... The Sentencing Reform Act and the [Guidelines] also may impose a minimum term of imprisonment and/or fine, and the [Guideline] may authorize departure from the minimum and

---

**19.** As indicated, on 15 October 1996, Electrodyne entered a plea of guilty to Counts Two and Ten of the Indictment. *See* Transcript from Electrodyne Plea Hearing. On 27 May 1997, Electrodyne was sentenced to five years probation and a fine in the amount of $1,000,000.00 due and payable immediately. *See* Transcript from Electrodyne Sentencing at 9–11.

maximum penalties under certain circumstances.

. . .

The sentence to be imposed upon [Lander] is within the sole discretion of the sentencing judge. This Office cannot and does not make any representation or promise as to what [G]uideline range will be found applicable to [Lander], or as to what sentence [Lander] ultimately will receive.

Lander Plea Agreement at 3.

As part of the Lander Plea Agreement, the Government and Lander stipulated to the following:

1. As [Lander] has been convicted of a violation of ... [Section] 542, the applicable [G]uideline is [Section] 2T3.1. See U.S.S.G., Appendix A [ ("Appendix A") ]. This [G]uideline carries a base offense level of [four]. The United States did not suffer a tax loss as a result of [Lander's] conduct.

2. [Lander] used sophisticated means to impede discovery of the nature and existence of the offense. Accordingly, the specific offense characteristics of [Section] 2T3.1(b)(1) applies and [Lander's] adjusted offense level is [six].

3. In committing the offense described in the Information, [Lander] did not endanger national security. Accordingly, the [G]overnment will not seek an upward departure pursuant to [U.S.S.G.] § 5K2.14, or any other basis.

4. As of the date of his agreement, [Lander] has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the offense charged under ... [Sections] 542 and 2. Therefore, a downward adjustment of two points to [a

total base offense] level [of four] for acceptance of responsibility is appropriate if the defendant's acceptance of responsibility continues through the date of sentencing. (See U.S.S.G. § 3E1.1(a).) There are no other applicable Chapter [Three] adjustments.

Lander Plea Agreement, Schedule A.

### b. The Lander Plea Hearing

On 31 October 1996, a thorough hearing pursuant to Rule 11 took place with the advice and assistance of counsel. At the Lander Plea Hearing, Lander entered his plea of guilty to the superseding Information. See Transcript from Lander Plea Hearing at 22. Lander was asked a series of questions to lay the factual foundation for the plea, including the following: [20]

GOVERNMENT: Mr. Lander, during 1993, was Electrodyne Systems Corporation in the business of providing electronic components to the United States Government?

LANDER: Yes

GOVERNMENT: During that time, were you the director of marketing of Electrodyne?

LANDER: Yes, sir.

GOVERNMENT: On or about [13 August 1993], did Electrodyne enter into a contract to supply the United States Government with [twenty-five] broad-band amplifiers, which were to be manufactured in the United States?

LANDER: Yes, sir.

GOVERNMENT: On or about [13 August 1993], did Electrodyne import five of the NRL amplifiers into the United States from Enterprise Saturn in Ukra[i]ne?

LANDER: Yes.

GOVERNMENT: Were these amplifiers marked with the Enterprise Saturn logo?

LANDER: Correct.

---

**20.** The questions which the Government asked to establish a factual basis for the Lander Plea were set forth in a plea memorandum, dated 25 October 1996 (the "Lander Plea Memorandum"), and received in Chambers on 25 October 1996. See Lander Plea Memorandum at 3–4. Lander received a copy of the Lander Plea Memorandum before the Lander Plea Hearing. The Lander Plea Memorandum was the subject of extensive questioning during the Lander Plea Hearing. Lander stated he received the Lander Plea Memorandum, reviewed it with counsel who explained it to him and understood it. See Transcript from Lander Plea Hearing at 10 to 13.

GOVERNMENT: On or about [23 November 1993], did you send Enterprise Saturn a facsimile transmission with instructions not to manufacture components in a way that indicated foreign manufacture?

LANDER: Yes, sir.

GOVERNMENT: On or about [30 December 1993], did you cause [twenty-two] broadband amplifiers to be imported into the United States from Ukra[i]ne without markings indicating the country of origin in violation of the laws of the United States and constructed to allow Electrodyne employees to cover the foreign markings and label them as if they had been manufactured in the United States?

LANDER: Yes, sir.

GOVERNMENT: Thereafter, did Electrodyne employees paint the amplifiers, attach a label indicating they had been manufactured by Electrodyne in the United States and deliver them to the United States Government?

LANDER: Yes.

GOVERNMENT: Did you cause the amplifiers to be imported into the United States without country of origin markings in order to assist Electrodyne in deceiving the United States Government into believing that the amplifiers had been manufactured in the United States when they had, in fact, been manufactured in the Ukra[i]ne?

LANDER: Yes, sir.

GOVERNMENT: Did you know at the time that you committed these acts that such conduct was wrong?

LANDER: Yes.

Transcript from Lander Plea Hearing at 18–21.

It was determined Lander had discussed the possible consequences of entering the instant plea with his attorney. *See* Transcript from Lander Plea Hearing at 21, 22. It was also determined Lander voluntarily entered the plea and was aware the stipulations entered between the Government and Lander were not binding upon the court. *See id.* at 3. Lander was also informed that under some circumstances the court could depart from the Guidelines and impose a sentence more or less severe than that called for by the Guidelines. *See id.* at 15. Lander stated he understood that if he received a sentence more severe than he expected, he would still be bound by his plea and he could not withdraw his plea. *See id.* at 16.

In addition to the admissions Lander made in response to the questioning by the Government, Lander admitted he had "knowingly, willfully and intentionally committed the conduct set forth in th[e] [I]nformation." *See* Transcript from Lander Plea Hearing at 20. The Lander guilty plea was accepted. *See id.* at 22–23. After a number of adjournments at the request of counsel for Lander, sentencing was scheduled for 12 August 1998.[21]

By letter, dated 20 February 1998 (the "20 February 1998 Letter"), the Individual Defendants were provided with a supplemental notice, pursuant to Rule 32 ("Rule 32") of the Federal Rules of Criminal Procedure, that an upward departure was being considered. *See* 20 February 1998 Letter (citing Rule 32; *Burns v. United States,* 501 U.S. 129, 138–39, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991); *United States v. Barr,* 963 F.2d 641, 655–56 (3d Cir.1992)).

The 20 February 1998 Letter stated:

Although it appears the Presentence Investigation Reports notified the [Individu-

---

**21.** Requests to adjourn Lander's sentencing were made on 27 December 1996, 28 January 1997, 3 March 1997, 28 April 1997, 14 May 1997, 18 July 1997 and 22 August 1997. Meanwhile, Electrodyne appealed the sentence it received on 27 May 1997. The sentencing of the Individual Defendants was delayed pending receipt of a decision by the Circuit. The decision of the Circuit was released 10 June 1998.

An attempt was made during the week of 20 July 1998 to schedule sentencing for the week of 27 July 1998. Counsel for Lander indicated he would be on vacation until 10 August 1998. Counsel requested Lander's sentencing be scheduled for 11 August 1998. When counsel for Nathan was contacted, he requested Nathan be sentenced at the same time as Lander. The Assistant United States Attorney, however, requested the sentencings be postponed until 12 August 1998 because he was returning from vacation on 11 August 1998. In order to accommodate the requests of counsel, the sentencings for Electrodyne, Nathan and Lander were scheduled for 12 August 1998.

al] Defendants of the possibility of upward departures, *see* Nathan Presentence Investigation Report, Addendum; Lander Presentence Investigation Report, ¶¶ 204–206, this letter is intended to supplement such notice.

The basis for a possible upward departure is two-fold. First, an upward departure may be appropriate for each of the [Individual] Defendants based upon the conduct underlying the counts which were dismissed as to the [Individual] Defendants pursuant to their plea agreements. *See United States v. Baird*, 109 F.3d 856, 863 (3d Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 243, 139 L.Ed.2d 173 (1997).

Second, an upward departure may be appropriate for each of the [Individual] Defendants for reasons set forth in the [Lander] Presentence Investigation Report.... *See* [Lander] Presentence Investigation Report ..., ¶ 206. The violations of the Buy American Act by each of the Individual Defendants in fulfilling certain Government contracts may not be adequately measured by the ... Guidelines if ... Section 2T3.1 is applicable. *See* Application Note Two to Section 2T3.1. It appears Section 2T3.1 may not adequately reflect the harm posed by the conduct of each of the [Individual] Defendants.

*Id.*

The 20 February 1998 Letter indicated if the Individual Defendants desired to respond, such submissions were to be received by 9 March 1998. *See* 20 February 1998 Letter. Michael Critchley, counsel for Nathan, telephoned chambers on 2 March 1998 and requested an extension until 20 March 1998 to respond to the 20 February 1998 Letter; this request was granted by letter, dated 2 March 1998 (the "2 March 1998 Letter"). *See* 2 March 1998 Letter. A joint response from the Individual Defendants was thereafter received by letter, dated 20 March 1998 (the "20 March 1998 Letter").

### 2. *Nathan*
#### a. *The Nathan Plea*

As mentioned, on 25 September 1996, Nathan signed the Nathan Plea Agreement. Nathan agreed to plead guilty to Count Twelve of the Indictment which charged him with knowingly importing merchandise into the United States contrary to law and with the intent to defraud the United States, in violation of Sections 545 and 2. *See* Nathan Plea Agreement. The Nathan Plea Agreement provides:

> The violation of ... [Sections] 545 and 2 to which [Nathan] agrees to plead guilty carries a statutory maximum prison sentence of [five] years.... The Sentencing Reform Act and the [Guidelines] also may impose a minimum term of imprisonment and/or fine, and the [Guidelines] may authorize departure from the minimum and maximum penalties under certain circumstances.
>
> . . .
>
> The sentence to be imposed upon [Nathan] is within the sole discretion of the sentencing judge. This Office cannot and does not make any representation or promise as to what [G]uideline range will be found applicable to [Nathan], or as to what sentence [Nathan] ultimately will receive.

Nathan Plea Agreement at 3.

The Government and Nathan stipulated to the following:

1) The applicable [G]uideline is [Section] 2T3.1. This [G]uideline carries a base offense level of [four]. The United States did not suffer any tax loss as a result of defendant's conduct.

2) The defendant used sophisticated means to impede discovery of the nature and existence of the offense. Accordingly[,] the specific offense characteristic of [Section] 2T3.1(b)(1) applies and the defendant's adjusted level is [six].

3) In committing the offense described in Count [Twelve] of the [I]ndictment, the defendant did not endanger national security. Accordingly, the [G]overnment will not seek an upward departure pursuant to [U.S.S.G.] § 5K2.14, or any other basis.

4) As of the date of this agreement, [Nathan] has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the offense charged under ... [Sections] 545 and 2. Therefore, a

downward adjustment of two points to [a total offense] level [of four] for acceptance of responsibility is appropriate if [Nathan's] acceptance of responsibility continues through the date of sentencing. (*See* U.S.S.G. § 3E1.1(a).) There are no other applicable Chapter [Three] adjustments.

Nathan Plea Agreement, Schedule A.

b. *The Nathan Plea Hearing*

On 16 October 1996, a thorough hearing pursuant to Rule 11 took place with the advice and assistance of counsel. At the Nathan Plea Hearing, Nathan entered his plea of guilty as to Count Twelve of the Indictment with the court. *See* Transcript from Nathan Plea Hearing at 4, 21. Nathan was asked a series of questions to lay the factual foundation for the plea: [22]

> GOVERNMENT: Mr. Nathan, from on or about [31 October 1989] through [10 March 1994], was Electrodyne Systems Corporation in the business of providing electronic components to the United States Government?
>
> NATHAN: Yes, they were [sic].
>
> GOVERNMENT: During that time, were you the majority shareholder, president and vice-president of Electrodyne?
>
> NATHAN: Yes, I was.
>
> GOVERNMENT: During that time, was [Lander] Electrodyne's director of marketing?
>
> NATHAN: He was.
>
> GOVERNMENT: During that time, did [Lander] report to you in your capacity as president of the company?
>
> NATHAN: He did.
>
> GOVERNMENT: During that time, were you aware [Lander] had arranged for various companies in Ukra[i]ne and Russia to build electronic components for Electrodyne?
>
> NATHAN: Yes, I was.

> GOVERNMENT: On or about [13 August 1993], did you sign a contract on behalf of [Electrodyne] with the United States Government to provide ... the NRL with [twenty-five] broad-band amplifiers?
>
> NATHAN: Yes, I did.
>
> GOVERNMENT: At the time you signed the contract, did you know that [Lander] had ordered the amplifiers from Saturn in Ukra[i]ne?
>
> NATHAN: Yes.
>
> GOVERNMENT: Had [Lander] done so acting at your direction and with your knowledge and approval?
>
> NATHAN: Yes.
>
> GOVERNMENT: Did the NRL contract contain a Buy American Act clause obligating Electrodyne to buy the end product manufactured in the United States?
>
> NATHAN: Yes, it did.
>
> GOVERNMENT: On or before [23 November 1993], did employees of Electrodyne import five of the NRL amplifiers into the United States from Enterprise Saturn without markings indicating they had been manufactured in Ukra[i]ne?
>
> NATHAN: Yes, they did.
>
> GOVERNMENT: Were these employees acting at your direction and with your knowledge and approval?
>
> NATHAN: Yes.
>
> GOVERNMENT: ...[O]n or before [23 November 1993], did employees of Electrodyne paint the amplifiers imported from the Ukra[i]ne to obscure markings indicating foreign manufacturing and affix stickers with the words "Electrodyne Systems Corporation"?
>
> NATHAN: Yes, they did.
>
> GOVERNMENT: Were those employees acting at your direction and with your knowledge and approval?
>
> NATHAN: Yes, they were.

---

**22.** The questions which the Government asked to establish a factual basis for the Nathan Plea were set forth in a plea memorandum, dated 16 October 1996 (the "Nathan Plea Memorandum"), and received in Chambers on 16 October 1996. *See* Nathan Plea Memorandum at 3–4. Nathan received a copy of the Nathan Plea Memorandum before the Nathan Plea Hearing. The Nathan Plea Memorandum was the subject of extensive questioning during the Nathan Plea Hearing. Nathan stated he received the Nathan Plea Memorandum, reviewed it with counsel who explained it to him and understood it. *See* Transcript from Nathan Plea Hearing at 10 to 12.

GOVERNMENT: Did you cause the amplifiers to be painted and an Electrodyne sticker added with the intention of deceiving the NRL into believing that the amplifiers had been manufactured by Electrodyne in the United States.

NATHAN: Yes, I did.

GOVERNMENT: Did you know at the time that you committed these acts that such conduct was wrong?

NATHAN: Yes.

*Id.* at 17–20.

It was determined Nathan had discussed the possible consequences of entering the instant plea with his attorney. *See* Transcript from Nathan Plea Hearing at 21, 22. It was also determined Nathan voluntarily entered the plea and was aware the stipulations entered between the Government and Nathan were not binding upon the court. *See id.* at 13, 22. Nathan was also informed that under some circumstances the court could depart from the Guidelines and impose a sentence more or less severe than that called for by the Guidelines. *See id.* at 15. Nathan stated he understood that if he received a sentence more severe than expected, he would still be bound by his plea and he could not withdraw his plea. *See id.* at 15–16.

In addition to the admissions Nathan made in response to the questioning by the Government, Nathan admitted he had "knowingly, willfully and intentionally committed the conduct set forth in count [Twelve] in the [I]ndictment." Transcript from Nathan Plea Hearing at 20. The Nathan guilty plea was accepted. *See id.* at 22. After a number of

adjournments at the request of counsel for Nathan, Nathan's sentencing was scheduled for 12 August 1998.[23]

### D. *Probation Investigation*

After the Defendants entered pleas of guilty as described above, Probation conducted a presentence investigation to assist in the sentencing of the Defendants. Probation conducted interviews with representatives of the Office of the United States Attorney, the United States Naval Criminal Investigative Service, the Air Force Office of Special Investigations, NASA and the United States Customs Service ("Customs"). *See* Presentence Investigation Reports, ¶ 18.[24] The findings of Probation are set forth below.

On 1 January 1990, Nathan purchased a controlling block of Electrodyne stock to become a majority owner of the corporation. *See* Presentence Investigation Reports, ¶ 35. Shortly thereafter, Nathan hired Lander as the Director of Marketing. *See id.*

As mentioned, between 6 November 1989 and 10 March 1994, Electrodyne entered the Contracts to provide United States Government agencies and branches of the military with electronic components for use in research, communications, radar and weapons systems. *See* Presentence Investigation Reports, ¶ 36. Each of the Contracts required Electrodyne to comply with the provisions of the Buy American Act. *See id.,* ¶ 36.

In each Contract, Nathan and Electrodyne represented they (a) intended to manufacture the components in the United States, (b) would not use foreign components, and (c) would not use offshore manufacturing sites.[25]

---

**23.** Adjournment requests were made by counsel for Nathan on 27 December 1996, 28 January 1997, 19 March 1997, 28 April 1997, 14 May 1997, 18 July 1997 and 22 August 1997. Meanwhile, Electrodyne appealed the sentence it received on 27 May 1997. The sentencing of the Individual Defendants was delayed pending receipt of a decision by the Circuit. The decision of the Circuit was released 10 June 1998.

As previously noted, an attempt was made during the week of 20 July 1998 to schedule sentencing for the week of 27 July 1998. Counsel for Lander indicated he would be on vacation until 10 August 1998. Counsel requested Lander's sentencing be scheduled for 11 August 1998. When counsel for Nathan was contacted, he re-

quested Nathan be sentenced at the same time as Lander. The Assistant United States Attorney, however, requested the sentencings be postponed until 12 August 1998 because he was returning from vacation on 11 August 1998. In order to accommodate the requests of counsel, the sentencings for Electrodyne, Nathan and Lander were scheduled for 12 August 1998.

**24.** The term Probation Investigation Reports also includes the Electrodyne Presentence Investigation Report.

**25.** Nathan contends the Contracts did not provide Electrodyne would not use foreign components or would not use offshore manufacturing

*See* Presentence Investigation Reports, ¶ 38. Despite the representations made in the Contracts, the Individual Defendants caused Electrodyne to enter into agreements with several Foreign Manufacturers to build the military components outside the United States. *See id.*

These Foreign Manufacturers included:

(a) "ISTOK" Research and Production Corp., located in Moscow, Russia ("Istok Research"),

(b) Enterprise Saturn, a/k/a Research Institute "Saturn", located in Kiev, Ukraine ("Enterprise Saturn"),

(c) Research Institute of Long Range Communications, a/k/a NIIDAR, located in Moscow, Russia . . . [ (the "Russian Institute") ],

(d) S & R Institute "ORION", also located in Kiev ("Enterprise Orion"), and

(e) NKPT "PHASA" a/k/a Rostov State University, located in Rostov, Russia ("Enterprise Phasa") [collectively, the "Foreign Manufacturers"].

Presentence Investigation Reports, ¶ 40.

In order to facilitate the building of the military components and contrary to the express terms of the Contracts and, in some cases, DOD security directives, the Individual Defendants and Electrodyne disclosed to the Foreign Manufacturers the drawings, technology and specifications of the components and provided engineering and scientific assistance necessary to build the compo-

nents. *See* Presentence Investigation Reports, ¶ 41.

In an attempt to hide certain conduct from the Government, as well as Electrodyne employees, the Defendants: (1) told Electrodyne employees the foreign-made components were for "low cost commercial" applications and not United States military and Government contracts,[26] (2) instructed employees not to disclose the use of foreign components to anyone outside the corporation, (3) instructed the Foreign Manufacturers not to mark the components in any way which would indicate the country of origin, (4) marked the components to make it appear they were made in the United States, and (5) instructed employees to cover up any markings which would indicate that the components were foreign-made. *See* Presentence Investigation Reports, ¶ 42.

In an effort to hide certain conduct and, despite their obligation to do so, the Defendants failed to disclose to the United States Government the following: (1) the agreements with the Foreign Manufacturers, (2) travel to Ukraine and Russia, and (3) the use of off-site manufacturing locations to build Electrodyne components. *See* Presentence Investigation Reports, ¶ 43. The Defendants also failed to register with the State Department as a manufacturer and exporter of defense articles, defense services, and munitions. *See id.* Further, the Defendants failed to obtain export licenses from the State Department for the technology and

---

sites for fabrication of components. *See* Nathan Presentence Investigation Report at 38. The Government indicates it is concerned with what appears to be a repudiation of the stipulations to the Electrodyne Plea Agreement. *See id.* As part of the Electrodyne Plea Agreement, Electrodyne admitted the Pin Diode Contract, Phase Shifter Contract, the Broad Band Amplifier Contract and NASA Contract, defined *infra,* required disclosure of the use of foreign components. *See id.;* Electrodyne Plea Agreement, Schedule A, ¶ 2. The Government indicates it is able to prove all other Contracts alleged in the Indictment contained this requirement as well. *See* Nathan Presentence Investigation Report at 38.

**26.** The Individual Defendants contend they did not tell employees that foreign made components were for "low cost commercial" applications. *See* Nathan Presentence Investigation Re-

port at 39; Lander Presentence Investigation Report at 42. The Government indicates many Electrodyne Employees, especially lower level employees, who stood to lose the most from offshore procurement, were not told the truth about the extent of use of foreign components by Electrodyne when they expressed their concern about losing their jobs if components were built overseas. *See* Nathan Presentence Investigation Report at 39; Lander Presentence Investigation Report at 42. The Government indicates Electrodyne employees were told their jobs were safe because the imported components were not for Government contracts. *See* Nathan Presentence Investigation Report at 39; Lander Presentence Investigation Report at 42. It has been established by a preponderance that Electrodyne did in fact tell employees the imported products were for commercial applications.

defense services exported to Russia and Ukraine as required by ITAR. *See id.*

### 1. *The Diplexer Contract*

On 31 October 1989, Electrodyne entered into "contract # N00104–89–M355" (the "Diplexer Contract") with the Navy to supply 220 electronic components known as OE 82/WSC–1(V) Diplexers (the "Diplexers") at an average unit cost of $3,697.58, for a total contract price of $753,468. *See* Presentence Investigation Reports, ¶ 44. The initial solicitation, which was incorporated into the Diplexer Contract, was signed by Nathan, as vice-president of Electrodyne. *See id.*

The Diplexer is a defense article within the meaning of ITAR, 22 C.F.R. §§ 120.3 and 121.8(b). *See* Presentence Investigation Reports, ¶ 45. Accordingly, Electrodyne could not arrange for the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification or operation of the Diplexer outside the United States without prior approval of the ODTC. *See id.*

The Diplexer is a component part of a satellite communications antenna system (the "System") mounted on the decks of all fighting ships in the Navy. *See* Presentence Investigation Reports, ¶ 46. The System allows ships to communicate quickly and efficiently with other armed services during a military engagement. *See id.*

In January of 1989, the Navy delivered the specifications for the Diplexer to Electrodyne. *See* Presentence Investigation Reports, ¶ 47. After being awarded the Diplex-

er Contract, Nathan and Lander, acting on behalf of Electrodyne, contracted with the Russian Institute to build the Diplexer. *See id.,* ¶ 48.

From October 1989 through December 1993, an Electrodyne engineer, working in the United States, developed engineering specifications, plans, diagrams and drawings (the "Diplexer Plans") for the Diplexer. *See* Presentence Investigation Reports, ¶ 49. On 9 December 1993, Lander exported the Diplexer Plans to the Russian Institute. *See id.* ¶ 50.

Both before and after sending the Diplexer Plans, Lander had discussions with persons at the Russian Institute regarding the design, development, engineering, manufacture, production and assembly of the Diplexer. *See* Presentence Investigation Reports, ¶ 51. These discussions constituted the providing of a "defense service" within the meaning of ITAR regulations, more specifically 22 C.F.R. § 120.9.[27] *See id.*

At no time did the Individual Defendants and Electrodyne seek the required export license from the Government to send the Diplexer Plans to Russia or to discuss the design, development, engineering, manufacture, production and assembly of the Diplexer with the Russian Institute.[28] *See* Presentence Investigation Reports, ¶ 52.

### 2. *The Tone Modulator Contract*

On 20 August 1991, Electrodyne entered into a classified contract with the Air Force (the "Tone Modulator Contract") to supply

---

**27.** Nathan admits the Diplexer is a defense article within the meaning of ITAR. *See* Nathan Presentence Investigation Report at 41. Nathan, however, contends the technical documents relating to the Diplexer did not contain the necessary warning statement in compliance with applicable DOD directives. *See id.* Nathan further argues the military specifications for the Diplexer, according to the DOD, "may be made or sold to the public and foreign nationals, companies, and governments, including adversary governments, and may be exported." *Id.* The Government responds the Diplexer, as Nathan acknowledges, is a defense article and, accordingly, pursuant to ITAR Electrodyne could not instruct the Russians on how to build such an item. *See id.* Providing technical data and technical expertise is prohibited pursuant to ITAR. *See id.*

**28.** Nathan argues the Diplexer Contract was never executed. *See* Nathan Presentence Investigation Report at 42. Rather, Nathan contends Electrodyne sought a quotation from the Russian Institute to manufacture some of the aluminum parts comprising the Diplexer. *See id.* Nathan indicates Electrodyne ultimately contracted with Ryan Machine and American Metal Company, located in the United States, to manufacture the components which were used in the Diplexer. *See id.* While the Diplexer which was delivered to the Navy was ultimately build by domestic companies, it has been established by a preponderance of the evidence Electrodyne hired these domestic companies only after the search warrant was executed and the plans to build the Diplexer in Russia were revealed. *See id.*

124 tone modulators (the "Tone Modulators") at a cost of $1,095 each. *See* Presentence Investigation Reports, ¶ 53. The Tone Modulator Contract also obligated Electrodyne to build two prototypes at a cost of $23,100 each. *See id.* The total contract price was $198,980. *See id.* The initial solicitation, which was incorporated into the Tone Modulator Contract, was signed by Nathan, as Vice–President of Electrodyne. *See id.*

Tone Modulators are a component part of the APG–63 fire control radar installed in the F–15 fighter aircraft. *See* Presentence Investigation Reports, ¶ 54. The APG–63 fire control radar is used to control the firing of the aircraft's AIM–7 air-to-air missiles. *See id.* The APG–63 radar utilizes advanced signal processing technologies to provide unambiguous target presentations on the radar indicators used on the F–15 aircraft. *See id.* The Tone Modulator is a component of the transmitter assembly and provides the means by which real and false targets are distinguished and discriminated by the radar processor on board an F–15. *See id.* Construction of the Tone Modulator requires careful component specification and vendor selection. *See id.*

A critical part of the Tone Modulator is an electronic component called the "Isolator." *See* Presentence Investigation Reports, ¶ 55. Within each Tone Modulator, there are two Isolators, a high power unit and a low power unit. *See id.* The function of the Isolator is to control the flow of radio frequencies ("RF") within the Tone Modulator. Isolators are critical to the performance of the Tone Modulator. *See id.* Proper specification of the parameters of an Isolator is paramount to optimum performance and to avoid premature failure of the Isolator or the Tone Modulator. *See id.* The RF Isolators are the single most expensive electronic component utilized in the Tone Modulator assemblies.[29] *See id.* The Isolator is a "defense article" within the meaning of ITAR, 22 C.F.R. §§ 120.3 and 121.8(b). *See id.,* ¶ 56.

On 8 June 1993, Electrodyne entered into an agreement with Enterprise Phasa, a manufacturer of electronic components in Rostov, Russia, to build 140 of the Isolators at a cost of $30 each. *See* Presentence Investigation Reports, ¶ 57. On that date, Lander, acting on behalf of Electrodyne sent Enterprise Phasa an electronic facsimile transmission of the specifications for the engineering, manufacture, production and assembly of the Isolators.[30] *See id.,* ¶ 58.

---

**29.** The Individual Defendants contend the discussion of the Isolator and its function and cost as a component of the Tone Modulator is inaccurate, in part. *See* Nathan Presentence Investigation Report at 54; Lander Presentence Investigation Report at 46. The Individual Defendants contend the Isolators used in the Tone Modulator are subassemblies which are comprised of individual component parts such as ferrites, magnets and connectors. *See* Nathan Presentence Investigation Report at 54; Lander Presentence Investigation Report at 46. Other subassemblies also serve as subcomponents of the Tone Modulator and, the Individual Defendants contend, as an assembly are more expensive than the Isolator. *See* Nathan Presentence Investigation Report at 54; Lander Presentence Investigation Report at 46. The Individual Defendants contend the Isolator is a passive component which contains ferrite magnetic material which provides isolation to a device into which it is installed. *See* Nathan Presentence Investigation Report at 54; Lander Presentence Investigation Report at 47. The function of the Isolator is to protect, by preventing the flow of power in the opposite direction, the input or output of the component in which it is installed. *See* Nathan Presentence Investigation Report at 54; Lander Presentence Investigation Report at 47. Regardless of the disagree-

ment as to the specific cost of the Isolator, the Isolator is a defense article pursuant to ITAR requiring an export license if discussion concerning its manufacture or engineering occurs. The Defendants did not have such an export license.

**30.** The Individual Defendants contend Lander, acting on behalf of Electrodyne, sent a facsimile transmission containing performance parameters not specifications for the engineering, manufacture, production or assembly of the Isolator to Enterprise Phasa. *See* Nathan Presentence Investigation Report at 43; Lander Presentence Investigation Report at 42. The Individual Defendants argue Lander did not instruct employees at Enterprise Phasa on the "engineering, manufacture, production and design of the [I]solator" because Electrodyne had no expertise which would serve as the basis for providing such advice. *See* Nathan Presentence Investigation Report at 43.

The Individual Defendants argue the performance parameters they provided Enterprise Phasa set forth the performance an engineer would expect from an Isolator. *See* Nathan Presentence Investigation Report at 39; Lander Presentence Investigation Report at 42. Additionally, the Individual Defendants contend because Isolators are not application specific, it would be

Lander instructed employees of Enterprise Phasa on the engineering, manufacture, production, and design of the Isolator. *See* Presentence Investigation Reports, ¶ 59. These discussions constituted the providing of a "defense service" within the meaning of ITAR, 22 C.F.R. § 120.9.

At no time did the Individual Defendants and Electrodyne seek the required export license from the Government to send the plans and specifications or to discuss the design, development, engineering, manufacture, production and assembly of the Isolator with Enterprise Phasa. *See* Presentence Investigation Reports, ¶ 60.

On 28 July 1993, in addition to the agreement with Enterprise Phasa, Electrodyne entered into an agreement with Istok Research, a manufacturer of electronic components in Moscow, Russia, to build the Isolators. *See* Presentence Investigation Reports, ¶ 61. On 29 July 29, Lander sent Istok Research an electronic facsimile transmission of certain specifications for the engineering, manufacture, production and assembly of the Isolator. *See id.*, ¶ 62.

From 28 July 1993 through 29 July 1993, Lander instructed Istok Research employees on the engineering, manufacture, production and design of the Isolator. *See* Presentence Investigation Reports, ¶ 63. These discussions constituted the providing of a "defense service" within the meaning of ITAR regulations, 22 C.F.R. § 120.9. *See id.*

At no time did the Individual Defendants and Electrodyne seek the required export license from the Government to send the

plans and specifications for the Isolator to Russia or to discuss the design, development, engineering, manufacture, production and assembly of the Isolator with Istok Research. *See* Presentence Investigation Reports, ¶ 64.

### 3. *The Switchable Amplifier Contract*

On 26 December 1992, Electrodyne entered into a contract (the "Switchable Amplifier Contract") with the Navy to supply thirty-seven switchable amplifiers (the "Switchable Amplifiers") at a unit cost of $2,374, for a total contract price of $87,838. *See* Presentence Investigation Reports, ¶ 65. The initial solicitation, which was incorporated into the Switchable Amplifier Contract, was signed by Nathan. *See id.*

The Switchable Amplifier is a component part of the MK–92 fire control system used on Navy warships. *See* Presentence Investigation Reports, ¶ 66. MK–92 fire control system is used to control the firing of missiles, both anti-ship and surface-to-air, as well as the ship's guns. *See id.* The Switchable Amplifier is a "defense article" within the meaning of ITAR, 22 C.F.R. §§ 120.3 and 121.8(b).[31] *See id.*, ¶ 67.

On 14 July 1993, Electrodyne entered into an agreement with Istok Research, to build forty Switchable Amplifiers at a unit cost of $350. *See* Presentence Investigation Reports, ¶ 68. On 14 July 1993, Lander sent Istok Research an electronic facsimile transmission of the specifications for the engineering, manufacture, production and assembly of the Switchable Amplifiers. *See id.*, ¶ 69.

impossible for anyone to determine where, how or what an Isolator would be used for based upon basic performance parameters. *See* Nathan Presentence Investigation Report at 39; Lander Presentence Investigation Report at 42. Also, the Individual Defendants argue the performance parameters for the Isolator are used in a wide variety of commercial hardware. *See* Nathan Presentence Investigation Report at 39; Lander Presentence Investigation Report at 42. The Individual Defendants further argue an export license was not required for Electrodyne to import Isolators or to supply Enterprise Phasa with the performance specifications because the Isolators were not "defense articles." *See* Nathan Presentence Investigation Report at 43.

Probation indicates the Government provided it with a certificate indicating the Isolator was a defense article within the meaning of ITAR. *See*

*id.* It has been established by a preponderance of the evidence that the Isolators were defense articles covered by ITAR. The Government also indicates it is able to prove Electrodyne violated the AECA when it ordered the Isolators from Enterprise Phasa and discussed the Isolator with it. *See id.* at 44.

**31.** The Individual Defendants contend the Switchable Amplifier is not a defense article within the meaning of ITAR. *See* Nathan Presentence Investigation Report at 44. Probation indicates the State Department provided a certificate stating such. *See id.* It has been established by a preponderance of the evidence that the Switchable Amplifier is, in fact, a defense article covered by ITAR.

From 23 August 1993 through 27 October 1993, Lander instructed employees of Istok Research on the engineering, manufacture, production and design of the Switchable Amplifiers.[32] *See* Presentence Investigation Reports, ¶ 70. These discussions constituted the providing of a defense service within the meaning of ITAR, 22 C.F.R. § 120.9. *See id.*

The Individual Defendants and Electrodyne did not seek the required export license from the Government to send the plans and specifications for the Switchable Amplifier to Russia or to discuss the design, development, engineering, manufacture, production and assembly of the Switchable Amplifiers with Istok Research. *See* Presentence Investigation Reports, ¶ 71.

### 4. *The Phase Shifter Contract*

On 22 March 1993, Electrodyne entered into a contract (the "Phase Shifter Contract") with the Air Force to supply twenty-eight digital phase shifters (the "Phase Shifters") at an average cost of $3,880 each for a total contract price of $108,640. *See* Presentence Investigation Reports, ¶ 72. The initial solicitation, which was incorporated into the Phase Shifter Contract, was signed by Nathan as Vice–President of Electrodyne. *See id.*

Phase Shifters are a component part of the Radio Frequency Simulator (the "RFS"), a device used to evaluate radar guided weapons systems. *See* Presentence Investigation Reports, ¶ 73. The RFS is to used to provide simulation support to the AMRAAM. *See id.* Phase Shifters are "defense articles" within the meaning of ITAR, 22 C.F.R. §§ 120.3 and 121.8(b).[33] *See id.,* ¶ 74.

On 18 May 1993, Electrodyne entered into an agreement with Enterprise Phasa to build the Phase Shifters. *See* Presentence Investigation Reports, ¶ 75. On that same day, Lander sent Enterprise Phasa a facsimile transmission of the specifications for the engineering, manufacture, production and assembly of the Phase Shifters. *See id.,* ¶ 76. Lander also instructed Enterprise Phasa employees on the engineering, manufacture, production and design of the Phase Shifters. *See id.,* ¶ 77. These instructions constituted the providing of a "defense service" within the meaning of ITAR, 22 C.F.R. § 120.9.[34] *See id.*

The Individual Defendants and Electrodyne did not seek the required export license from the Government to send the plans and specifications for the Phase Shifter to Russia or to discuss the design, development, engineering, manufacture, production and assembly of the Phase Shifter with Enterprise Phasa. *See* Presentence Investigation Reports, ¶ 78.

On 15 February 1994, the Individual Defendants and Electrodyne imported five Phase Shifters from Russia. *See* Presentence Investigation Reports, ¶ 79. The

---

**32.** The Individual Defendants contend no engineering, manufacture, production or assembly specifications were sent to Istok Research. *See* Nathan Presentence Investigation Report at 44; Lander Presentence Investigation Report at 43. They contend only a limited portion of a performance specification for the RF Amplifier, a subassembly of the Switchable Amplifier, was sent by facsimile transmission so Istok Research could produce the RF Amplifier subsection. *See* Nathan Presentence Investigation Report at 44; Lander Presentence Investigation Report at 43. The Government indicates it could prove Electrodyne violated the AECA when it ordered the Switchable Amplifier from Istok Research and discussed the Switchable Amplifier with them. *See* Lander Presentence Investigation Report at 43; Nathan Presentence Investigation Report at 45.

**33.** The Individual Defendants contend the Phase Shifters are not defense articles covered by ITAR.

*See* Nathan Presentence Investigation Report at 45. Probation indicates the Government provided Probation with a certificate from the State Department indicating the Phase Shifters were defense articles. *See id.* Accordingly, it has been established by a preponderance of the evidence that the Phase Shifters are defense articles covered within the meaning of ITAR.

**34.** The Individual Defendants argue Electrodyne only provided performance specifications to Enterprise Phasa and did not instruct Enterprise Phasa employees on the engineering, manufacture, production or design of the Phase Shifter. *See* Nathan Presentence Investigation Report at 46. The Individual Defendants, therefore, contend a defense service was not provided by Electrodyne. *See id.* The Government indicates it could prove Electrodyne violated the AECA when it ordered the Phase Shifter from Enterprise Phasa and discussed the Phase Shifter with them. *See id.*

Phase Shifters did not have the markings indicating the country of origin.[35] *See id.*

### 5. *The Pin Diode Switch Contract*

On 12 November 1993, Electrodyne entered into a contract (the "Pin Diode Switch Contract") with the Air Force to supply 2,377 Pin Diode Switches at an average cost of $368.23 each for a total contract price of $875,280.00. *See* Presentence Investigation Reports, ¶ 80. The Pin Diode Switch Contract was signed by Nathan. *See id.* A Pin Diode Switch is also a component part of the RFS and is a "defense article" within the meaning of ITAR, 22 C.F.R. §§ 120.3 and 121.8(b).[36] *See id.*, ¶ 81.

On 29 October 1993, Electrodyne entered into an agreement with Istok Research to build 1,245 of the switches at an average cost of $77.91 each. *See* Presentence Investigation Reports, ¶ 82. On that same day, Lander sent Istok Research a facsimile transmission of the specifications for the engineering, manufacture, production and assembly of the Pin Diode Switches. *See id.*

From 29 October 1993 through 19 November 1993, Lander instructed employees of Istok Research on the engineering, manufacture, production and design of the Pin Diode Switches. *See* Presentence Investigation Reports, ¶ 84. These instructions constituted the providing of a "defense service" within the, meaning of ITAR, 22 C.F.R. § 120.9.[37] *See id.*

The Individual Defendants and Electrodyne did not seek the required export license from the Government to send the plans and specifications for the Pin Diode Switches to Russia or to discuss the design, development, engineering, manufacture, production and assembly of the Pin Diode Switches with Istok Research. *See* Presentence Investigation Reports, ¶ 8.

On 25 October 1993, in addition to the agreement with Istok Research, Electrodyne entered into an agreement with Enterprise Orion, a manufacturer of electronic components in Kiev, Ukraine, to build 1,245 Pin Diode Switches at an average cost of $53.42 each. *See* Presentence Investigation Report, ¶ 86. On that same date, Lander sent Enterprise Orion a facsimile transmission of the specifications for the engineering, manufacture, production and assembly of the switches. *See id.*, ¶ 87.

From 25 October 1993 through 5 March 1994, Lander instructed Enterprise Orion employees on the engineering, manufacture, production, and design of the Pin Diode Switches. *See* Presentence Investigation Reports, ¶ 88. These discussions constituted the providing of a "defense service" within the meaning of ITAR, 22 C.F.R. § 120.9. *See id.*

The Individual Defendants and Electrodyne did not seek the required export license from the Government to send the plans and specifications for the Pin Diode Switches to Ukraine or to discuss the design, develop-

35. The Individual Defendants contend RF subassemblies, a component part of the Phase Shifter, and not completed Phase Shifters were imported from Russia. *See* Nathan Presentence Investigation Report at 46. The Individual Defendants argue country of origin markings were accordingly not required as a substantial transformation occurred in the United States. *See id.* Probation observes the Phase Shifters did not undergo a substantial transformation after their importation. *See id.* The Government indicates it could prove country of origin markings were required for the Phase Shifters. Accordingly, it has been determined country of origin markings were required.

36. The Individual Defendants argue the Pin Diode Switches were not defense articles within the meaning of ITAR. *See* Nathan Presentence Investigation Report at 47. Probation indicates the Government provided a certification from the State Department stating the Pin Diode Switch is, in fact, a defense article covered by ITAR. *See id.* It has been established by a preponderance of the evidence the Pin Diode Switch is a defense article covered by ITAR.

37. The Individual Defendants contend an export license was not required because only performance specifications and not instructions on the engineering, manufacture, production or design of the Pin Diode Switches were sent to Istok Research. *See* Nathan Presentence Investigation Report at 47, 48; Lander Presentence Investigation Report at 44. The Government has indicated it could prove Electrodyne violated the AECA when it ordered the Pin Diode Switches from Istok Research and Orion and discussed the Pin Diode Switches with them. *See* Nathan Presentence Investigation Report at 48; Lander Presentence Investigation Report at 44.

ment, engineering, manufacture, production and assembly of the Pin Diode Switches with Enterprise Orion. *See* Presentence Investigation Report, ¶ 89.

On 12 November 1993, Electrodyne and Nathan signed the Pin Diode Switch Contract with the Air Force. *See* Presentence Investigation Reports, ¶ 90. The Pin Diode Switch Contract stated that the Pin Diode Switches would be manufactured in the United States, although the Individual Defendants and Electrodyne knew the Pin Diode Switches would be manufactured in Russia and Ukraine. *See id.*

### 6. *The Broad Band Amplifier Contract*

On 13 August 1993, Electrodyne entered into a contract with the NRL (the "Broad Band Amplifier Contract") to supply twenty-five broad band amplifiers (the "Broad Band Amplifiers") at a cost of $1,595 each for a total contract price of $39,875. *See* Presentence Investigation Reports, ¶ 91. The Broad Band Amplifier Contract was signed by Nathan and contained a "Buy American" provision.[38] *See id.* The NRL intended to use the Broad Band Amplifiers in conjunction with a high priority Government program which was designing a component for attachment to NASA aircraft for airborne surveillance.[39] *See id.,* ¶ 92.

As early as 13 August 1993, Electrodyne entered into an agreement with Enterprise Saturn, a manufacturer of electronic components in Kiev, Ukraine, to build the Broad Band Amplifiers at a cost of $210.00 each.

*See* Presentence Investigation Reports, ¶ 93. On 23 November 1993, Electrodyne imported five Broad Band Amplifiers from Enterprise Saturn into the United States without markings indicating the country of origin. *See id.,* ¶ 94. On 30 December 1993, Electrodyne imported twenty-two Broad Band Amplifiers from Enterprise Saturn into the United States without markings indicating the country of origin. *See id.,* ¶ 95.

After the Broad Band Amplifiers had been imported into the United States, Electrodyne employees painted the Broad Band Amplifiers to obscure and disguise foreign markings on the Broad Band Amplifiers and attached a label which stated "Electrodyne Sys. Corp." *See* Presentence Investigation Reports, ¶ 96. On 23 November 1993, Electrodyne supplied five of the Broad Band Amplifiers to the NRL. *See id.,* ¶ 97. The Broad Band Amplifiers are not classified; however, the data obtained from the unit that the Broad Band Amplifiers would have been attached to is classified. *See id.*

On 7 December 1993, at the request of Customs, an independent third-party (the "Examiner") examined one of the Broad Band Amplifiers. *See* Presentence Investigation Reports, ¶ 98. The Examiner concluded that, although the mechanical design and construction of the Broad Band Amplifiers were "good," the internal parts were of low quality and the poor seal of the Broad Band Amplifier was non-hermetic and precluded use in an environment with high humidity and changing pressures.[40] *See id.*

---

38. The Dixplexer Contract, Tone Modulator Contract, Switchable Amplifier Contract, Phase Shifter Contract and the Pin Diode Switch Contract also contained Buy American clauses. *See* Presentence Investigation Reports, ¶ 37. In addition, all of these contracts covered defense articles within the meaning of ITAR and, accordingly, the products contracted for could not be designed, developed, engineered, manufactured, produced, assembled, tested, repaired, modified or operated outside of the United States without the prior approval of the ODTC. *See* Presentence Investigation Reports, ¶¶ 45, 56, 67, 74, 81.

39. It was anticipated the Broad Band Amplifiers would be mounted on a NASA aircraft which would have the ability to generate pictures of the ground and the capability to look through clouds. *See* Nathan Presentence Investigation Report, ¶ 97.

40. Electrodyne objects to the statement in the Electrodyne Presentence Investigation Report that the Broad Band Amplifiers were of "poor quality." *See* Second Electrodyne Sentencing Memorandum at 5 (citing Electrodyne Presentence Investigation Report, ¶ 105). Electrodyne indicates a report was prepared by J.P. Parekh, Professor of Engineering in the Department of Electrical Engineering at the State University of New York at Stonybrook, which concluded " 'the quality of assembly [of the Broad Band Amplifiers] is high and represents good workmanship practice.' " *Id.* at 5–6 (quoting Exhibit B attached to Second Electrodyne Sentencing Memorandum). Electrodyne indicates Parekh also examined a number of other components referred to in the Indictment and found the quality of workmanship to be good. *See id.* at 6. This disputed fact does not affect the instant sentenc-

Thereafter, on or about 2 January 1994, Electrodyne supplied twenty of the Broad Band Amplifiers to NRL. *See id.*, ¶ 99.

In February of 1994, Nathan was informed NRL was questioning the design and components of the Broad Band Amplifiers, and was asked by a NRL contracting official where the Broad Band Amplifiers were made. *See* Presentence Investigation Reports, ¶ 100. Nathan eventually admitted the Broad Band Amplifiers were made in Ukraine. *See id.*

### 7. *The Scheme to Sell Ukrainian Converters to NASA*

Electrodyne was awarded separate contracts from NASA (the "NASA Contracts") to build five "up" and five "down" converters for the Advanced Communication Technology Satellite (the "ACTS"). *See* Presentence Investigation Reports, ¶ 101. On November 29, 1993, Customs inspected a shipment from Ukraine to Electrodyne containing five "down" converters. *See id.* The country of origin was listed as "Ukraine" and the unit value was $1,500. *See id.* Inside the package was a commercial invoice and a document, believed to be in Ukrainian, containing specifications. *See id.* No country of origin markings were on any of the five converters. *See id.*

During the first week of December 1993, two "down" converters were shipped by Electrodyne to NASA. *See* Presentence Investigation Reports, ¶ 102. On 17 December 1993, the contracting officer and the project manager for ACTS were interviewed by Customs officials. *See id.*, ¶ 103. Both of these individuals stated that neither Nathan nor David Heller, the Director of Engineering at Electrodyne, ever indicated the converters were not American made.[41] *See id.* Each of the converters was examined and every unit had a label which stated: "Electrodyne Systems Corp. So. Hackensack, NJ 07606, Cage Code: OAUS1, S/N–004, P/N–M21–00–10." *Id.*

The NASA Contracts contained "Buy American" provisions similar to the Broad Band Amplifier Contract previously described with the NRL.[42] *See id.*, ¶ 104. The NASA Contract for the five "down" converters indicated a unit price of $15,940. *See id.* The NASA Contract for the five "up" converters showed a unit price of $34,942. *See id.* The specifications supplied to NASA by Electrodyne matched the specifications imported with the converters. *See id.*

One of the converters was examined by an independent thirdparty; the internal components were found to be similar to the Broad Band Amplifier supplied to the NRL and described as "unusual." *See* Presentence Investigation Reports, ¶ 105. None of the converters had identifying markings. *See id.* The third-party also noted enameled wires touching metal surfaces in many places which he described as a "bad practice." *See id.* The converters were described as a "poor quality, to the point that performance at any level seems unlikely and reliability poor."[43]

---

ing determination. Reliance upon such information is disclaimed for purposes of this opinion.

41. The Individual Defendants contend they did not inform NASA the converters were not made in the United States because no one from NASA asked this particular question. *See* Nathan Presentence Investigation Report at 48. In response, the Government indicates it is concerned over what appears to be a repudiation of the Electrodyne Plea Agreement. *See id.* The Government further indicates Electrodyne has admitted it defrauded NASA by failing to disclose the use of a Foreign Manufacturer. *See id.*

42. The Individual Defendants contend the converters ultimately supplied to NASA complied with the Buy American Act because a filer subassembly connected to the "down" converter subassembly was manufactured in the United States. *See* Nathan Presentence Investigation Report at 49. The Individual Defendants at-

tempt to support this contention by arguing the materials involved in manufacturing the filter subassembly cost more than the "down" converter subassembly manufactured overseas. *See id.* The Government indicates it is concerned with what appears to be a repudiation of the stipulations involved in the Electrodyne Plea Agreement. *See id.* Moreover, the Government indicates the parts added to the converters were added only after the "down" converters had to be redesigned. *See id.* Electrodyne cannot deliver a noncomplying product, modify it in the United States, and then claim protection pursuant to the Buy American Act.

43. The Government indicates it does not allege the converters were defective or failed to meet performance specifications. *See* Nathan Presentence Investigation Report at 49; Lander Presentence Investigation Report at 45. Probation spoke with Customs officials, an agent at the

*Id.* Characters on one component were described as "cyrillic" (Slavic or Russian) in origin.[44] *See id.*

### 8. *Importation of Unmarked Components*

On 16 February 1994, Customs received information that Electrodyne was importing, via Federal Express, 800 "power dividers" at $8.00 per unit. *See* Presentence Investigation Reports, ¶ 106. On 18 February 1994, the shipment, which arrived in a wooden crate, was inspected by Customs. *See id.* There were six different items inside the crate, none of which were marked to indicate the country of origin. *See id.* According to industry sources, five components in the shipment were "vector modulators" and not power dividers.[45] *See id.*

Vector modulators are used in a variety of applications, including missile technology. *See* Presentence Investigation Reports, ¶ 106. Some of the components were "hybrid power dividers" and according to a confidential source, Electrodyne intended to provide those components to Raytheon, a Canadian Corporation, for use in a "military job." *See id.*

On 1 March 1994, Customs inspectors in Memphis, Tennessee discovered that Electrodyne had imported another shipment from Ukraine. *See* Presentence Investigation Reports, ¶ 107. Inside was a single component

which was believed to be one of the "down" converters destined for NASA. *See id.* Although the commercial invoice listed the country of origin as Ukraine, the component contained no markings indicating its Ukrainian manufacturer and, in fact, was pre-marked with an Electrodyne label displaying its New Jersey address. *See id.*

## II. *DISCUSSION*

Section 1B1.2 directs a sentencing court to apply the offense Guideline in Chapter Two which is "most applicable to the offense of conviction." *See* Section 1B1.2. There are two limited exceptions to this rule: 1) the introductory comment to Appendix A concerning "atypical" cases (the "Introductory Comment to Appendix A"), and 2) Application Note One to Section 1B1.2 regarding a plea agreement containing a stipulation which establishes a more serious offense than the offense of conviction. *See United States v. Jackson,* 117 F.3d 533, 535–536, 538 (11th Cir.1997); *see also United States v. Elefant,* 999 F.2d 674, 676–677 (2d Cir.1993); *United States v. McCall,* 915 F.2d 811, 815–16 (2d Cir.1990).

### A. *Applicable Guideline*

The Individual Defendants object to the Guideline calculations set forth in ¶¶ 148 and

Office of the Inspector General for NASA Lewis Research Center and a NASA engineer and was advised the converters were tested and found to be of a "low quality." *See* Nathan Presentence Investigation Report at 50; Lander Presentence Investigation Report at 45. After certain corrections were made, NASA was able to use the converters. *See* Nathan Presentence Investigation Report at 50; Lander Presentence Investigation Report at 45.

**44.** These characters were found on the inside of a sealed unit and were discovered only after the unit was disassembled. *See* Lander Presentence Investigation Report at 45.

**45.** The Individual Defendants contend vector modulators were not in the referenced shipment but, rather, RF subassemblies which consisted of integrated power dividers and hybrid structures in a single housing. *See* Nathan Presentence Investigation Report at 50; Lander Presentence Investigation Report at 45. The RF subassemblies are parts for vector modulators. *See* Nathan Presentence Investigation Report at 50; Lander Presentence Investigation Report at 45. The Individual Defendants argue the vector mod-

ulators that these subassemblies were used in were standard catalog items at Electrodyne. *See* Nathan Presentence Investigation Report at 50; Lander Presentence Investigation Report at 45. The Individual Defendants further argue the hybrids referred to were for Raytheon in Canada. *See* Nathan Presentence Investigation Report at 50; Lander Presentence Investigation Report at 45. Because the hybrids were for shipment to Canada, the Individual Defendants contend country of origin markings are not required. *See* Nathan Presentence Investigation Report at 50; Lander Presentence Investigation Report at 45.

The Government indicates the vector modulators are also known as Phase Shifters and were imported by Electrodyne for delivery under the Phase Shifter Contract. *See* Nathan Presentence Investigation Report at 50; Lander Presentence Investigation Report at 45. Moreover, the hybrids arrived into the United States from the site of foreign manufacture pre-marked with Electrodyne stickers indicating the country of origin was the United States. *See* Nathan Presentence Investigation Report at 50; Lander Presentence Investigation Report at 46.

149 of the Lander Presentence Investigation Report and ¶¶ 141 and 142 of the Nathan Presentence Investigation Report.[46] The Individual Defendants argue the Guidelines as stipulated by the parties in ¶ 123(1)—(4) of the Lander Presentence Investigation Report and ¶ 125(1)—(4) of the Nathan Presentence Investigation Report should apply instead of those Probation recommends. *See* Lander Objection at 19. The Government contends the Individual Defendants should be sentenced in a manner consistent with their respective plea agreements. *See* Government Sentencing Memorandum at 1.

The Individual Defendants argue the Statutory Index contained in Appendix A provides Section 2T3.1 is "ordinarily applicable" to violations of Sections 545 and 542, the statutes involved in the pleas from Nathan and Lander. *See* Lander Objection at 19–20. The Presentence Investigation Reports, however, recommend the Individual Defendants be sentenced under Section 2F1.1 because "the nature of the offense was/is fraud and ... the [G]uideline for 'Evading Import Duties or Restrictions (Smuggling); Receiving or Trafficking in Smuggled Property,' [Section] 2T3.1, is not the most appropriate [G]uideline." Lander Presentence Investigation Report, ¶ 149; Nathan Presentence Investigation Report, ¶ 142.

The Individual Defendants specifically object to the use of Section 2F1.1 for two reasons: (1) the absence of preponderant proof that the case is "atypical," and (2) the erroneous premise that admissions made by the Individual Defendants at their plea hearings constitute "stipulations" under Section 1B1.2(a). *See* Lander Objection at 20.

### 1. *Case is not "atypical"*

The first argument of the Individual Defendants is based upon the language of Appendix A which states:

> This index specifies the [G]uideline section or sections ordinarily applicable to the statute of conviction.... If, in an atypical case, the [G]uideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the [G]uideline most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted.

*Id.*

The Individual Defendants contend Appendix A references Section 2T3.1 as the Guideline "ordinarily applicable" to violations of Sections 542 and 545.[47] The Presentence Investigation Reports, however, conclude Section 2F1.1 is the appropriate Guideline because "[t]he smuggling of goods into the United States without markings indicating a country of origin was to further [a] fraud; the focus of this crime was not to evade an import tax, although the [Individual Defendants] knowingly did this as well." Nathan Presentence Investigation Report, ¶ 141; Lander Presentence Investigation Report, ¶ 148. The Individual Defendants contend

---

**46.** In support of his position, Lander submitted Defendant Victor Aron Lander's Sentencing Memo with Exhibits A–U (the "Lander Objection"). In support of his position, Nathan submitted a Letter Memorandum, dated 31 December 1997, with Exhibits A–L (the "Nathan Objection").

In the Nathan Objection, counsel for Nathan indicated counsel for Lander had "agreed to brief the matter [concerning the applicable base offense Guideline] ... on behalf of ... [the Individual] Defendants." *See* Nathan Objection at 1 n. 2. Accordingly, the objections of Lander similarly apply to Nathan concerning the conclusion that Section 2F1.1, and not Section 2T3.1, is the appropriate Guideline section under which the Individual Defendants should be sentenced. *See id.*

Electrodyne submitted a sentencing memorandum, dated 5 August 1998 (the "Second Electro-

dyne Sentencing Memorandum"), and received in Chambers on 5 August 1998, which incorporated by reference the arguments advanced in its sentencing memoranda, dated 22 May 1997 (the "First Electrodyne Sentencing Memorandum"). *See* Second Sentencing Memorandum at 1.

The Government submitted the Government Sentencing Memorandum on 5 August 1998.

During the Nathan and Lander sentencings and the Electrodyne resentencing the parties were asked if they had anything more to add to the record. All parties declined.

**47.** Appendix A also references U.S.S.G. 2Q2.1 ("Section 2Q2.1") as a Guideline ordinarily applicable to a violation of Section 545. Section 2Q2.1 explicitly applies to offenses involving fish, wildlife and plants and is, therefore, inapplicable to the instant offense. *See* Section 2Q2.1.

this conclusion is "deeply flawed" and provides insufficient reason to deviate from the ordinarily applicable Guideline, Section 2T3.1. *See* Lander Objection at 20. The Individual Defendants rely upon the Introductory Comment to Appendix A which states a case must be atypical before a different Guideline other than the one recommended can be used. *See id.* (citing *United States v. McCall,* 915 F.2d 811, 815 (2d Cir.1990)).

Arguing the instant case is not atypical,[48] the Individual Defendants rely upon the Guidelines, the language of Sections 542 and 545 and caselaw. The Individual Defendants first argue the Guidelines, specifically Section 2T3.1, apply to various categories of customs violations, only one of which involves the evasion of customs duties. *See* Lander Objection at 22. The Individual Defendants further contend the Sentencing Commission intended Section 2T3.1 to apply to cases involving little, if any, loss of customs revenue, because Section 2T3.1 explicitly provides for a base offense level of four "if the tax loss did not exceed $100." *See id.* (quoting Section 2T3.1). In further support of this construction of Section 2T3.1, the Individual Defendants note the Introductory Comment to subpart 3 of Chapter Two, Part T ("Introductory Comment to Part T") states this subsection of the Guidelines "is designed to address violations involving revenue collection *and* trade regulation." *See* Lander Objection at 22–23 (emphasis in original). The Individual Defendants contend these examples show the Sentencing Commission made an effort to explain Section 2T3.1 "applies to a broader array of cases than just those involving the evasion of custom duties." *Id.* at 23.

The Individual Defendants rely upon a Ninth Circuit decision to further support

their position. *See* Lander Objection at 23 (citing *United States v. Carrillo–Hernandez,* 963 F.2d 1316 (1992)). In *Carrillo–Hernandez,* the defendants were charged with, *inter alia,* making a false statement to a Federal officer, in violation of Section 1001. *See id.* at 1317. This false statement arose from the defendants having lied to a Customs officer about their possession of $431,000 worth of Mexican pesos. *See id.* The court initially looked to Section 2F1.1 as the governing Guideline because that is the Guideline ordinarily applicable to the statute of conviction. *See id.* The court ultimately concluded, however, that Section 2F1.1, which deals with offenses involving fraud and deceit, was inapplicable. *See id.* In making this determination, the court relied upon Application Note Thirteen to Section 2F1.1 ("Application Note Thirteen"), which states:

> Sometimes, offenses involving fraudulent statements are prosecuted under [Section] 1001, or a similarly general statute, although the offense is also covered by a more specific statute. Examples include false entries regarding currency transactions, for which U.S.S.G. § 2S1.3 [ ("Section 2S1.3") ] would be more apt, and false statements to a[C]ustoms officer, for which [Section] 2T3.1 likely would be more apt.

*Id.*

The *Carrillo–Hernandez* court then decided the offense was best characterized as "the making of false entries regarding currency transactions." *See* 963 F.2d at 1317. Relying upon Application Note Thirteen, the court determined Section 2S1.3 was the appropriate Guideline. *See id.*

On appeal the Ninth Circuit reversed the decision of the trial court noting the count of conviction states, in pertinent part: "[D]efen-

---

48. The Government brought a thirteen count, thirty-eight page Indictment against the Defendants which potentially exposed the Individual Defendants to significant jail time. The Government then entered into pleas with the Individual Defendants stipulating to the least serious of the offenses charges in the Indictment. The Government Sentencing Memorandum reads as if it had been submitted by counsel for the Individual Defendants. The Government indicates its willingness to enter into a stipulation as to the applicability of Section 2T3.1 evidences the Government does not view this case as an atypical

violation of either Section 545 or Section 542. *See* Government Sentencing Memorandum at 8 n. 9.

If probable cause existed to return the thirteen count, thirty-eight page Indictment, it is difficult to understand why the Government now has chosen not to advocate the position it once held that the Defendants violated a number of statutes and regulations, namely the AECA, ITAR and the Buy American Act and that such conduct adversely impacted upon the security of the United States.

dants ... knowingly and willfully made false ... statements ... in a matter within the jurisdiction of ... Customs...." *Carrillo–Hernandez*, 963 F.2d at 1317. The court further observed Application Note Thirteen specifically points to Section 2T3.1 as the "more apt" Guideline for "false statements to a[C]ustoms official." *Id.* The Circuit concluded the defendant did not make "false entries regarding currency transactions" but, rather, made "false statements to a[C]ustoms official." *Id.* Accordingly, the court held the defendants should have been sentenced under Section 2T3.1, not Section 2S1.3. *See id.* at 1318.

The *Carrillo–Hernandez* court also recognized the Introductory Comment to Section 2T3.1 stated the Guideline is "primarily [but not exclusively] aimed at revenue collection and trade regulation." [49] *See* 963 F.2d at 1318 (quoting Introductory Comment to Section 2T3.1). The court explained Section 2T3.1 is applicable to cases involving violations of the country's trade regulations even when those violations do not result in lost revenues to the United States. *See id.; see also United States v. Bagnall*, 907 F.2d 432, 436 (3d Cir.1990) (indicating the purpose of Section 542 "is no less than to preserve the integrity of the process by which foreign goods are imported in the United States").

The Individual Defendants also cite *United States v. Dall*, 918 F.2d 52 (8th Cir.1990), to support their contention that the instant case is not atypical. In *Dall*, the defendant pleaded guilty, *inter alia*, to the unlawful importation of fifty kilograms of drugs in violation of Section 545. *See id.* at 53. The Individual Defendants observe that despite the fact that the defendant in *Dall* had paid duty on the unlawful shipment of drugs, thus causing no financial loss to the Government, the district court sentenced the defendant under Section 2T3.1. *See* Lander Objection at 24 (citing *Dall*, 918 F.2d at 53). The court of appeals affirmed the decision of the sentencing court. *See Dall*, 918 F.2d at 53–54.

The Individual Defendants argue their criminal conduct is directly related to trade regulation and involves the evasion of import restrictions and the knowing evasion of an import tax. *See* Lander Objection at 24–25. Therefore, they contend Section 2T3.1, and not Section 2F1.1, is the most appropriate Guideline to apply. *See id.*

The second argument advanced by the Individual Defendants relies upon the language of Sections 542 and 545. The Individual Defendants argue Sections 542 and 545 can be violated in two ways. *See* Lander Objection at 25. First, Section 542, the statute to which Lander pleaded guilty, proscribes the introduction of imported merchandise into the commerce of the United States by means of any "false or fraudulent practice," "whether or not the United States shall or may be deprived of any lawful duties." [50] *See id.* (quoting Section 542). Second, Section 542 proscribes the willful failure to pay customs

---

49. In 1992, Section 2T3.1 was amended and this quoted language was omitted. The Introductory Comment to Section 2T3.1 currently states:
 This Subpart deals with violations of ... [Sections 542 and 545] ... and is designed to address violations involving revenue collection or trade regulation.
 *Id.*

50. There is a split among the circuits as to whether a false statement affecting the amount of duty to be paid, without more, violates the first paragraph of Section 542. Specifically, a number of courts have held that, in order to establish liability under the first paragraph of Section 542, the Government must demonstrate that the false statement at issue actually affected the entry of goods into the country which would have otherwise been denied. *See, e.g., United States v. Corcuera–Valor*, 910 F.2d 198, 199–200 (5th Cir. 1990) (first paragraph of Section 542 requires proof that, but for false statement, goods would not have been permitted into the United States; second paragraph requires only proof of false statement resulting in loss of duties); *United States v. Teraoka*, 669 F.2d 577, 578–79 (9th Cir.1982) (reversing Section 542 conviction where imported nails would have been permitted to enter country regardless of false statement which only affected the amount of duty to be paid). Even those courts which have held to the contrary, *i.e.* that "a false statement is material under [S]ection 542 if it has the potential significantly to affect the integrity or operation of the importation process as a whole, and that neither actual causation nor actual harm to the [G]overnment need to be demonstrated," *United States v. Holmquist*, 36 F.3d 154, 159 (1st Cir.1994) (citing *Bagnall*, 907 F.2d at 436), have done so based upon a theory that Section 542 encompasses false statements which affect the customs laws in any way.

duties. *See id.* (citing Section 542). Section 542 does not require the Government to prove fraudulent intent. *See id.* (citing Section 542).

The Individual Defendants also contend Section 545, the statute to which Nathan pleaded guilty, has two operative paragraphs. They contend it can be violated in two distinct ways, only one of which requires proof that the accused intended to defraud the Government of customs revenue. *See* Lander Objection at 26 (citing *United States v. Menon,* 24 F.3d 550, 554–58 (3d Cir.1994) (only the first paragraph of Section 545 requires a showing that defendant intended to deprive the United States of revenue)). The Individual Defendants argue the fraud they committed is, therefore, not an atypical violation of the smuggling laws based upon the language of Sections 542 and 545. *See id.* at 27.

The Individual Defendants also rely upon caselaw further interpreting Section 542 and 545 to support the position that their offenses were not atypical. The Individual Defendants contend persons ordinarily are charged with having violated Sections 542 and 545 for a variety of reasons, only one of which is the evasion of customs duties. *See* Lander Objection at 29. The Individual Defendants cite a number of cases wherein defendants were convicted of smuggling offenses with the intent to circumvent non-duty related laws, or because the merchandise was otherwise banned and subject to seizure.[51] *See id.* at 30. The Individual Defendants conclude there are many cases which charge individuals with customs violations where the amount of duty is not at issue. Therefore, the Individual Defendants argue, it would be "wrong" to consider the instant offenses atypical. They contend it was not their goal to deprive the Government of customs revenue but, rather, to avoid trade regulation restrictions. *See id.* at 32.

■ The violations of the Individual Defendants fall within the classification of importing merchandise into the United States by use of false or fraudulent means whether or not the Government is or may be deprived of lawful duties. Appendix A states Section 2T3.1 is the appropriate Guideline to use when Sections 542 and 545 are violated. *See* Appendix A. Further, *Stinson v. United States,* 508 U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993), states that commentary "that interprets or explains a[G]uideline is authoritative unless it violates the Constitution or a[F]ederal statute, or is inconsistent

---

**51.** In support of this contention, the Individual Defendants cite: *United States v. Gardner,* 894 F.2d 708, 709–710 (5th Cir.1990) (automobiles, to circumvent environmental standards); *United States v. Felsen,* 648 F.2d 681, 682 (10th Cir. 1981) (same); *Dall v. United States,* 957 F.2d 571, 572 (8th Cir.1992) (banned, non-FDA approved animal drugs); *United States v. Turner,* 558 F.2d 46, 48 (2d Cir.1977) (banned vitamins); *United States v. Vallejo,* 69 F.3d 992, 993 (9th Cir.1995) (firearms); *United States v. Arrellano,* 812 F.2d 1209, 1210 (9th Cir.1987) (same); *United States v. Dodd,* 43 F.3d 759, 760–61 (1st Cir. 1995) (military armaments); *United States v. Gezen,* Civ.A.No. 91–7696, 1992 WL 289, at * 1 (4th Cir. 3 Jan. 1992) (importing military hardware by means of a false statement as to its country of origin); *United States v. Cox,* 696 F.2d 1294, 1295–96 (11th Cir.1983) (switchblades); *United States v. Murphree,* 783 F.2d 605, 607 (6th Cir. 1986) (same); *United States v. Bowe,* 360 F.2d 1, 5 (2d Cir.1966) (same); *United States v. One 18th Century Colombian Monstrance,* 802 F.2d 837, 838 (5th Cir.1986) (artwork); *United States v. Meyer,* 802 F.2d 348, 349–50 (9th Cir.1986) (pornography); *United States v. Hale,* 784 F.2d 1465, 1466–68 (9th Cir.1986) (same); *United States v.*

*Borello,* 766 F.2d 46, 48–49 (2d Cir.1985) (same); *United States v. Patel,* 762 F.2d 784, 786–88 (9th Cir.1985) (coffee); *United States v. Asbury,* 586 F.2d 973, 975 (2d Cir.1978) (counterfeit securities); *United States v. Van Leeuwen,* 427 F.2d 1174, 1174 (9th Cir.1970) (gold coins); *United States v. Boggus,* 411 F.2d 110, 112 (9th Cir. 1969) (same); *United States v. Ackerman,* 704 F.2d 1344, 1348 (5th Cir.1983) (duty-free jewelry); *United States v. Kurfess,* 426 F.2d 1017, 1019 (7th Cir.1970) (watches); *United States v. McKee,* 220 F.2d 266, 269 (2d Cir.1955) (snowmobiles); *United States v. Goldstein,* 323 F.2d 753, 753–54 (2d Cir.1963) (goods under the Trading with the Enemy Act: hog bristles); *United States v. Quong,* 303 F.2d 499, 500–02 (6th Cir.1962) (same: "Chinese-type drugs"); *United States v. Wing Leong,* 287 F.2d 849, 849–50 (7th Cir.1961) (same: food, medicine and tea).

The Individual Defendants observe that although each of these cited cases involved some type of fraud, not one involved the evasion of custom duties. *See* Lander Objection at 31. The Individual Defendants do not contest that Sections 542 and 545 also address frauds designed to evade the payment of customs duties. *See id.* at 31 n. 4 (citations omitted).

with, or a plainly erroneous reading of that subsection." *Id.*

The current Introductory Comment to Part T states this subsection of the Guidelines "is designed to address violations involving revenue collection *or* trade regulation." Introductory Comment to Part T (emphasis added); *see also Carrillo–Hernandez,* 963 F.2d at 1317–18. The conduct of the Individual Defendants, although fraudulent, was also in violation of trade regulations and it appears that it is the type of violation Section 2T3.1 was intended to cover. Accordingly, the instant matter is not atypical as to the Guideline section ordinarily applicable to the offense of conviction. Unless another exception applies, the directive contained in the Introductory Comment to Appendix A instructs a sentencing court to use the Guideline section ordinarily applicable to the statute of conviction, which in the instant matter is Section 2T3.1. *See* Introductory Comment to Appendix A.

### 2. *Section 1B1.2(a) Stipulations*

Section 1B1.2(a) also contains an exception to the rule of applying the Guideline which is ordinary applicable to the offense of conviction. In the case of a plea agreement "containing a stipulation that specifically establishes a more serious offense than the offense of conviction," the more serious offense so stipulated is used to determine the applicable offense Guideline. *See* 1B1.2(a); *Braxton v. United States,* 500 U.S. 344, 346–47, 111 S.Ct. 1854, 114 L.Ed.2d 385 (1991); *United States v. McGee,* 7 F.3d 1496, 1498 (10th Cir.1993); *see also United States v. Saldana,* 12 F.3d 160, 162 (9th Cir.1993) (interpreting Section 1B1.2 as requiring a sentencing court to use the Guideline which applies to other or greater offenses included within the plea agreement) (citing *United States v. Bos,* 917 F.2d 1178 (9th Cir.1990)). The "stipulation" referred to in Section 1B1.2(a) must be "set forth in a written plea agreement or made between the parties on the record during a plea proceeding" and must specifically establish facts that prove a more serous offense or offenses. *See* Application Note One to Section 1B1.2.

In *Braxton,* the defendant pleaded guilty during a plea hearing to assault on a Federal officer and to use of a firearm during a crime of violence, but did not plead guilty to the more serious charge of attempting to kill the Federal officer. *See* 500 U.S. at 345, 111 S.Ct. 1854. At the plea hearing, the defendant agreed to the presentation of facts by the Government including that he twice shot at the Federal officer. *See id.* Based upon these facts, the district court sentenced the defendant "as though he had been convicted of the attempt to kill count, relying on . . . [Section] 1B1.2(a). . . ." *See id.* The Fourth Circuit upheld the sentence. *See id.* (citing *United States v. Braxton,* 903 F.2d 292, 299 (4th Cir.1990)).

Section 1B1.2(a), as it was then drafted, provided that " 'in the case of a conviction by a plea of guilty or nolo contendere containing a stipulation that specifically establishes a more serious offense than the offense of conviction, [the court shall apply the [G]uideline in such chapter] most applicable to the stipulated offense.' " *Braxton,* 500 U.S. at 346, 111 S.Ct. 1854 (quoting Section 1B1.2(a)). The questions presented to the Court in *Braxton* were (1) whether the plea contained a stipulation that (2) specifically established the defendant attempted to kill the Federal officer. *See id.* at 346–47, 111 S.Ct. 1854. The defendant argued his plea did not contain a "stipulation" within the meaning of Section 1B1.2(a) because it was not part of a formal plea agreement. *See id.*

The Court recognized a split in authority regarding whether Section 1B1.2(a), as it was then drafted, required a "stipulation" that is part of a formal plea agreement. *See Braxton,* 500 U.S. at 347, 111 S.Ct. 1854. The Court observed:

Some Circuits to consider the question have agreed with [the defendant's] interpretation, believing that the "stipulation" must be part of the "quid pro quo" for the Government's agreement not to charge a higher offense. *See, e.g., United States v. McCall,* 915 F.2d 811, 816 n. 4 (2d Cir. 1990); *United States v. Warters,* 885 F.2d 1266, 1273 n. 5 (5th Cir.1989). But as the Government points out, [Section] 1B1.2 does not by its terms limit its application to stipulations contained in plea agreements; the language speaks only of

"plea[s] ... containing a stipulation." Since, [sic] the Government argues, any formal assent to a set of facts constitutes a stipulation, [the defendant's] guilty plea "contain[ed] a stipulation upon which the court could rely in setting his base-offense level."

*Id.* The Court did not resolve the question whether the plea contained a stipulation within the meaning of Section 1B1.2(a) because the Sentencing Commission was in the process of addressing the issue and because the specific controversy in the case could be decided on other grounds. *See id.* at 348–49, 111 S.Ct. 1854.

Section 1B1.2(a) was subsequently revised and now provides:

Determine the offense [G]uideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (*i.e.,* the offense conduct charged in the count of the indictment or information of which the defendant was convicted). *Provided,* however in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense [G]uideline section in Chapter Two most applicable to the stipulated offense.

*Id.* (emphasis added).[52]

▮▮▮▮ As indicated, the Presentence Investigation Reports clearly and unambiguously state Section 2F1.1 is the appropriate Guideline based upon factual stipulations made by the Individual Defendants at their respective plea hearings indicating the more serious offense of fraud. *See* Nathan Presentence Investigation Report, ¶ 141; Lander Presentence Investigation Report, ¶ 148. The Individual Defendants argue oral statements made at the time of a plea do not constitute the type of stipulations contemplated by Section 1B1.2(a). *See* Lander Objection at 36. This argument appears to rely upon the distinction between statements made at a plea hearing and those set out in a plea agreement.

In *United States v. Passi,* 62 F.3d 1278 (10th Cir.1995), the defendant pleaded guilty to knowingly engaging in a sexual act with a minor on Federal property in contravention of 18 U.S.C. § 2243(a). *See id.* at 1279. In his plea agreement, the defendant stipulated the child victim was his minor biological daughter.[53] *See id.* Although the Government and the defendant had proposed the

---

**52.** Section 1B1.2 also provides:

(b) After determining the appropriate offense [G]uideline section pursuant to subsection (a) of this section, determine the applicable [G]uideline range in accordance with [U.S.S.G.] § 1B1.3 (Relevant Conduct) [("Section 1B1.3")].

(c) A plea agreement (written *or made orally on the record*) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offenses.

(d) A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.

*Id.* (emphasis added).

The Individual Defendants also argue U.S.S.G. § 6B1.4 ("Section 6B1.4") contemplates that any stipulations relevant to sentencing are to be memorialized in writing. *See* Lander Objection at 35. Although the Sentencing Commission originally may have intended a narrow definition of a stipulation which ordinarily included a writing requirement, *see* Section 6B1.4, the amendment to Section 1B1.1 indicates certain oral stipula-

tions are given equal standing with written stipulations. *See* Section 1B1.1.

In the instant matter, the Individual Defendants orally stipulated during their plea hearings, and before a plea was entered, to the more serious offense of fraud. Nathan and Lander also adopted the Nathan Plea Memorandum and the Lander Plea Memorandum respectively before pleas were entered. The memoranda contained the written factual admissions indicating the commission of a more serious offense. Each of the Individual Defendants stated they received the applicable plea memorandum, reviewed it with counsel who explained it to him and understood it. *See* Transcript from Nathan Plea Hearing at 10 to 12; Transcript from Lander Plea Hearing at 10 to 13. Each of the Individual Defendants, thereby adopted the writing contained in his plea memorandum, and did so before his plea was accepted.

**53.** Specifically, the plea agreement in *Passi,* in pertinent part, stated:

The parties recommend that the court find that the fact that the child victim was the daughter of the defendant warrants an upward departure under U.S.S.G. § 5K2.0.

62 F.3d at 1279 n. 1.

defendant be sentenced under one Guideline, the sentencing court determined a different Guideline was more appropriate. *See id.* at 1280. Before imposing a greater sentence under the Guidelines, the court explained the defendant had stipulated to a more serious offense than that agreed upon in his plea agreement. *See id.* The court provided the parties with an opportunity to brief the issue. *See id.*

The *Passi* court concluded the defendant had stipulated to a more serious offense, aggravated incest, than the offense of sexual abuse of a minor agreed upon by the Government and the defendant in the plea agreement. *See Passi,* 62 F.3d at 1280. The circuit affirmed the decision of the district court and agreed that as part of his plea agreement the defendant had stipulated to a more serious offense. *See id.* at 1281. The Tenth Circuit explained the defendant specifically pleaded guilty to sexual abuse of a minor, but then stipulated in his plea agreement that his victim was his daughter. *See id.*

In *United States v. Warters,* 885 F.2d 1266 (5th Cir.1989),[54] the defendant entered into a written agreement to plead guilty to misprision of a felony and was ultimately sentenced based upon his guilt for the underlying felony, drug conspiracy. *See id.* at 1272. At the plea hearing in its statement of facts supporting the plea, the Government recited that the defendant was "also a member of the conspiracy which [committed] ... overt acts ... within the Southern District of Texas, [and] in the Northern District of Ohio [the defendant] furnished $20,000 for the purchase of approximately [twenty] pounds of marijuana, which he was going to distribute." *Id.* at 1270. The sentencing court inquired whether the defendant "failed to report [the above information] to an authority when [he] knew that a crime was being committed." *Id.* The sentencing court interpreted the affirmative response from the defendant to its inquiry as an indication the defendant agreed to the statement from the Government as well. *See id.*

The Tenth Circuit in *Warters* upheld the sentence by characterizing it as a departure.

*See Warters,* 885 F.2d at 1275. The Circuit noted the particular oral admissions from the defendant at the plea hearing were insufficient to specifically establish his guilt to a higher offense. *See id.* at 1274 n. 5.

> As the information to which [the defendant] pleaded guilty alleged that the felony to which his misprision related was a conspiracy among him and others, such a finding would be supported by the record. Record support is also found in [the defendant's] admissions at the plea hearing respecting the [G]overnment's recital of the facts, which stated he was a member of the conspiracy.... We do not, however, regard this case as one in which "a stipulation ... specifically establishes a more serious offense" within the meaning of ... [Section] 1B1.2(a). [The defendant's] guilt of misprision of the conspiracy did not depend on his having been a member of the conspiracy; nor was there any formal stipulation of his guilt of conspiracy. The plea agreement does not say anything about [the defendant] being part of the conspiracy.

*Id.*

The instant case is similar to *Warters* with one important distinction. The particular oral admissions of the Individual Defendants during their plea hearings, in addition to adoption by each of his written plea memorandum are sufficient to specifically establish a more serious offense—fraud.

The Individual Defendants argue if they have stipulated to the more serious offense of fraud, they did not stipulate to every element of the fraud offense. *See* Lander Objection at 41. Rather, the Individual Defendants contend "fraud is simply an element of the smuggling offense to which [the Individual Defendants] pleaded guilty." *Id.*

■ A Section 1B1.2(a) stipulation must "establish a factual basis for each essential element of th[e more serious] offense." *United States v. Domino,* 62 F.3d 716, 722 (5th Cir.1995). Specifically, the Individual

---

54. The previous version of Section 1B1.2(a) applied when the *Warters* case was decided.

Defendants stipulated during their plea hearings to a violation of Section 1001.

Section 1001 states:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title or imprisoned not more than [five] years, or both.

*Id.*

During their plea hearings, the Individual Defendants admitted they knowingly and willfully entered into the Broad Band Amplifier Contract containing a Buy American clause with the NRL knowing the Broad Band Amplifiers they would provide had been ordered from Enterprise Saturn in Ukraine. *See* Transcript from Nathan Plea Hearing at 18–19; Lander Plea Hearing at 19. The Individual Defendants also admitted during their plea hearings that on 23 November 1993 they imported five of these Broad Band Amplifiers from Ukraine without markings indicating the country of origin. *See* Transcript from Nathan Plea Hearing at 28–29; Transcript from Lander Plea Hearing at 19–21. The Individual Defendants further admitted the Broad Band Amplifiers were painted to obscure markings indicating foreign manufacture and affixed stickers with the words "Electrodyne Systems Corporation" intending to deceive the NRL into believing the Broad Band Amplifiers had been manufactured by Electrodyne in the United States. *See* Transcript from Nathan Plea Hearing at 28–29; Transcript from Lander Plea Hearing at 19–21.

These admissions establish the Individual Defendants knew the Broad Band Amplifiers would not be manufactured in the United States at the time the Broad Band Amplifier Contract, a matter within the jurisdiction of the executive branch of the United States, was executed. These admissions also establish the Individual Defendants fraudulently misrepresented to the NRL that such Broad Band Amplifiers would be manufactured in the United States in order to comply with the stated terms of the Broad Band Amplifier Contract.

The Broad Band Amplifier Contract specifically contained a Buy American clause making the country of origin of the Broad Band Amplifiers a material part of the Broad Band Amplifier Contract. The Broad Band Amplifier Contract could not have been executed without such a Buy American clause. Moreover, the admissions of the Individual Defendants during their plea hearings establish the Individual Defendants took affirmative steps to hide the fact that the Broad Band Amplifiers were not from the United States by requesting Enterprise Saturn manufacture the Broad Band Amplifiers without a country of origin marking. During the plea hearings, the Individual Defendants each admitted they went as far as instructing Electrodyne Employees to paint the Broad Band Amplifiers to further obfuscate they were manufactured by a foreign manufacturer. *See* transcript from Nathan Plea Hearing at 19; Transcript from Lander Plea Hearing at 20. The Individual Defendants each admitted they instructed Electrodyne Employees to mark the Broad Band Amplifiers so that they appeared to have been manufactured in the United States. *See* Transcript from Nathan Plea Hearing at 19; Transcript from Lander Plea Hearing at 20. Accordingly, the Individual Defendants specifically stipulated to every element of fraud under Section 1001(a).

Stipulations were also discussed in *United States v. McCall*, 915 F.2d 811 (2d Cir. 1990), where the Circuit reversed the sentence imposed by the district court. It was held the appropriate Guideline section should have been based upon the offense of conviction because the defendant did not stipulate to a more serious offense. See *id.* at 815–16.

In *McCall*, the defendant pleaded guilty to a one–count information charging him with committing a violent crime in aid of racke-

teering activity. *See* 915 F.2d at 812. The underlying crime charged in aid of the racketeering activity was assault with a dangerous weapon. *See id.* In addition to pleading guilty to this offense, the defendant agreed to admit to the court his involvement in four shootings charged in the information and in drug distribution. *See id.*

Before the sentencing, the Guidelines were amended and the Guideline selected by Probation was no longer applicable to the offense. *See McCall*, 915 F.2d at 813. Probation obtained additional information and utilized the Guideline section applicable to the crime of assault with intent to commit murder to three of the assaults charged in the information. *See id.* The sentencing court applied the Guideline suggested by Probation based upon the finding the defendant had acted with a "depraved indifference to human life." *See id.*

The defendant appealed his sentence and argued the district court should have applied the Guideline for the offense to which he pleaded guilty. *See McCall*, 915 F.2d at 813. After determining that the facts alleged in the information were not atypical, the Second Circuit held the defendant did not stipulate to a more serious offense.

> [The defendant] agreed to plead guilty to assault with a dangerous weapon pursuant to a written plea agreement with the [G]overnment. The reasonable expectations of the parties to a plea agreement cannot be fulfilled unless the Guidelines section is determined solely on the basis of the offense of conviction, facts alleged in the information or indictment, and the formal stipulations to facts establishing a more severe offense. If the [G]overnment desired to have [the defendant] sentenced under another Guidelines section, it could have sought an appropriate stipulation pursuant to a proviso to Section 1B1.2. That proviso establishes a mechanism for the [G]overnment to extract a stipulation to conduct more serious than the offense of conviction in order to apply the Guidelines section for the more serious offense while retaining the statutory maximum sentence for the offense of conviction.[55] *See* [Sec-

tion] 1B1.2(a) .... In this case, the plea agreement did not contain such a stipulation. The agreement refers only to stipulations to factors that will be used "to calculate the defendant's adjusted offense level." Because the choice between Guidelines sections in this case determines the base (rather than adjusted) offense level, this clause is inapplicable.

*Id.* at 815.

In so holding, the *McCall* court relied upon *United States v. Guerrero*, 863 F.2d 245, 248 (2d Cir.1988), which "requires that any stipulation be part of the plea agreement, whether oral or written." *See McCall*, 915 F.2d at 816 n. 4.

In *Guerrero*, a three-count indictment charged the defendant and others with conspiracy (count one), and with the underlying offense (count two) of distributing heroin. *See* 863 F.2d at 246. The third count of the indictment charged the defendant alone with distributing an unspecified amount of a Schedule I narcotic drug. *See id.* At his plea hearing, the defendant acknowledged he had received a small quantity of heroin and had given it to an individual, a Government agent, whom he believed to be a potential purchaser. *See id.*

Before the defendant was sentenced, the Government and defense counsel entered into a stipulation of facts to obviate the need for a hearing to establish circumstances relevant to sentencing. *See Guerrero*, 863 F.2d at 246. The stipulation revealed the defendant had engaged in a number of conversations with the Government informant during which the defendant organized a meeting to introduce the informant to a potential supplier of heroin. *See id.* The stipulation also noted the defendant arranged to have the informant retrieve a sample of heroin from the defendant which had been furnished by this supplier. *See id.* The defendant also indicated he knew the informant intended to purchase additional amounts of heroin from this supplier. *See id.* The defendant further admitted he introduced the informant to the supplier and remained present while the two negotiated a sale of heroin. *See id.* The sale

---

**55.** The previous version of Section 1B1.2(a) was in effect at this time.

which later transpired involved 698 grams of heroin. *See id.*

At sentencing, the Government contended, the appropriate base offense level for the defendant should be based upon the quantity of drugs involved in the overall scheme in which he participated. *See Guerrero,* 863 F.2d at 248. Instead, the court selected the base offense level applicable to the amount the defendant actually distributed, not the amount concerning the totality of his conduct. *See id.* at 247.

In response to the argument of the Government, the Second Circuit noted this contention was based upon the provision in Section 1B1.2(a), which requires use of the Guideline applicable to the stipulated offense when a guilty plea contains a stipulation "that specifically establishes a more serious offense than the offense of conviction." *See Guerrero,* 863 F.2d at 248. The *Guerrero* court specifically disagreed with the view of the Government that the stipulation between the Government and defense counsel, which was intended to obviate fact-finding at the sentencing, invoked the proviso to Section 1B1.2(a). *See id.* The court held:

> The proviso [to Section 1B1.2(a)] applies only to a stipulation contained in a plea of guilty or nolo contendere, not to a stipulation negotiated after a plea in connection with sentencing.[56] The distinction has significance. Prior to plea, the prosecution has the opportunity to condition its willingness to accept a plea to less than all counts of an indictment on the defendant's willingness to stipulate that he committed crimes in addition to those to which he is pleading guilty. In offering to reduce the defendant's maximum exposure to the penalties in the conviction counts, the prosecution is entitled to extract an admission of facts that may justify a substantial sentence within that maximum. But once the Government agrees to a plea bargain without extracting such an admission, facts admitted by the defendant to shorten or obviate a sentencing hearing do not establish a "stipulated offense" within the meaning of [S]ection 1B1.2(a).

*Id.; see United States v. Rutter,* 897 F.2d 1558 (10th Cir.), *cert. denied,* 498 U.S. 829, 111 S.Ct. 88, 112 L.Ed.2d 60 (1990) (quoting *Guerrero,* 863 F.2d at 248).

The instant case is distinguishable from *Guerrero.* Lander and Nathan did not bargain with the Government after they entered into their plea agreements to obviate fact-finding at their sentencings. Rather, the Individual Defendants each specifically admitted to a more serious offense during their plea hearings conducted in conformity with Rule 11. These admissions were the result of questions which were part of the Nathan and Lander Plea Memoranda submitted to the court before each sentencing hearing. The questions asked and answered by the Individual Defendants were not surprises. Before the sentencing hearings, Nathan and Lander reviewed with counsel the plea memoranda and the attached questions which they would be asked under oath. *See* Transcript from Lander Plea Hearing at 10–11; Transcript from Nathan Plea Hearing at 10. Lander and Nathan each stated counsel explained the plea memorandum and that each of them understood it. *See* Transcript from Nathan Plea Hearing at 10; Transcript from Lander Plea Hearing at 10 to 11.

Lander admitted during his plea hearing, but before his plea was accepted, that he instructed Enterprise Saturn not to mark future components in a way that indicated foreign manufacture. *See* Transcript from Lander Plea Hearing at 19–20. Lander also admitted on or about 30 December 1993, he caused twenty-two Broad Band Amplifiers to be imported into the United States from Ukraine without markings indicating the country of origin in order to assist Electrodyne in deceiving the Government such items had been manufactured in the United States. *See id.* at 20.

Similarly, Nathan admitted during his plea hearing, but before his plea was accepted, that on or about 13 August 1993 he signed a contract containing a Buy American clause on behalf of Electrodyne with the Government to provide the NRL with twenty-five Broad Band Amplifiers. *See* Transcript from Nathan Plea Hearing at 18. Nathan further

---

**56.** The previous version of Section 1B1.2(a) was in effect at this time.

admitted at the time he signed this contract he knew Lander had ordered the Broad Band Amplifiers from a Foreign Manufacturer in Ukraine. *See id.* at 19. Nathan also admitted on 23 November 1993, five of the Broad Band Amplifiers were imported into the United States without country of origin markings and were then pained and marked to indicated Electrodyne has manufactured them. *See id.* Nathan admitted he caused the Broad Band Amplifiers to be painted and marked to indicate Electrodyne had manufactured them so as to deceive the United States they had been manufactured in the United States. *See id.* at 19–20.

The factual basis established by the Government at each of the Lander and Nathan Plea Hearings transpired before the pleas were accepted and the Individual Defendants were found guilty. The voluntary admissions made by the Individual Defendants at their plea hearings were "made orally on the record" and were part of the plea agreements. Nathan and Lander also adopted the written statements setting forth the factual basis for each of them, as contained in his plea memorandum. These admissions were not made to shorten a sentencing hearing as in *Guerrero.* Moreover, the Individual Defendants were aware such admissions would be required in order to lay the factual basis for their pleas. *See* Rule 11(f); *see also* the Nathan and Lander Plea Memoranda.

The questions which the Government asked to establish a factual basis for the Nathan Plea were set forth in the Nathan Plea Memorandum. *See* Nathan Plea Memorandum at 3–4. During the Nathan Plea Hearing, counsel for Nathan was specifically asked if Nathan had received an opportunity to review the Nathan Plea Memorandum. *See* Transcript from Nathan Plea Hearing at 4. Counsel for Nathan stated Nathan had reviewed the Nathan Plea Memorandum. *See id.* Nathan was also asked if he had read the Nathan Plea Memorandum and if his attorney had discussed it with him. *See id.* at 10. Nathan stated his attorney had

reviewed the Nathan Plea Memorandum with him and that he understood it. *See id.*

Similarly, the questions which the Government asked to establish a factual basis for the Lander Plea were set forth in the Lander Plea Memorandum. *See* Lander Plea Memorandum at 3–4. During the Lander Plea Hearing, counsel for Lander was specifically asked if Lander had received an opportunity to review the Lander Plea Memorandum. *See* Transcript from Lander Plea Hearing at 3. Counsel for Lander stated Lander had reviewed the Nathan Plea Memorandum. *See id.* Lander also stated he had read and discussed the Lander Plea Memorandum with his attorney. *See id.* at 10–11. Lander further stated he understood the Lander Plea Memorandum. *See id.* at 10.

■ Admissions under oath and, therefore, subject to the penalty of perjury, are as, if not more, reliable than stipulations. Admissions, such as those made by the Individual Defendants during their plea hearings, provide cause to utilize the limited exception provided for in Section 1B1.2(a). The answers of Nathan and Lander providing a factual basis for the pleas and the adoption of the plea memorandum by each Individual Defendant clearly establish the knowing and willful commission of fraud.

The statements by the Individual Defendants served as affirmative admissions and were not merely statements of approval to the facts as set forth by the Government. These admissions were part of the quid pro quo between the Government and the Individual Defendants and are properly termed stipulations. Moreover, these admissions, which were oral statements made under oath during the Nathan and Lander Plea Hearings, and as part of the Nathan and Lander Plea Agreements, establish a more serious offense. Accordingly, the Individual Defendants stipulated to the more serious offense of fraud and Section 2F1.1 is the applicable Guideline.

### 3. *Calculation of Loss*

The Individual Defendants, as well as Electrodyne,[57] object to the amount deemed

---

57. Chapter Eight of the Guidelines governs the sentencing of organizations such as Electrodyne. Section 8C2.3(a) of the Guidelines sets forth:

"For each count covered by [U.S.S.G.] § 8C2.1 (Applicability of Fine Guidelines) [ ('Section 8C2.1')], use the applicable Chapter Two

by Probation to be the applicable calculation of loss under Section 2F1.1.[58] *See* Lander Objection at 45; Transcript for Electrodyne Sentencing at 3–7.

During the Electrodyne Sentencing, Electrodyne challenged the calculation of loss as stated in the Electrodyne Presentence Investigation Report. *See* Transcript from Electrodyne Sentencing at 3. The Electrodyne Presentence Investigation Report suggested the restitution amount stipulated by Electrodyne in the Electrodyne Plea Agreement of $369,105.70 served as an appropriate calculation of loss as well. *See id.* 3–4. Electrodyne contended the restitution amount inflated the amount of loss because some of the figures were counted twice. *See id.* at 6. Also, Electrodyne argued a portion of the restitution was being paid in kind instead of money. *See id.* Probation indicated Electrodyne contended the appropriate loss figure was $229,905.70.[59] *See* Electrodyne Presentence Investigation Report at 33. The Government indicated it stood by the stipulated figure contained in the Electrodyne Plea Agreement and considered the objections of Electrodyne to be a breach of the Electrodyne Plea Agreement. *See id.* Further, the Government indicated it could prove the total loss was, at a minimum, $369,105.70. *See id.* In the Government Sentencing Memorandum, however, the Government indicates, without explanation, the loss figure of $189,-255.65 should be used. *See* Government Sentencing Memorandum at 1 n.1.

During the Electrodyne Sentencing, the stipulated restitution figure of $369,105.70 was deemed adequate to serve as the loss figure as well. *See* Transcript from Electrodyne Sentencing at 7. The Circuit remanded

the determination as to the loss figure indicating a sufficient finding of the amount of loss, as required by Rule 32(c)(1), was necessary. *See Electrodyne,* 147 F.3d 250, ——, 1998 WL 304358, at * 6. Such findings as to the calculation of loss for Electrodyne will be made in connection with the loss calculation for the Individual Defendants.

The Individual Defendants argue the calculation of loss set forth in paragraphs 108 and 109 of the Presentence Investigation Reports, as well as the adjustment applied in paragraph 143 of the Nathan Presentence Investigation Report and paragraph 150 of the Lander Presentence Investigation Report, are incorrect. *See* Lander Objection at 45. As a result of this argued miscalculation, the Individual Defendants contend the adjusted and total offense levels appearing in paragraphs 155, 158 and 160 of the Lander Presentence Investigation Report and paragraphs 148, 151 and 153 of the Nathan Presentence Investigation Report are also incorrect. *See id.*

The Individual Defendants argue Probation has calculated the amount of loss attributable to them based solely upon loss figures stipulated by Electrodyne. *See* Lander Objection at 45–46. The Individual Defendants argue they are not bound by the stipulations regarding loss contained in the Electrodyne Plea Agreement, which was authorized by Nathan as sole director of Electrodyne, *see* Corporate Resolution, dated 16 October 1996, and are only responsible for the loss applicable to their individual offenses. *See id.* at 46.

Lander contends the amount of loss applicable to his offense is $7,250. *See* Lander Objection at 46; Lander Presentence Investi-

---

[G]uideline to determine the base offense level and apply, in the order listed, any appropriate adjustments contained in that [G]uideline." U.S.S.G. § 8C2.3(a). In the instant matter, Section 2F1.1 is the applicable Guideline for Count Ten and is included as a section covered by Section 8C2.1. *See* Section 8C2.1. One of the enhancements applicable pursuant to Section 2F1.1 is dependant upon the amount of loss involved in the offense. *See* Section 2F1.1(b)(1). Accordingly, the calculation of loss must also be determined for Electrodyne.

**58.** It is unclear if Nathan objects to the calculation of loss figures set forth by Probation. As

indicated, counsel for Lander has agreed to brief the issues concerning the application of Section 2F1.1 for the Individual Defendants. *See* Nathan Objection at 1 n. 2. Because the calculation of loss figure is part of the Section 2F1.1 analysis, the objections of Lander will be attributed to Nathan as well. Accordingly, the portion of the brief submitted by Lander dealing with the correct calculation of loss under Section 2F1.1 will be deemed to apply to Nathan as well.

**59.** It appears Electrodyne contended the total loss was $189,255.65. *See* First Electrodyne Presentence Investigation Report at 5.

gation Report at 40. Nathan argues the applicable loss figure is $229,905.70, which excludes the $139,200 claim forgiven as to the Air Force. *See* Nathan Presentence Investigation Report at 36. Nathan argues the adjustment set forth in paragraph 143 of the Nathan Presentence Investigation Report should be two levels pursuant to Section 2F1.1(b)(1)(C).[60] Lander contends the adjustment set forth in paragraph 150 of the Lander Presentence Investigation Report should be eight levels pursuant to Section 2F1.1(b)(1)(I).[61]

Probation observes that in the Electrodyne Plea Agreement, the Government stipulated to restitution figures with regard to the contracts specified in Schedule A of the Electrodyne Plea Agreement. *See* Presentence Investigation Reports, ¶ 108. Probation indicates Electrodyne agreed to pay restitution of at least $229,905.70 and to relinquish a claim against the Air Force of $139,200.00 *See id.* Probation further notes assuming the inclusion of relevant conduct, Electrodyne stipulated to a total loss figure for all Contracts of $369,105.70. *See id.* Nathan, as the sole director of Electrodyne, authorized counsel for Electrodyne to enter into this stipulation with the Government. *See* Certificate, executed 16 October 1996.

Probation states pursuant to Section 1B1.3, the Individual Defendants are responsible for the loss as computed for Electrodyne. Section 1B1.3(a)(1) states the base offense level shall be determined by:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> . . .
>
> (B) in the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

*Id.*

Probation states the Individual Defendants were aware of and participated in the full scope of the conspiracy to defraud the United States Government and its agencies and to sell foreign manufactured items as having been made in the United States. *See* Lander Presentence Investigation Report at 41; *see also* Presentence Investigation Reports, ¶ 41. In fact, the conspiracy was made possible because of the actions of Nathan and Lander. Electrodyne was able to act only through them.

■ During the plea hearings, both Nathan and Lander admitted to orchestrating and participating in such fraudulent conduct making it appropriate to attribute the Individual Defendants with the full extent of the loss suffered by the Government because of their actions. It was only because of the actions of Nathan and Lander that such conduct occurred. Nathan, as the President, Vice–President and sole director of Electrodyne, had the authority to enter into the Contracts. Nathan not only held a position of power in Electrodyne but, also, a large equity interest in the company.

Lander, the director of marketing of Electrodyne, was in charge of finding suppliers of items necessary to fulfill the Contracts executed by Nathan. His position of authority permitted him to direct the Foreign Manufacturers not to mark their products with country of origin markings. Lander also had control over Electrodyne employees and the packaging of Electrodyne products. The positions of authority both Nathan and Lander held further evidence their involvement in the instant conspiracy to defraud the Government.

---

**60.** Section 2F1.1(b)(1)(C) states if the loss is more than $5,000 but less than $10,000 add two levels to the offense level. *See id.*

**61.** Section 2F1.1(b)(1)(I) states if the loss is more than $200,000 but less than $350,000 add eight levels to the offense level. *See id.*

In calculating the amount of loss figure, Application Note Eight to Section 2F1.1 states:

> For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offenders's gain from committing the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

*Id.*

Probation states it attempted to calculate the gain of the Individual Defendants and Electrodyne by "subtracting the Russian/Ukrain[ian] contract cost from the cost contracted with the [G]overnment agencies." *See* Presentence Investigation Reports, ¶ 109. Probation explains because Electrodyne contracted with the Foreign Manufacturers to build only a subpart of the unit, it is unable to determine the exact pecuniary gain. *See id.* Accordingly, Probation states the stipulated loss figure of Electrodyne should be used in computing the appropriate loss for sentencing purposes for all Defendants. *See id.*

■ The amount stipulated to as restitution by Electrodyne,[62] at the direction and approval of Nathan as the sole director of Electrodyne, is an adequate estimate of the full amount of loss sustained by the Federal Government and its agencies.[63] Section 3663(a)(3) indicates restitution may be ordered in a criminal case "to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). As indicated, the stipulated amount in the instant matter includes $2,000.00 to the Office of the General Counsel, Navy Research Laboratory, $170,660.00 to the Air Force, Attorney Advisor, $139,200.00 in a Stipulated Settlement with the Air Force and $57,245.70 to the Inspector General of NASA, Lewis Research Center. *See* Transcript from Electrodyne Sentencing at 4–5.

As mentioned, Electrodyne contends some of the loss figures were double counted. *See* Transcript from Electrodyne Sentencing at 6. Additionally, Electrodyne contends a portion of the restitution was being paid in kind rather than in money. *See id.* These arguments are unpersuasive, especially considering Electrodyne stipulated to the $369,105.70 in the Electrodyne Plea Agreement.

■ The amounts stipulated as restitution, and by analogy used to calculate loss, were

---

**62.** The Electrodyne Plea Agreement stated:

2. Pursuant to [U.S.S.G.] § 8B1.1 and 18 U.S.C. §§ 3663–3664, [Electrodyne] agrees to pay at sentencing in full the following restitution to the enumerated agencies:

a) United States Air Force: $170,660. In addition, as restitution to the Air Force, [Electrodyne] agrees to relinquish any claim to any recovery from the Air Force under contract # F08651–93–C–0306;

b) United States Naval Research Laboratory: $2,000;

c) [NASA]: *either 1) $14,595.65 and three* additional functioning converters as described in NASA contracts NAS3–26899 and NAS3–26974 or 2) $42,650.05 and one additional functioning converter as described in NASA contracts NAS3–26899 and NAS3–26974.

Electrodyne Plea Agreement, Schedule A, ¶ 2(a)-(c).

**63.** During the Electrodyne Sentencing, it was observed that if an extensive hearing was held on the amount of loss the figure would be "extraordinarily higher." *See* Transcript from Electrodyne Sentencing at 7. This statement is supported by the fact that not all victims provided loss figures. *See* Electrodyne Presentence Report, ¶ 115. As well, it was stated if the amount of $369,105.70 was "good enough for restitution … it [was] good enough to … [serve as] an analogy as [an] appropriate loss figure." *Id.*

The Individual Defendants indicate if Section 2T3.1 is used as the applicable base offense level an evidentiary hearing on the amount of loss need not be held. *See* Lander Objection at 45 n. 6. Besides contending the applicable loss attributable to Nathan and Lander, respectively, is $229,905.70 and $7,200 the Individual Defendants did not offer any other evidence concerning loss.

and are appropriately included in any sentencing determination.[64] There is no question the Air Force suffered a loss of at least $170,660; Electrodyne stipulated it would pay $170,660 to the Air Force. *See* Electrodyne Plea Agreement, Schedule A, ¶ 2(a). In part, this amount reflects a payment of $89,-240 by the Air Force to Electrodyne for Phase Shifters which were never delivered.[65] *See* Electrodyne Presentence Investigation Report, ¶ 111. Also, the Air Force stated an outlay of an additional $14,420 was necessary for re-procurement costs in connection with the Phase Shifters. *See id.*

**64.** Typically, before ordering restitution the following factual issues are to be considered: 1) the amount of loss, 2) the ability of the defendant to pay and the financial need to the defendant and any dependents, and 3) the relationship between the restitution award and the loss caused by the conduct of the defendant. *See United States v. Copple,* 74 F.3d 479, 481 (3d Cir.1996) (citing *United States v. Copple,* 24 F.3d 535, 549 (3d Cir.), *cert. denied,* 513 U.S. 989, 115 S.Ct. 488, 130 L.Ed.2d 400 (1994)). These requirements serve as procedural safeguards. In the instant matter, the Electrodyne Plea Agreement stipulated restitution in the amount of $369,105.70 . was appropriate. *See* Electrodyne Plea Agreement, ¶ 2. Because Electrodyne agreed to this amount, this figure should accordingly serve as an appropriate and conservative analogy basis for the loss caused by the conduct of Electrodyne.

**65.** Electrodyne argued it performed the Phase Shifter Contract with the Air Force by delivering twenty-three of the twenty-eight Phase Shifters ordered. *See* Electrodyne Presentence Investigation Report at 48. Electrodyne contended the Phase Shifters were tested and accepted by the Air Force in conformity with the Phase Shifter Contract. *See id.* Electrodyne was paid $89,240 for the Phase Shifters. *See id.* Electrodyne further argued:

Whether and if the Air Force gave up the [P]hase [S]hifters that it purchased to [C]ustoms or any other branch of the [G]overnment is not of moment in connection with Electrodyne's fulfillment of … [the Phase Shifter C]ontract. No document has ever been provided to Electrodyne from the Air Force, or any other branch of [G]overnment, establishing that the [P]hase [S]hifters were given up by the Air Force to another branch of [G]overnment. Finally, as part of the restitution in the [Electrodyne] Plea Agreement, Electrodyne is compensating the Air Force.

*Id.*

The Government responded these statements could be construed as repudiations of the stipulations in the Electrodyne Plea Agreement. *See* Electrodyne Plea Agreement at 48. The Govern-

Additionally, the loss experienced by the Air Force includes $12,000 [66] to compensate the Air Force for its expenditure in excess of the price of the Pin Diode Switch Contract to procure Pin Diode Switches which were never delivered by Electrodyne. *See* Electrodyne Presentence Investigation Report, ¶ 112. Funds totaling $67,000 associated with finding an alternative source of Pin Diode Switches were also spent by the Air Force for employee time, labor, costs, travel expenses, administrative expenses and copying expenses and are appropriately included in the loss calculation.[67] *See id.,* ¶ 113. Also,

ment further explained five of the Phase Shifters were seized at the boarder by Customs. *See id.* The other twenty-three were seized by the Air Force Office of Special Investigation after Electrodyne delivered them to the Air Force. *See id.* Moreover, the Government contended Electrodyne admitted the Phase Shifters did not comply with the Phase Shifter Contract because the Air Force only wanted items made in America. *See id.* The Government has established by a preponderance of the evidence the $89,240 is appropriately included in the calculation of loss because representative of the loss suffered by the Air Force.

**66.** It appears the Electrodyne Presentence Investigation Report indicates an additional $115,660 was expended by the Air Force in procurement costs and associated administrative expenses relating to the Pin Diode Switch Contract. *See* Electrodyne Presentence Investigation Report, ¶ 112. Electrodyne disputes the additional loss of approximately $115,660 because the replacement contract the Air Force entered into was for less than the Pin Diode Switch Contract. *See id.* The Electrodyne Presentence Investigation Report establishes by a preponderance of the evidence only an additional outlay of $89,000 for recoupment and procurement costs over and above the price of the Pin Diode Switch Contract. *See id.* Accordingly, only the outlay of $89,000 will be included as loss.

**67.** The Defendants dispute the claim of the Air Force that it expended $67,000 in expenses in connection with any of the Contracts. *See* Electrodyne Presentence Investigation Report at 48; Nathan Presentence Investigation Report at 52. The Defendants also contend they should not be attributed with a loss of $240,000 claimed by the Air Force resulting from delays associated with the Pin Diode Contract. *See* Electrodyne Presentence Investigation Report at 48; Nathan Presentence Investigation Report at 52. Probation responded to this objection by observing that this information was provided by the Air Force and that this amount was not included as relevant conduct. *See* Electrodyne Presentence Report at

the Air Force relinquished a claim of approximately $139,200 against Electrodyne for failure to perform "contract # F08651–93–C–0306." *See id.*, ¶ 123.

Electrodyne contended the relinquishment of the $139,200 claim by the Air Force was not appropriately termed restitution but, rather, was a "mutual . . . forgiveness." *See* Transcript from Electrodyne Sentencing at 6. The language of the Electrodyne Plea Agreement clearly indicates the Air Force had agreed to accept something other than cash as restitution for the inability of Electrodyne to perform. *See* Electrodyne Plea Agreement, Schedule A, ¶ 2(a). This relinquishment of the claim for approximately $139,200 compensates the Air Force for a loss which includes items Electrodyne never delivered and the accompanying delays and expenses related to this nonperformance.[68]

Section 3663 does not limit restitution to only cash payments. Restitution, in certain instances, may be paid in property as well. *See* 18 U.S.C. § 3663(b). Moreover, 18 U.S.C. § 3664(f)(3)(a) states: "A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." *See* 18 U.S.C. § 3664(f)(3)(a). In-kind payments are permitted to be in the form of replacement of property as is the case in the instant matter. *See* 18 U.S.C. § 3664(f)(4).

Electrodyne agreed to pay as restitution to NASA a combination of cash and property, specifically converters contracted for in certain NASA agreements with Electrodyne. *See* Electrodyne Plea Agreement, Schedule A, ¶ 2(c). The stipulation was structured so the cash payment due from Electrodyne decreased depending on the number of converters Electrodyne supplied to NASA.[69] *See id.* In total, Electrodyne provided NASA with $55,245.70 when the value of the converters and the cash is considered.[70] Accordingly,

---

49; Nathan Presentence Report at 52. The outlay of $67,000 has been established by a preponderance of the evidence and will be included in the loss figure. The loss of $240,000, however, has not been adequately established and will not be included in the calculation of loss. Accordingly, determinations as to the objection of Electrodyne concerning the $240,000 need not be made because it is not relied upon in sentencing.

The amount of loss sustained by the Air Force has been determined to be $321,860 ($89,240 + $12,000 + $14,420 + $67,000 + 139,200). The stipulated figure of loss to the Air Force, $309,860, however, will be used. The difference between the two figures does not affect the upward adjustment for the amount of loss pursuant to Section 2F1.1(b). *See* Section 2F1.1(b) (stating nine levels is to be added for total loss of more than $350,000 up to and including $500,000).

68. The Government terminated this contract because of the failure of Electrodyne to perform work within the time required. *See* First Electrodyne Sentencing Memorandum at 3. Electrodyne filed a notice of appeal contending this contract was canceled for the convenience of the Government and it was entitled to damages. *See id.* Electrodyne indicated the parties discussed settlement whereby Electrodyne would have the obligation to manufacture and deliver to the Air Force 300 Pin Diode Switches and the Air Force would be obligated to pay $139,200. *See id.* A settlement, however, was never reached. *See id.* Accordingly, the notice of appeal continued and a judgment against the Air Force remained a possibility.

In the Electrodyne Plea Agreement, Electrodyne agreed to forgo this claim as restitution. *See* Electrodyne Plea Agreement, Schedule A, ¶ 2(a). As previously mentioned, the relinquishment of the claim for approximately $139,200 compensates the Air Force for a loss which includes items Electrodyne never delivered and the accompanying delays and expenses related to this nonperformance.

69. Electrodyne had the option to make restitution to NASA as follows:

1) $14,595.65 and three additional functioning converters as described in NASA Contacts NAS 3–26899 and NAS 3–26947 or
2) $42,650.05 and one additional functioning converter as described in NASA Contracts NAS 3–26899 and NAS 3–26947.

Electrodyne Plea Agreement, Schedule A, ¶ 2(c). Electrodyne agreed to make restitution to NASA pursuant to option one. *See* First Electrodyne Plea Agreement at 4.

70. Electrodyne made the requisite cash payment, supplied one additional converter to NASA and NASA sent two converters to Electrodyne for repair. *See* First Electrodyne Sentencing Memorandum at 4–5. Electrodyne contends the repair to these two converters had a market value or an actual cost value of less than $2,000. *See id.* at 5. Electrodyne argues because NASA accepted the repair of these units, the loss suffered by NASA is the value of the repairs. *See id.*

Probation, however, calculated the loss as equaling the value of four converters. *See id.*

the total value of the converters provided to NASA in addition to the cash payment is appropriately considered in calculating the amount of loss.[71]

The Individual Defendants by abusing their positions of authority, aided in, if not caused, the full extent of the fraud perpetuated against the Government causing such losses. The conspiracy against the Government was effectuated through and by the Individual Defendants. Electrodyne, a corporation, can only act through its employees. Here, the fraud perpetrated against the Government was channeled by the Individual Defendants through Electrodyne. Accordingly, the total loss figure of $369,105.70 is an appropriate and reasonable estimate warranting the inclusion of the nine-level adjustment pursuant to Section 2F1.1(b)(1)(M) as to the Individual Defendants and Electrodyne.

### 4. *More Than Minimal Planning*

 Probation states a two-level adjustment is applicable under Section 2F1.1(b)(2)(A) for more than minimal planning.[72] *See* Lander Presentence Investigation Report, ¶ 151; Nathan Presentence Investigation Report, ¶ 144. "More than minimal planning" is defined in Application Note One, (f), to Section 1B1.1, which provides, in pertinent part: [73]

"More than minimal planning" means more planning than is typical for the commission of the offense in simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which [U.S.S.G.] § 3C1.1 (Obstructing or Impeding the Administration of Justice) applies. "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

*Id.*

 In the instant case, Nathan knowingly and fraudulently entered into the Contracts with various branches of the United States Government claiming the contracted for military parts would be manufactured in the United States. Nathan and Lander were both aware Russian and Ukrainian parts would be used in fulfilling the Contracts with the Government. The Individual Defendants sent plans and specifications concerning defense services to the Foreign Manufacturers without obtaining the necessary export licenses required by ITAR. The Individual Defendants traveled to Russia to visit some of the Foreign Manufacturers.

Nathan and Lander, moreover, intentionally and knowingly requested that the Foreign Manufactures omit country of origin markings. They went as far as to paint over existing country of origin markings so as to make the contracted for items appear as if they had been manufactured in the United

---

71. It is also undisputed the NRL suffered a loss of $2,000. This amount will accordingly be reflected in the calculation of loss.

72. Nathan contends Section 2T3.1 does not include an enhancement for more than minimal planning. *See* Nathan Presentence Investigation Report at 36. Probation observes Nathan is correct, but notes such an enhancement was used for calculations pursuant to Section 2F1.1 which does provide for such an enhancement. *See id.*

73. " '[C]ommentary in the Guidelines Manual that interprets or explains a[G]uideline is authoritative unless it violates the Constitution or a[F]ederal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.' " *United States v. Monaco*, 23 F.3d 793, 796 (3d Cir.1994) (quoting *Stinson*, 508 U.S. at 38, 113 S.Ct. 1913). None of these exceptions apply.

Electrodyne contended "inasmuch as restitution may not be in excess of the amount of loss suffered by the victim ... the loss here is not the total original cost of the units which the [G]overnment is accepting, but rather the cost to repair same, together with the $15,381.24 agreed upon amount." *Id.* (citing *United States v. Harris*, 7 F.3d 1537, 1539 (10th Cir.1993)).

This argument was rejected during the Electrodyne Sentencing and it is rejected now. The loss suffered by the Government and agreed to be compensated by Electrodyne was the equivalent of four converters. Electrodyne agreed to provide Electrodyne with a cash payment and three functioning converters. The appropriate amount for the total cost of these converters, as agreed to by Electrodyne, is included in the loss figure, not just the cost associated with repair. Accordingly, the value of the cash and converters provided, which equals $55,245.70, will be included in the loss figure.

States. These requests made of the Foreign Manufactures establish the Individual Defendants had contemplated and determined how they would incorporate foreign built parts into items which were to be made with American parts and labor. Also, the directions the Individual Defendants gave to the Electrodyne employees to paint over foreign markings and to affix Electrodyne labels further evidences their thought out plan to hide any indication of foreign manufacture. This scheme required more than minimal planning. Accordingly, the two-level adjustment is appropriate.

### 5. *Aggravating Role* [74]

■ Nathan objects to the four-level upward adjustment recommended by Probation pursuant to Section 3B1.1(a). *See* Nathan Objection at 12. Section 3B1.1 provides adjustments to the offense level of a defendant based upon the role the defendant played in committing the offense. The applicability of this Guideline enhancement is based upon all relevant conduct and not solely upon the elements and acts cited in the counts of conviction. *See* Introductory Commentary to Section 3B1.1.

Section 3B1.1 sets forth the appropriate upward adjustments for individuals who play an aggravating role in the offense:

Based on the defendant's role in the offense, increase the offense level as follows:
(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by [four] levels.
(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by [three] levels.
(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by [two] levels.

*Id.*

■ Nathan first argues the Nathan Plea Agreement stated no other Chapter Three adjustments applied except for a re-

duction for acceptance of responsibility. *See* Nathan Objection at 12 (citing Nathan Plea Agreement, Schedule A). Nathan concedes the stipulations he entered into with the Government are not binding on the court, but argues these stipulations should be accepted because they were the product of "extensive plea negotiations." *See id.* As indicated, the stipulations in the Nathan Plea Agreement are not binding and do not constrain the instant determination of an appropriate sentence.

Second, Nathan contends his criminal activity did not involve five or more participants. *See* Nathan Objection at 12. Application Note One of the Commentary to Section 3B1.1 ("Application Note One to Section 3B1.1") defines "participants" as persons who are criminally responsible for the commission of the offense, but need not have been convicted. *See* Application Note One to Section 3B1.1. Nathan argues "[v]iewed in its worst light, [his] criminal activity ... involved primarily two ... participants—himself and his co-defendant Lander." Nathan Objection at 12.

Probation argues Nathan "instructed Electrodyne's employees not to disclose to anyone, outside of the company, that components were manufactured overseas and instructed employees to cover any markings indicating the country of origin." Nathan Presentence Investigation Report, ¶ 133. Additionally, in support of the four-level enhancement Probation points out that Nathan received a larger share of the proceeds from the illegal activity because of his supervisory role. *See id.*

Nathan attacks the statements of Probation by arguing that nowhere does Probation assert Electrodyne employees, other than Lander, were aware of the criminal activity and participated in this activity with the requisite mental state to render them "criminally responsible." *See* Nathan Objection at 12. Nathan also argues Probation fails to specify the actual number of Electrodyne employees who were criminally responsible. *See id.* at 12–13.

■ The court in *Phillips* explained:

---

74. Probation did not suggest an upward adjust- ment for role in the offense as to Lander.

Clearly, Section 3B1.1 is intended to apply to criminal activity engaged in by more than one participant. Moreover, because Section 3B1.1 does not apply when a defendant engages in criminal activity that is executed without the aid of others, for Section 3B1.1 to apply, "the defendant must have exercised some degree of control over others involved in the commission of the offense."

*Id.* at 1191 (quoting *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir.1990)); *see also United States v. Fuentes*, 954 F.2d 151, 154 (3d Cir.1992) (holding that under Section 3B1.1 "a defendant's offense level may not be increased ... in the absence of evidence that he or she managed or supervised someone else."), *cert. denied*, 504 U.S. 977, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992). Therefore, Section 3B1.1 applies to instances where an individual is a leader or organizer of individuals who participate together in committing one or more criminal acts.

■■ "[T]he adjustments authorized for role in the offense are directed to the relative culpability of participants in group conduct." *United States v. Belletiere*, 971 F.2d 961, 969 (3d Cir.1992) (quoting *United States v. Bierley*, 922 F.2d 1061, 1065 (3d Cir.1990)). The participants need not each be criminally culpable of the charged offense, but must be criminally culpable of "the underlying activities ... that directly brought about the more limited sphere of the elements of the specific charged offense." *Id.* (quoting *United States v. Inigo*, 925 F.2d 641, 659 (3d Cir.1991)) (quoting *United States v. Manthei*, 913 F.2d 1130, 1136 (5th Cir.1990)). In other words, the participants do "not have to be guilty [of the charged offense] in connection with [the defendant's] scheme so long as their own criminal conduct made it possible." *Id.* It appears it has not been established by a preponderance of the evidence that Nathan

supervised five or more participants who were criminally culpable in the instant case.

■■ A four-level enhancement pursuant to Section 3B1.1(a), however, is also appropriate if the criminal enterprise was "otherwise extensive." *See* Section 3B1.1(a). In assessing whether an organization is "otherwise extensive," every person involved during the course of the offense is to be considered. *See Belletiere*, 971 F.2d at 969. Accordingly, a fraud involving only three participants but using the unknowing services of many outsiders can be considered extensive.[75] *See id.* (quoting Commentary, Application Note Three to Section 3B1.1). Also, the background commentary to Section 3B1.1 states: "This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense." Background to Section 3B1.1.

In committing the fraud, viewed in the light most favorable to Electrodyne employees, the Individual Defendants used the unknowing assistance of Electrodyne employees. At the direction of the Individual Defendants, these employees painted over and relabeled products manufactured in Russia and Ukraine so the foreign manufactured products appeared to have been manufactured in the United States. This fraudulent scheme orchestrated by Nathan involved Electrodyne employees who may not necessarily have participated in the illegal activities with the requisite intent.

The Electrodyne Presentence Report indicates Electrodyne employed approximately fifty employees.[76] *See* Electrodyne Presentence Report, ¶ 134. The Nathan Presentence Investigation Report states Electrodyne employed at least sixty-three people at

---

**75.** Nathan relies upon the wording of Application Note Three to Section 3B1.1 that "all persons involved during the course of the entire offense are to be considered. Thus a fraud that involved only three participants, but used the unknowing services of any, *could* be considered extensive." Nathan Objection at 13 (quoting Application Note Three to Section 3B1.1) (emphasis added by Nathan). Nathan contends the operative word of Application Note Three to Section

3B1.1 is "could" and does not require an enhancement be imposed if this example is applicable. *See id.* Nathan does not contest that such an enhancement is within the discretion of the sentencing court if the requirements of Section 3B1.1 are met.

**76.** *See* pp. 275–77 *infra* regarding the calculation of the number of Electrodyne employees.

the time a search warrant was issued in the instant matter. *See* Nathan Presentence Investigation Report at 34. During the Nathan Plea Hearing, Nathan admitted Electrodyne employees imported a number of the Broad Band Amplifiers without markings indicating their country of origin. *See* Transcript from Nathan Plea Hearing at 19. Nathan also directed these employees not to disclose the use of foreign components to anyone outside of Electrodyne. *See* Nathan Presentence Investigation Report at 34. Nathan also admitted Electrodyne employees acting at his direction and with his knowledge and approval painted the Broad Band Amplifiers to obscure markings indicating their foreign manufacture and affixed stickers indicating Electrodyne had made them in the United States. *See id.*

**77.** The Guideline calculations for Nathan previously set forth using Section 2F1.1 as the base offense level take this four-level adjustment into account. *See supra* at p. 223. Likewise, the Guideline calculations for Nathan using Section 2T3.3 as the base offense level implement this four-level increase.

**78.** In *United States v. Wong*, 3 F.3d 667 (3d Cir.1993), the Circuit addressed the issue of double counting under the Guidelines. The defendant in *Wong* challenged the simultaneous imposition of upward adjustments for more than minimal planning under Section 2B1.1(b)(5) and for acting as an organizer or leader of a criminal enterprise under Section 3B1.1(c). *See id.* at 670. The court explained that "because the Guidelines are explicit when two … Guideline sections may not be applied at the same time, the principle of statutory construction, '*expressio unius est exclusio alterius*,' [the expression of one thing is exclusion of another], applies." *Id.* at 670-71. The *Wong* court concluded that "an adjustment that clearly applies to the conduct of an offense must be imposed unless the Guidelines exclude its applicability." *Id.* at 671.

This reasoning was similarly applied in *United States v. Maurello*, 76 F.3d 1304 (3d Cir.1996). The court in *Maurello* held that "[n]othing in the Guidelines indicates that Section 3B1.3 and [Section] 2F1.1(b)(3)(B) may not be applied in tandem." *Id.* at 1315. The court explicitly rejected the double counting argument proffered by the defendant. *See id.* The court stated that even in the absence of governing legal precedent, [it] would reject defendant's argument on purely logical grounds. Contrary to his assertions, the enhancements under [Section] 2F1.1(b)(3)(B) and [Section] 3B1.3 do not "dr[a]w from the same well." *Id.* (quoting *United States v. Kopshever*, 6 F.3d 1218, 1224 (7th Cir.1993)). The court reasoned that "even if there is some overlap in the

Although the specific number of employees was not specifically mentioned, it is clear from the total number of employees working at Electrodyne in combination with the admissions of Nathan during his plea hearing, a number of employees beside the Individual Defendants participated, innocently or otherwise, in this fraudulent scheme.[77] The instant scheme orchestrated by Nathan was otherwise extensive and warrants the imposition of a four-level adjustment pursuant to Section 3B1.1(a).[78]

### 6. *Abuse of Position of Trust* [79]

The Guidelines provide for an increase of two levels if a defendant is convicted of abusing a position of "public or private trust." [80] U.S.S.G. § 3B1.3 ("Section

factual basis for two or more sentencing adjustments, so long as there is sufficient factual basis for each they may both be applied." *Id.* (quoting *United States v. Haines*, 32 F.3d 290, 293-93 (7th Cir.1994)).

The *Maurello* court concluded the two applicable Guidelines slightly overlapped but also noted the Guidelines targeted different behavior. *See* 76 F.3d at 1315. The court further concluded "even if the law forbade double counting in the absence of explicit instructions in the [G]uidelines, the simultaneous application of these two enhancement provisions would not constitute double counting." *Id.* at 1315-16.

In the instant matter, there is a sufficient factual basis to impose upward adjustments pursuant to both Sections 3B1.1(a) and 2F1.1(b)(2)(A). Accordingly, because the Guidelines do not prohibit upward adjustments under both sections, such adjustments are appropriate in the instant matter.

**79.** Although not required, the 20 February 1998 Letter advised the Individual Defendants a two-level adjustment pursuant Section 3B1.3 was being considered based upon each of the Individual Defendants abusing a position of trust. *See* 20 February 1998 Letter at 2.

**80.** An enhancement pursuant to Section 3B1.3 is inapplicable if abuse of trust was "included in the base offense level or specific offense characteristic." Section 3B1.3. In *United States v. Broderson*, 67 F.3d 452 (2d Cir.1995), the court stated: "The conduct that is the basis of the conviction must be independently criminal … and not itself the abuse of trust." *Id.* at 456.

In *Broderson*, the defendant, a high level employee at Grumman Data Systems Corporation ("Grumman"), negotiated a contract for the pur-

3B1.3").[81] In order for the two-level enhancement to be applied, a defendant must be found (1) to have been in a position of trust, and (2) to have abused the position of trust in a manner that significantly facilitated the crime. *See United States v. Sokolow*, 91 F.3d 396, 412 (3d Cir.1996) (quoting *United States v. Craddock*, 993 F.2d 338, 340 (3d Cir.1993)); *United States v. Boggi*, 74 F.3d 470, 478 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 82, 136 L.Ed.2d 40 (1996); *United States v. Coyle*, 63 F.3d 1239, 1250 (3d Cir. 1995); *United States v. Blackwell*, 954 F.Supp. 944, 976 (D.N.J.1997). Application Note One to Section 3B1.3 provides:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the

commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

*Id.*

■ In determining whether a position constitutes a position of trust for the purposes of Section 3B1.3, a court must consider:

> (1) whether the position allows the defendant to commit a difficult to detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.

chase of computer related products with NASA on behalf of Grumman. *See* 67 F.3d at 454. The Truth in Negotiations Act ("TINA"), 10 U.S.C. § 2306a, and TINA's implementing regulations found in the Federal Acquisition Regulations ("FAR"), 48 C.F.R. §§ 15.801–15.804, governed the contract negotiations. *See id.* FAR and TINA required the defendant to reveal and update all " 'cost or pricing data' " until NASA and Grumman reached an agreement. *See id.* (citing 10 U.S.C. § 2306a; 48 C.F.R. § 15.801). The contract set forth Grumman was to purchase certain computer items and lease them to NASA. *See id.*

The defendant originally arranged the purchase to be financed by a third-party at an interest rate of 13.77 percent. *See Broderson*, 67 F.3d at 455. The interest rate was subsequently reduced to 10.5 percent, but the defendant failed to inform NASA of this reduction. *See id.* Thereafter, the defendant signed and caused to be submitted two Certificates of Current Cost or Pricing Data (the "Certificates") to NASA. *See id.* The Certificates falsely stated as far as the defendant was concerned the cost or pricing data were accurate, current and complete. *See id.* NASA was never informed of the reduction in the interest rate on the loan to Grumman. *See id.*

The defendant was subsequently convicted, *inter alia*, of making false statements to the United States, in violation of Sections 1001 and 1002, for the fraudulent and defective pricing scheme

associated with the NASA contract. *See Broderson*, 67 F.3d at 455. The district court enhanced the sentence of the defendant by two points for abuse of trust. *See id.* at 455. The appellate court reversed this determination and concluded the fraudulent conduct of the defendant was signing the Certificates attesting to compliance by Grumman with FAR and TINA. *See id.* at 456. Accordingly, the court held, *inter alia*, any abuse of trust had been "included in the base offense [level]," Section 2F1.1(a), which had been used in sentencing. *See id.*

Accordingly, an enhancement for an abuse of trust pursuant to Section 3B1.1 will be implemented only if Section 2T3.1 is used as the base offense level in the instant matter.

81. Section 3B1.3 provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by [two] levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under [Section] 3B1.1 (Aggravating Role) ....

*Id.*

*Sokolow,* 91 F.3d at 413 (citing *United States v. Pardo,* 25 F.3d 1187, 1192 (3d Cir.1994)); *Blackwell,* 954 F.Supp. at 975. These factors are to be considered in light of the governing rationale of Section 3B1.3—"to punish 'insiders' who abuse their positions rather than those who take advantage of an available opportunity." *Pardo,* 25 F.3d at 1192.

The Circuit has recognized " 'the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.' " *United States v. Lieberman,* 971 F.2d 989, 993 (3d Cir.1992) (quoting *United States v. Hill,* 915 F.2d 502, 506 (9th Cir. 1990)); *see Pardo,* 25 F.3d at 1191 (quoting same); *United States v. Craddock,* 993 F.2d 338, 341 (3d Cir.1993) (quoting same); *United States v. Brann,* 990 F.2d 98, 103 (3d Cir.1993) (quoting same). Also relevant in finding a position of trust "is the authority given to defendant by the position which provides the wherewithal to commit the wrongful act." *Pardo,* 25 F.3d at 1192 (citation omitted).

Nathan argues an enhancement for abuse of trust is unwarranted.[82] *See* 20 March 1998 Letter at 8. Nathan contends the presence of a Government quality representative, Mr. John Roone, who was permanently assigned to monitor Electrodyne's compliance with the Contracts, negates the existence of any position of trust held by him. *See id.* Nathan also argues that

> although a defense contractor has been held to have abused a position of trust vis-a-vis the [G]overnment where he was permitted to 'self-certify' his compliance with applicable [G]overnment regulations, and where no [G]overnment inspector double-checked this certification, *see United States v. Glymph,* 96 F.3d 722, 727–28 (4th Cir.1996), a[G]overnment contractor does not abuse a position of trust *per se* simply because he fails to comply with the terms of a[G]overnment contract, or an applicable regulation. *See United States v. Broderson,* 67 F.3d 452, 455–56 (2d Cir.1995)

(no abuse of trust where defendant violated TINA and its implementing regulations, which governed negotiations for NASA computer contract).

20 March 1998 Letter at 8.

The position held by Nathan enabled him to commit "difficult to detect" crimes. Nathan, as President of Electrodyne, used his authority to enter into the Contracts with the Government and its agencies knowing that he would not be providing what he had promised. His position allowed him to breach the Contracts without interference from superiors. The Broad Band Amplifier Contract specifically contained a Buy American clause. The Diplexer Contract, Tone Modulator Contract, Phase Shifter Contract and Pin Diode Contract, in addition to containing Buy American clauses, involved defense articles or services covered by ITAR and required special licenses in order to export the technology involved in production of the contracted for items.

The Government and its agencies contracted with Electrodyne in reliance that its officers, including Nathan, would faithfully comply with the terms and conditions of the Contracts. The Government and its agencies, relying upon the integrity of Nathan, revealed military information to Nathan which Lander, with the full knowledge and approval of Nathan, shared with the Foreign Manufacturers in Russia and Ukraine. Additionally, the Buy American clauses were included in the Contracts to ensure American businesses would profit from these Contracts. The position of authority held by Nathan at Electrodyne permitted him to ignore the Buy American clauses and, instead, look to cheaper suppliers in Russia and Ukraine for the items.

The abuse of a position of trust held by Nathan through his disclosure of technology and specifications as to military items utilized in combat could have greatly compromised the safety of members of the United States

---

**82.** The enhancement for abuse of a position of trust is applicable only to Nathan; such enhancement is not applicable as to Lander.

military.[83] In order to have qualified to receive such critical technical data, Nathan, acting as Vice–President of Electrodyne, submitted an agreement in compliance with DOD directives wherein Nathan certified:

1) acknowledgment of all responsibilities under applicable United States export control laws and regulations; 2) his agreement not to disseminate military critical technical data in a manner that would violate applicable United States export control laws and regulations; 3) he would not provide access to military critical data to persons other than [Electrodyne's] employees, or persons acting on its behalf, unless such access is permitted by the United States DOD; 4) no person employed by [Electrodyne], or acting on its behalf, who will have access to military critical technical data, is debarred, suspended, or otherwise ineligible to perform on United States contracts or has violated United States export control laws or has had a certification revoked by the DOD; and is not debarred, suspended, or otherwise ineligible to perform on United States Government contracts; and has not violated United States export control laws, and has not had a certification revoked.

Nathan Presentence Investigation Report, ¶ 25.

The abuse of trust by Nathan is evidenced by the use of his position to evade and disregard restrictions on sharing information concerning certain defense articles and providing defense services as defined by ITAR in connection with the Contracts.

First, the abuse of trust by Lander is demonstrated by his breach of the Diplexer Contract. As indicated, the Diplexer, a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b), is an important component part of the System [84] which permits Navy ships to communicate quickly and efficiently with armed services during a military engagement. *See* Nathan Presentence Investigation Report, ¶¶ 45–46. Without obtaining the requisite approval, Nathan, through Lander, shared the Diplexer Plans with the Russian Institute. *See* Nathan Presentence Investigation Report, ¶¶ 44–52. This constituted the providing of a defense service pursuant to ITAR, Section 120.9. *See id.,* ¶ 51.

The failure of Nathan to obtain the approval of the Government before sharing the Diplexer Plans clearly evidences his abuse of trust. He had been trusted with the Diplexer Plans which provide for the construction of an integral part of a communications systems which must be functional during military engagement. At the time Nathan shared the Diplexer Plans with the Russian Institute, business opportunities with Russia and Ukraine were still suspect and not automatically encouraged. A case-by-case analysis is now done to determine if such involvement is beneficial. Moreover, to ensure defense services are not provided to suspect countries or individuals, the Government engages in this analysis before defense services are provided.

Second, also evidencing the abuse of trust is the disregard of Nathan of the Tone Modulator Contract. As mentioned, Tone Modulators are a component part of the APG–63 fire control radar installed in the F–15 supersonic fighter aircraft. *See* Nathan Presentence Investigation Report, ¶ 54. Among other things, the APG–63 fire control radar is used to control the firing of the aircraft's AIM–7 air-to-air missiles. *See id.* The Tone Modulator is a component of the transmitter assembly. *See id.* It also provides the means by which real and false targets are distinguished and discriminated by the radar processor on board the plane. *See id.* Construction of the Tone Modulator requires careful component specification and vendor selection. *See id.*

A critical part of the Tone Modulator is the Isolator. *See* Nathan Presentence Investiga-

---

**83.** It is difficult to understand how the office of the United States Attorney in this District could stipulate the security of the United States was not compromised, or may not in the future be compromised, in any way by Nathan's disclosures, as discussed in this opinion. *See* Government Sen-

tencing Memorandum at 4 n. 6. This is surprising considering Nathan's disclosures included specifications concerning items used in combat such as communications, weapons and radar systems.

**84.** The System is defined *supra* pp. 232–33.

tion Report, ¶ 55. The Isolator is a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b). *See id.*, ¶ 56. Proper specification of the parameters of an Isolator is paramount to optimum performance and necessary to avoid premature failure of the Isolator or the Tone Modulator. *See id.*, ¶ 55. Lander, on behalf of Electrodyne and with the full knowledge of Nathan, shared information concerning the engineering, manufacture, production and design of the Isolators. *See id.*, ¶ 58. This constituted the providing of a defense service pursuant to ITAR, Section 120.9. *See id.*, ¶ 63.

By awarding the Tone Modulator Contract to Electrodyne, the Government was relying upon compliance by Nathan with the stated terms of the Tone Modulator Contract and his understanding of the importance of vendor selection. Nathan ignored this reliance by contracting with Enterprise Phasa to manufacture the Isolators, an important electronic component utilized in the Tone Modulator assemblies. *See id.*, ¶ 55.

Third, the breach of the Switchable Amplifier Contract also demonstrates abuse of trust by Nathan. As previously explained, the Switchable Amplifier is a component part of the MK–92 fire control system used on Navy warships and is a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b). *See* Nathan Presentence Investigation Report, ¶¶ 66–67. The MK–92 provides small fleet units with a combined stabilized radar search and "Track–While–Scan" capability, plus rapid detection and simultaneous engagements of fast, low-flying air targets, naval surface craft and shore targets. *See id.*, ¶ 66. The MK–92 fire control system is also used to control the firing of missiles and guns on a ship. *See id.* The sending of a facsimile transmission of the specifications for the Switchable Amplifier to Istok Research constituted the providing of defense services in contravention of ITAR, Section 120.9. *See id.*, ¶ 70.

Fourth, an abuse of trust is established by the breach of the Phase Shifter Contract. As mentioned, the Phase Shifter, a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b), is a component part of the RFS. *See* Nathan Presentence Investigation Report, ¶¶ 73–74. The RFS provides a RF environment for the evaluation of active and passive radar guided weapon systems and is used to extensively provide simulation support the AMRAAM. *See id.*, ¶ 73. Instruction as to how to construct the Phase Shifters was provided by Electrodyne to Enterprise Phasa employees which constituted the providing of defense services in contravention of ITAR, Section 120.9. *See id.*, ¶ 77. Similarly, this was an abuse of trust.

Fifth, additional support for an abuse of trust as to Nathan is found in the breach of the Pin Diode Switch Contract. The Pin Diode Switch, a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b), is also a component part of the RFS. *See* Nathan Presentence Investigation Report, ¶ 81. Lander, on behalf of Electrodyne and Nathan, sent a facsimile transmission of the specifications for the Pin Diode Switch to Istok Research which constituted the providing of defense services in contravention of ITAR, Section 120.9. *See id.*, ¶¶ 83–84. This further exemplifies the clear abuse of information selectively provided by the Government to Nathan because Nathan was trusted.

Additionally, the position of authority held by Nathan allowed him to instruct Electrodyne employees to paint over the goods imported from Russia and Ukraine and to mark the items as if they had been manufactured by Electrodyne in the United States in direct violation of the Contracts. In fact, if a confidential informant had not provided information to a special Customs agent these crimes might not have ever been discovered. *See* Presentence Investigation Reports, ¶ 26.

Nathan abused the position of trust he held in order to significantly facilitate his crimes. Nathan took advantage of his positions as an "insider." The mere fact that a Government inspector attempted to monitor compliance by Electrodyne with the Contracts does not negate the existence of a position of trust held by Nathan. Upon receiving the information necessary to build the contracted for items from the Government, Nathan was aware of his obligation not to pass along such information, especially to the Foreign Manufacturers.

Nathan further abused the reliance of the Government upon his integrity by permitting Lander to request the Foreign Manufacturers not mark their products with country of origin markings. As mentioned, Nathan, with the assistance of Lander, also instructed Electrodyne employees to cover over any remaining country of origin markings and to affix Electrodyne labels to indicate the products had been manufactured in the United States. If Nathan did not possess this high level of authority, effectuating such a fraud upon the Government would have been quite difficult. Nathan, however, abused his authority and the trust the Government had placed in him by sharing with the Foreign Manufacturers information not generally shared with foreigners in order to accomplish this illegal scheme.

As previously indicated, Nathan would have never been privy to the data concerning American military items if the Government had not trusted him and deemed him worthy of possessing such information. Moreover, Nathan further violated the position of trust he held by orchestrating a deceptive scheme to cover up his illegal activities. Accordingly, a two-level enhancement for Nathan, pursuant to Section 3B1.3, is appropriate.[85]

The reliance of Nathan upon *Broderson* is unconvincing. Moreover, the instant case is factually distinguishable from *Broderson*. In *Broderson*, it appears the abuse of trust adjustment solely resulted from the failure of the defendant to comply with certain provisions contained in Government contracts. In contrast, in the instant case, not only did Nathan fail to comply with terms set forth in the Contracts, but, in order to facilitate his crimes, he also revealed information shared with him by the Government to Foreign Manufacturers who were not authorized to be privy to such information.

While Nathan was in the possession of the plans and specifications for the military items to be produced for the United States and its agencies, he was trusted with data not generally known. He was trusted with such data because the Government relied upon his integrity. There were procedures controlling who had access to such data. The Government chose to contract with Nathan and share these data for limited purposes only and with accompanying restrictions as to those entitled to receive them. For these reasons, it has been determined Nathan was in a position of trust as to the Government and its agencies. Accordingly, based upon authority in this Circuit, an enhancement pursuant to Section 3B1.3 is warranted as to Nathan.

### B. *Upward Departure*

Probation observes that if Section 2T3.1 is used as the applicable base offense level, as was stipulated between the Individual Defendants and the Government, the following calculations apply:

Guideline Calculations for Nathan

| | |
|---|---|
| Base Offense Level: | 4 |

The Guideline for a violation of Section 545 is found in Section 2T3.1(a)(3) and calls for a base offense level of [four].

| | |
|---|---|
| Specific Offense Characteristics: | 2 |

Sophisticated means were used to impede discovery of the offense. Pursuant to Section 2T3.1(b)(1), two levels are added.

| | |
|---|---|
| Victim Related Adjustments: None | 0 |
| Adjustments for Role in the Offense: | 4 |

Nathan owned and operated Electrodyne. He hired Lander as Electrodyne's Director of Marketing. In his capacity as President and/or Vice–President, Nathan negotiated the terms and conditions of each contract. Furthermore, he instructed Electrodyne's employees not to disclose to anyone, outside the company, that components were manufactured overseas and instructed employees to cover any markings indicating the country of origin. Additionally, as Presi-

---

**85.** The Guideline calculations set forth by Probation for Nathan using Section 2T3.3 as the base offense level omit this two-level increase. There-fore, when the two-level upward adjustment is included, the total offense level is ten for Nathan.

dent of Electrodyne, Nathan stood to gain a larger share of the proceeds of the illegal activity. Pursuant to [Section] 3B1.1(a), four levels are added.

| | |
|---|---:|
| Adjustment for Obstruction of Justice: None | 0 |
| Adjusted Offense Level (Subtotal): | <u>10</u> |
| Adjustment for Acceptance of Responsibility: | 2 |
| Pursuant to U.S.S.G. § 3E1.1(a), the offense is reduced two levels. | |
| Additional Adjustment for Acceptance of Responsibility: None | 0 |
| Total Offense Level: | 8 |
| Chapter Four Enhancements: None | 0 |
| Total Offense Level: | <u>8</u> |

*See* Nathan Presentence Investigation Report, ¶¶ 129–140.[86]

Guideline Calculations for Lander

| | |
|---|---:|
| Base Offense Level: | 4 |
| The Guideline for a violation of Section 542 is found in Section 2T3.1(a)(3) and calls for a base offense level of 4. | |
| Specific Offense Characteristics: | 2 |
| Sophisticated means were used to impede discovery of the offense. Pursuant to Section 2T3.1(b)(1), two levels are added. | |
| Victim Related Adjustments: None | 0 |
| Adjustments for Role in the Offense: None | 0 |
| Adjustment for Obstruction of Justice: None | 0 |
| Adjusted Offense Level (Subtotal): | <u>6</u> |
| Adjustment for Acceptance of Responsibility: | 2 |
| Pursuant to U.S.S.G. § 3E1.1(a), the offense is reduced two levels. | |
| Additional Adjustment for Acceptance of Responsibility: None | 0 |
| Total Offense Level: | 4 |
| Chapter Four Enhancements: None | 0 |
| Total Offense Level: | <u>4</u> [87] |

*See* Lander Presentence Investigation Report, ¶¶ 137–147.

■ Assuming for the purposes of this section of this opinion, the factual bases agreed to and admitted by the Individual Defendants at their plea hearings were insufficient to constitute Section 1B1.2 provisos stipulating to a more serious offense, an upward departure is appropriate based upon the seriousness of the offenses, including the dismissed counts, committed by Nathan and Lander. *See* Lander Objection at 42.

Section 5K2.0 states:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable [G]uideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the [G]uidelines that should result in a sentence different from that described." Circumstances that may warrant departure from the [G]uidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the courts. Nonetheless, this subpart seeks to aid the

---

86. As indicated, these calculations omit the two-level upward adjustment pursuant to Section 3B1.3 for abuse of a position of trust. Therefore, once these two points are included the total offense level is ten. With a Criminal History Category of One, the Guideline imprisonment range for Nathan is six to twelve months. The fine range is $2,000 to $20,000. *See* Section 5E1.2(c)(3).

87. With a Criminal History Category of One, the Guideline imprisonment range for Lander is zero to six months. The fine range is $250 to $5,000. *See* Section 5E1.2(3)(c)(3).

court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the [G]uidelines. Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the [G]uidelines, under some circumstances, in the discretion of the sentencing court. Similarly, the court may depart from the [G]uidelines, even though the reason for departure is taken into consideration in the [G]uidelines (*e.g.*, as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the [G]uideline level attached to that factor is inadequate.

*Id.*

Probation states an upward departure pursuant to Application Note Two to Section 2T3.1 ("Application Note Two") is appropriate if Section 2T3.1 is used as the base offense level.[88] *See* Lander Presentence Investigation Report, ¶ 206. Application Note Two states:

Particular attention should be given to those items for which entry is prohibited, limited, or restricted. Especially when such items are harmful or protective quotas are in effect, *the duties evaded on such items may not adequately reflect the harm to society or protected industries resulting from their importation. In such instances, an upward departure may be warranted.* A sentence based upon an alternative measure of "duty" evaded, such as the increase in market value due to importation, or [twenty-five] percent of the items' fair market value in the United States if the increase in market value due to impor-

tation is not readily ascertainable, might be considered.

*Id.* (emphasis added).

Probation contends the duties evaded by the Individual Defendants do not adequately measure the harm:

The Buy American Act protects stateside companies. By contracting with foreign companies to build U.S. Components, Electrodyne prevented its competitors (American Companies and American employees) from obtaining contracts, instead, they provided unfair competition to other stateside companies who submitted bids based on use of American goods and American labor.

Lander Presentence Investigation Report, ¶ 206.

 In *United States v. Baird,* 109 F.3d 856 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 243, 139 L.Ed.2d 173 (1997), the Circuit considered whether a court may depart from the applicable Guideline range based upon conduct in underlying counts which were dismissed pursuant to a plea agreement. The *Baird* court explained:

The Guidelines afford sentencing courts considerable leeway as to the information they may consider when deciding whether to depart from the Guideline range. Section 1B1.4 specifically states that in determining whether a departure is warranted, "the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4 [ ("Section 1B1.4") ]. Moreover, with respect to conduct underlying dismissed counts, the

---

**88.** The Nathan Presentence Investigation Report does not provide a similar justification for an upward departure. Addendum II (the "Addendum") to the Nathan Presentence Investigation Report, dated and distributed 16 May 1997, notes Probation inadvertently omitted the availability of an upward departure pursuant to Section 5K2.0. *See* Addendum. Without providing adequate explanation, Probation simply states: Should the Court follow the [Nathan P]lea [A]greement and apply [Section] 2T3.1, [Probation] notes that [Section] 2T3.1 does not fully capture the seriousness of [Nathan's] conduct. In structuring an upward departure, the

[G]uideline·calculations provided in the [Nathan Presentence Investigation Report], utilizing [Section] 2F1.1, could be used as a guide when structuring such a departure.
*Id.*
The reasons set forth by Probation for implementing an upward adjustment for Lander if Section 2T3.1 is used will also be deemed to apply to Nathan. This is in addition to those reasons given for an upward adjustment based upon dismissed counts for violations of the AECA, ITAR and the Buy American Act for sharing military data with potential adversaries.

commentary to [Section] 1B1.4, when read in conjunction with the commentary to [Section] 1B1.3, indicates that considering such conduct is appropriate. The commentary to [Section] 1B1.4 declares that "information that does not enter into the determination of the applicable [G]uideline sentencing range may be considered in determining whether and to what extent to depart from the [G]uidelines." [Section] 1B1.4, comment. backg. And, the commentary to [Section] 1B1.3 states that "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable [G]uideline sentencing range." [Section] 1B1.3, comment, backg.

*Id.* at 863 (citation form substituted when necessary). Accordingly, conduct underlying the dismissed counts which is not an element of the offense and which is related to the offense conduct may be considered at sentencing. *See id.* at 863, 865.

Lander argues the Lander Plea Agreement

> fairly reflects [his] role in the offense of conviction, his position in the corporate structure of Electrodyne, the complex nature of the regulatory framework alleged to have been violated, the true severity of the harm caused by [his] actions, as well as the now-changed geopolitical circumstances which gave rise to the government's investigation in the first instance.

Lander Objection at 42.

The duties evaded in the instant matter do not adequately measure the harm. The focus and intent of the conduct underlying the crimes, most of which were dismissed pursuant to the Nathan and Lander Plea Agreements, from their inception, were to criminally and fraudulently deviate from the contract provisions entered into with the United States Government and its various agencies.

The Individual Defendants admitted under oath they intended to deceive the United States into believing the parts they contracted to buy in the Broad Band Amplifier Contract were manufactured in the United States. The motivation of the Individual Defendants was the financial gain of Electrodyne, Nathan and Lander. The smuggling of goods into the United States without markings indicating the country of origin was to further that fraud; the focus of the crimes was not to evade an import duty or tax, although the Individual Defendants knowingly did this as well.

The actions of the Individual Defendant potentially could have compromised, and in the future may compromise, the operational safety of the military and/or the operational readiness and effectiveness of communications, weapons and radar systems. This is especially true considering the Individual Defendants shared data not generally known with Russia and Ukraine concerning components of weapons, communications and radar systems utilized by the American military during combat.

As mentioned, Nathan knowingly and fraudulently entered into the Contracts with various branches of the United States Government claiming the contracted for military parts would be manufactured in the United States. Nathan and Lander were aware Russian and Ukrainian parts would be used in fulfilling the Contracts with the Government. Nathan entered into these Contracts with full knowledge that the contracted for items would actually be made in Russia or Ukraine. In order to facilitate the building of the military components, and contrary to the express terms of the Contracts, Electrodyne and Lander, with the knowledge and approval of Nathan, disclosed to the Foreign Manufacturers the drawings, technology and specifications of United States military components (the Phase Shifter,[89] Isolator,[90]

---

89. As mentioned, the Phase Shifter, a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b), is a component part of the RFS. *See* Presentence Investigation Reports, ¶¶ 73–74. The RFS provides a RF environment for the evaluation of active and passive radar guided weapon systems and is used to extensively

provide simulation support the AMRAAM. *See id.*, ¶ 73.

90. As mentioned, Tone Modulators are a component part of the APG–63 fire control radar installed in the F–15 supersonic fighter aircraft. *See* Presentence Investigation Reports, ¶ 54. Among other things, the APG–63 fire control

Switchable Amplifier,[91] Pin Diode Switch,[92] Diplexer [93] and Broad Band Amplifier [94]). They provided engineering and scientific assistance necessary to build those components. Moreover, Nathan and Lander intentionally and knowingly requested that the Foreign Manufactures omit country of origin markings. They even went as far as to paint over existing country of origin markings so as to make the contracted for items appear as if they had been manufactured in the United States.

The offenses of Nathan and Lander did not stop once the Ukrainian and Russian manufactured items reached the United States boarder. The Individual Defendants continued their fraud against the Government by taking additional affirmative steps to obfuscate any indication the contracted for items had been manufactured outside of the United States.

The deceit the Individual Defendants perpetuated upon the Government and its various agencies was done solely to provide financial gain to the Individual Defendants at the expense of the United States Government and its citizens. This reprehensible conduct exposed, and exposes, American troops to the dangers associated with the compromise of weapons, communications and radar systems used during combat.

As indicated in the 20 February 1998 Letter, the dismissed counts against the Individual Defendants were contemplated as a reason to seek an upward enhancement. *See* 20 February 1998 Letter. The dismissed counts against the Individual Defendants include fraud under Section 1001 and 18 U.S.C. § 1002, *see* Indictment, Count Ten, and violations of the AECA and the Buy American Act. *See* Indictment, Counts Two, Six, Eight, Nine.

■■■ The AECA was enacted in order to control the import and export of defense articles and services. *See United States v. Durrani,* 835 F.2d 410, 421 (2d Cir.1987). Specifically, the AECA was "designed to protect against the national security threat created by the unrestricted flow of military information abroad." *United States v. Posey,* 864 F.2d 1487, 1495 (9th Cir.1989). The purpose of the AECA is set forth in Section 22 U.S.C. § 2778(a)(1) which states:

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense

---

radar is used to control the firing of an aircraft's AIM–7 air-to-air missiles. *See id.* The Tone Modulator is a component of the transmitter assembly. *See id.* It also provides the means by which real and false targets are distinguished and discriminated by the radar processor on board the plane. *See id.* Construction of the Tone Modulator requires careful component specification and vendor selection. *See id.*

A critical part of the Tone Modulator is the Isolator. *See* Presentence Investigation Reports, ¶ 55. The Isolator is a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b). *See id.,* ¶ 56. Proper specification of the parameters of an Isolator is paramount to optimum performance and necessary to avoid premature failed of the Isolator or the Tone Modulator. *See id.,* ¶ 55.

**91.** As previously set forth, the Switchable Amplifier is a component part of the MK–92 fire control system used on Navy warships and is a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b). *See* Presentence Investigation Reports, ¶¶ 66–67. The MK–92 provides small fleet units with a combined stabilized radar search and "Track–While–Scan" capability, plus rapid detection and simultaneous engagements of fast, low-flying air targets, naval surface craft

and shore targets. *See id.,* ¶ 66. The MK–92 fire control system is also used to control the firing of missiles and the guns on a ship. *See id.*

**92.** As indicated, the Pin Diode Switch, a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b), is also a component part of the RFS. *See* Presentence Investigation Reports, ¶ 81.

**93.** As previously indicated, the Diplexer, a defense article within the meaning of ITAR, Sections 120.3 and 121.8(b), is an important component part of the System which permits Navy ships to communicate quickly and efficiently with armed services during a military engagement. *See* Presentence Investigation Reports, ¶¶ 45–46.

**94.** As mentioned, NRL intended to use the Broad Band Amplifiers in conjunction with a high priority Government program which was designing a component for attachment to NASA aircraft for airborne surveillance. *See* Presentence Investigation Reports, ¶ 92. Although the Broad Band Amplifiers were not classified, the data obtained from the unit the Broad Band Amplifiers would have been attached to, is classified. *See id.,* ¶ 97.

articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. *Id.*

 Congress manifested "a clear intent to prevent unlicenced exports of defense articles" in passing the AECA. *See Durrani*, 835 F.2d at 420–21. This need to require licenses for such items stemmed from Congress' desire of "a world which is free from the scourge of war and the dangers and burdens of armaments." *See United States v. Evans*, 667 F.Supp. 974, 982 (S.D.N.Y.1987) (quoting Senate Committee on Foreign Relations, International Security Assistance and AECA, S.Rep.No. 876, 94th Cong., 2d sess. 8 (1976)).

> ITAR specifically states it is unlawful
>
> [t]o export or attempt to export from the United States any defense article or technical data or to furnish any defense service for which a license or written approval is required by this subchapter without first obtaining the required license or written approval from the [ODTC].

22 C.F.R. § 127.1 ("ITAR, Section 127.1").

It has been established by a preponderance of the evidence the Individual Defendants violated the AECA and ITAR, Section 127.1, numerous times. These violations included the export of a defense article or the export of engineering specifications, plans, diagrams and/or drawings constituting the furnishing of defense services to the Foreign Manufacturers in Russia and Ukraine without first obtaining the required licenses. Such violations in connection with the Diplexer Contract, the Tone Modular Contract, the Switchable Amplifier Contract, the Phase Shifter Contract and the Pin Diode Switch Contract have been established by a preponderance of the evidence. Although Russia and Ukraine are no longer on the list of countries prohibited from receiving military

exports,[95] they were prohibited countries at the time the Individual Defendants exported military articles and services to them in violation of the AECA. These actions of the Individual Defendants directly contravene the purpose behind the AECA.

 Additionally, the violations of the Buy American Act by the Individual Defendants warrants an upward departure because this conduct is not adequately considered by the Guidelines. As mentioned, the Buy American Act was enacted to protect American industry and labor. Instead of complying with the Buy American clauses contained in the Contracts, the Individual Defendants contacted Russian and Ukrainian corporations which could manufacture necessary parts at a discount thereby increasing the profits Electrodyne and Nathan would receive.

By using cheaper manufacturers in Russia and Ukraine, the Individual Defendants provided Electrodyne with an unfair competitive edge over other American manufacturers who were complying with the Buy American Act. This unfair advantage and increased financial gain to Electrodyne and the Individual Defendants was at the expense of American companies, American workers, and, more importantly, American Troops.

Section 2T3.1 provides for an enhancement of the offense level based upon the money duties evaded by illegal conduct. *See* Section 2T3.1(a). The money duties evaded by the Individual Defendants do not adequately measure the harm caused in the instant matter. Sentences using Section 2T3.1 as the base offense level do not adequately reflect the damage inflicted by the Individual Defendants through their violations of the Buy American Act.

 Unlike the standard of proof at trial, the standard at sentencing is a pre-

---

**95.** ITAR has been amended such that "it is no longer the policy of the United States to deny licenses, other approvals, exports and imports of defense articles and defense services destined for or originating the Russian Federation," 61 Fed. Reg. 19841 (1996), or Ukraine, 61 Fed.Reg. 41737 (1996). "All requests for approval involving items covered by the ... Munitions List [to Russia and Ukraine] will [now] be reviewed on a case-by-case basis." 61 Fed.Reg. 19841 and 61 Fed.Reg. 41737. Nevertheless, the sensitivity of sharing information concerning the components of weapons, communications and radar systems such as the Diplexer, Tone Modulator, Switchable Amplifier, Phase Shifter, Pin Diode Switch and Broad Band Amplifier, would obviously be the subject of such case-by-case review.

ponderance of the evidence, not "beyond a reasonable doubt." *See United States v. Paulino,* 996 F.2d 1541, 1545 (3d Cir.), *cert. denied,* 510 U.S. 968, 114 S.Ct. 449, 126 L.Ed.2d 382 (1993); *see Baird,* 109 F.3d at 865 n. 8 *United States v. McGlory,* 968 F.2d 309, 347 (3d Cir.1992), *cert. denied,* 507 U.S. 962, 113 S.Ct. 1388, 122 L.Ed.2d 763 (1993); *United States v. Kikumura,* 918 F.2d 1084, 1099 (3d Cir.1990) (reflecting the judgment that a convicted criminal is entitled to less process than a presumptively innocent criminal defendant); *United States v. Ebbole,* 917 F.2d 1495, 1496 (7th Cir.1990); *United States v. McDowell,* 888 F.2d 285, 291 (3d Cir.1989). "[O]nce convicted, a defendant has a liberty interest in the correct application of the [Sentencing] Guidelines within statutory limits, nothing more and nothing less." *United States v. Mobley,* 956 F.2d 450, 455 (3d Cir.1992) (citation omitted).

 When a sentencing court makes an extreme departure from the Sentencing Guidelines, a higher standard of proof, the clear and convincing standard, is applicable to establish facts relevant to sentencing. *See Paulino,* 996 F.2d at 1545 (citing *Kikumura,* 918 F.2d at 1101); *McGlory,* 968 F.2d at 347. In the instant matter, an extreme departure as to the Individual Defendants is not suggested. *See Baird,* 109 F.3d at 865 n. 8 (noting a five-level departure was not extreme enough to require proof by the clear

and convincing standard); *see also Kikumura,* 918 F.2d at 1100 (reasoning the facts underlying a departure of six levels only needs to be proven by a preponderance and that a ten-level increase is "probably" subject to the same standard).

The numerous violations by the Individual Defendants of the AECA, ITAR and the Buy American Act have been established by a preponderance of the evidence.[96] Upon signing the Diplexer Contract, the Tone Modular Contract, the Switchable Amplifier Contract, the Phase Shifter Contract and the Pin Diode Switch Contract, the Individual Defendants knew each Contract involved military articles or services necessitating an export license pursuant to the AECA and ITAR.

The Individual Defendants were experienced in the defense industry and were aware of the requirement of obtaining such licenses. This conduct is closely related to the counts of conviction for importing the articles from the Foreign Manufacturers without country of origin markings in violation of Sections 545 and 542. The violations of custom laws and the AECA and the fraudulent conduct of the Individual Defendants were all part of one large scheme to gain financially at the expense of the United States.

The violations of the AECA, ITAR, the Buy American Act and the fraud orchestrat-

---

**96.** The Individual Defendants argue the clear and convincing standard applies because "the departure being considered by the Court threatens to compel the imposition of a term of actual incarceration, despite the fact that—consistent with the parties' agreement—the [G]overnment has promised to recommend the imposition of a non-custodial sentence." 20 March 1998 Letter at 4.

During the Nathan Plea Hearing the court stated:

Now, do you understand that, as pointed out by your attorney, any stipulations that you may have entered into with the Government although [they] may be binding on the both of you ... [are] not binding upon me?

Transcript from Nathan Plea Hearing at 13; *see id.* at 4 (counsel for Nathan also indicated the stipulations with the Government were not binding upon the court). In response to the above question, Nathan stated "I understand that, sir." *See id.* at 13.

During the Lander Plea Hearing the court stated:

Have you advised [Lander] that any stipulation between [Lander] and the Government does not bind me?

Transcript from Lander Plea Hearing at 3. In response to this question, counsel for Lander stated "[a]bsolutely." *See id.*

Each of the Individual Defendants also indicated no one had promised him a light sentence or any particular sentence. *See* Transcript from Nathan Plea Hearing at 13; Transcript from Lander Plea Hearing at 14.

The recommendations of the Government as to the Individual Defendants are not binding as to the ultimate sentence to be imposed leaving the argument of the Individual Defendants without merit. As previously mentioned, an extreme departure is not contemplated and, accordingly, the preponderance of the evidence standard applies. Even if the clear and convincing standard applies, it has been met in this case.

ed by the Individual Defendants upon the Federal Government are not adequately reflected by using Section 2T3.1. The instant matter warrants a departure from the Guideline range calculated if Section 2T3.1 is used instead of 2F1.1.

It has been established by a preponderance of the evidence,[97] that there is an aggravating circumstance both of a kind and to a degree not taken into consideration by the Sentencing Commission. The conduct of the Individual Defendants went well beyond the usual violation of trade regulations contemplated by 2T3.1. Accordingly, if Section 2T3.1 is the applicable Guideline in the instant matter, an upward departure of nine levels for the Individual Defendants, similar to that imposed under Section 2F1.1 for the amount of loss involved, is warranted because of the serious circumstances involved in the instant offenses. The application Guideline calculations would be as follows:

Calculations for Nathan

| | |
|---|---|
| Base Offense Level (Section 2T3.1(a)(3)) | 4 |
| Sophisticated Means used to Impede Discovery of Offense (Section 2T3.1(b)(1)) | 2 |
| Role in Offense (Section 3B1.1(a)) | 4 |
| -Nathan was the organizer or leader of a criminal activity that was *otherwise extensive* | |
| Abuse of Position of Trust (Section 3B1.3) | 2 |
| Upward Departure | 9 |
| Adjusted Offense Level | 21 |
| Acceptance of Responsibility (Section 3E1.1(a)) | −2 |
| Additional Acceptance of Responsibility (Section 3E1.1(b)) | −1 |
| TOTAL OFFENSE LEVEL | 18 [98] |

Calculations for Lander

| | |
|---|---|
| Base Offense Level (Section 2T3.1(a)(3)) | 4 |
| Sophisticated Means used to Impede Discovery of Offense (Section 2T3.1(b)(1)) | 2 |
| Upward Departure | 9 |
| Adjusted Offense Level | 15 |
| Acceptance of Responsibility (Section 3E1.1(a)) | −2 |
| TOTAL OFFENSE LEVEL | 13 [99] |

## C. *Downward Departure* [100]

97. Moreover, as indicated, if the standard were applicable, it has been established by clear and convincing evidence there is an aggravating circumstance both of a kind and to a degree not taken into consideration by the Sentencing Commission.

98. With a total offense level of eighteen and a Criminal History Category of One, the Guideline imprisonment range for Nathan is 27–33 months. The fine range is $6,000 to $60,000. *See* Section 5E1.2(c)(3). As indicated, Application Note One to Section 1B1.2 limits the sentence that may be imposed to the maximum authorized by the statute under which the defendant is convicted. *See* Application Note One to Section 1B1.2. Nathan was convicted of violating Section 542 which has a maximum statutory sentence of five years. *See* Section 545. Any sentence within the above range is within this five-year limit.

99. Lander is not entitled to the additional adjustment pursuant to Section 3E1.1(b) because his

The Individual Defendants contend Section offense level, before making the adjustment pursuant to Section 3E1.1(a), is not greater than sixteen. *See* Section 3E1.1(b).

With a total offense level of thirteen and a Criminal History Category of One, the Guideline imprisonment range for Lander is twelve to eighteen months. The fine range is $3,000 to $30,-000. *See* Section 5E1.2(c)(3). As indicated, Application Note One to Section 1B1.2 limits the sentence that may be imposed to the maximum authorized by the statute under which the defendant is convicted. *See* Application Note One to Section 1B1.2. Lander was convicted of violating Section 545 which has a maximum statutory sentence of two years. *See* Section 545. Any sentence within the above range is within this two-year limit.

100. The Government contends the parties had been hopeful the Individual Defendants would provide substantial assistance to the Government in the prosecution or investigation of others. *See*

Section 2F1.1 is utilized, the Individual Defendants seek a downward departure to their sentences pursuant to U.S.S.G. § 5K2.0.[101]

### 1. *Unique Circumstances of Offenses*

 The Individual Defendants argue a downward departure is warranted because of the unique circumstances of their offenses. *See* Lander Objection at 47 (citing *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996)); Nathan Objection at 4. The Individual Defendants support this argument by pointing to the changes in the international climate occasioned by the end of the Cold War. *See* Lander Objection at 48; Nathan Objection at 4. Lander argues ITAR has been amended so that "it is no longer the policy of the United States to deny licenses, other approvals, exports and imports of defense articles and defense services, destined for or originating in the Russian Federations." Lander Objection at 49 (quoting 61 Fed.Reg. 19841 (1996)). Lander also argues the President, on 11 March 1997, issued a proclamation similarly exempting actions such as Lander's from the AECA which further supports a downward departure. *See id.* (citing 62 Fed.Reg. 13531 (1997)).

Nathan likewise argues the easing of trade restrictions in combination with promotional encouragement from the United States prompted several American businesses, included Electrodyne, to pursue business opportunities with Russian and Ukrainian defense enterprises. *See* Nathan Objection at 7. The Individual Defendants argue the Sentencing Commission did not adequately take these facts into consideration in formulating

Government Sentencing Memorandum at 5 n. 7. One transaction initially appeared to be an attempt by others to export communications equipment into an embargoed nation. *See id.* The suspected individuals, however, failed to consummate the transaction with the Individual Defendants and the information revealed was deemed insufficient to determine if a criminal transaction had been proposed. *See id.* The Government indicates:

> Nevertheless, throughout their efforts at cooperation ..., the [Individual D]efendants made every effort to assist the [G]overnment and were extremely cooperative. While their cooperation did not bear fruit and therefore no

the Guidelines and, therefore, a downward departure is warranted. *See* Lander Objection at 50.

The Individual Defendants are correct in arguing the facts at issue are of a kind not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. This is why it has been determined an upward departure would be implemented if Section 2T3.1 was used in sentencing the Individual Defendants instead of Section 2F1.1. Accordingly, a downward departure based upon unusual circumstances is denied.

### 2. *Reasons for Downward Departure for Lander*

#### a. *Atypical Offender Characteristics*

 Lander argues his circumstances were atypical making a downward departure appropriate. *See* Lander Objection at 50 (citing *Koon*, 518 U.S. at 109, 116 S.Ct. at 2052, 135 L.Ed.2d 392). Lander argues a downward departure is warranted because of his "struggle against the oppression and persecution of the Soviet Union, induced by his desire to identify and practice his religion." *Id.* at 51. Lander contends his status as a refugee is a factor not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines make this an atypical case. *See id.*

In support of this position for a downward departure, Lander relies upon *United States v. Vue*, 865 F.Supp. 1353, 1359–60 (D.Neb. 1994), where a defendant moved for a downward departure based upon his status as a war-refugee from Laos. *See* Lander Objection at 51. In *Vue*, the court placed great

motion for a downward departure under U.S.S.G. [§ ] 5K1.1 would be appropriate, the [G]overnment believes that the Court could view the attempt at cooperation favorably and take it into consideration when computing the [Individual D]efendants' overall sentence. *Id.*

**101.** When the Individual Defendants contend a downward departure is warranted for similar reasons their arguments will be dealt with in a single discussion. Otherwise, the arguments in support of downward departures proffered by each Individual Defendant will be dealt with separately.

weight on the fact that the defendant came to the United States because he was persecuted in his home country for attempting to spread democratic ideals. *See Vue*, 865 F.Supp. at 1360. The *Vue* court reasoned the defendant was not voluntarily governed by American law "because these men did not voluntarily consent ... to the application of our laws to their lives, but were forced to come to our country because they fought our enemies, then it seems only 'just' that we consider treating them less harshly because they are truly less culpable than the average drug offender." [102] *Id.*

Lander argues the conclusions reached by the *Vue* court are equally applicable to him. *See* Lander Objection at 53. Lander attempts to strengthen this argument by complaining about the complex "labyrinthine [of] import/export regulations" involved in the instant case. *See id.* Additionally, Lander argues he was not involved in the negotiation of the Contracts but only the engineering involved in those Contracts. *See id.*

The argument for a downward departure is far from convincing. It is nonsense to argue because Lander no longer can live in his country of birth he need not be governed by the same laws and to the same extent as those who were born in the United States. This request for a downward departure is denied.

b. *Benefit of the Lander Plea Agreement*

■ Lander further argues a downward departure is appropriate to give effect to the Lander Plea Agreement negotiated between Lander and the Government. *See* Lander Objection at 54. In support of this contention, Lander quotes *United States v. Fernandez*, 877 F.2d 1138, 1145 (2d Cir.1989):

Since [sic] the Sentencing Commission has not yet fully considered plea bargaining as

a factor in sharping the current Guidelines ... it is not startling that a district court presently may depart from a Guideline sentence in order to give effect to a plea bargain if such a departure is warranted. Congress has cautioned that courts should not sanction plea agreements if they will "result in the undue leniency or unwarranted sentencing disparities," (citations omitted), but a district court presented with a plea agreement retains discretion to depart so long as the sentence that results reflects the seriousness of the crime and deters future misconduct, *see* 18 U.S.C. § 3553(a) ....

*Id.* Although a plea bargain may be taken into account in determining the appropriate sentence, a court is not bound by a plea bargain and retains full discretion to determine the sentence.

■ During the Lander Plea Hearing, Lander was told his appropriate sentence could not be determined until the Lander Presentence Investigation Report was prepared and both Lander and the Government had the opportunity to challenge the contents of the facts contained within the Lander Presentence Investigation Report. *See* Transcript from Lander Plea Hearing at 14–15. Lander acknowledged that after it was determined which Guidelines apply, the court "[could] impose a sentence that is ... more ... severe than that called for by the [G]uidelines." *Id.* at 15. Lander also acknowledged he understood if he received a sentence that was more severe than he expected, he would still be bound by his plea and he could not withdraw his plea. *See id.* at 16. [103] Further, Lander stated no one promised him a light sentence or any particular sentence. [104] *See id.* at 16. The sentence imposed fairly represents the offense committed by Lander and a downward departure

---

**102.** The reasoning and rationale of the *Vue* court are rejected.

**103.** Even though not raised by Nathan, a downward departure based upon this argument would similarly be denied. Nathan also acknowledged that after it was determined which Guidelines apply, the court could impose a sentence that is more severe than that called for by the Guidelines. *See id.* at 15. Nathan further acknowledged he understood if he received a sentence

more severe than expected, he would still be bound by his plea and he could not withdraw his plea. *See id.* at 15–16.

**104.** Specifically, Lander was asked the following:

Has anybody told you or promised you that if you pled guilty you would receive a light sentence, or indeed, any particular sentence? Transcript from Lander Plea Hearing at 14. Lander responded, "no, sir." *See id.*

based upon the Lander Plea Agreement is denied.

### 3. *Reasons for Downward Departure for Nathan*

■ Nathan [105] argues a downward departure is warranted pursuant to Section 5K2.0 because of his "extraordinary acceptance of responsibility." *See* Nathan Objection at 9–10. Nathan notes he has divested himself of all interests in and severed all ties to Electrodyne, a company he presided over for ten years.[106] *See id.* at 10 (citing Nathan Presentence Investigation Report, ¶ 177). Nathan further notes he has honored his agreement not to do business with the Government for three years. *See id.* These actions, Nathan indicates, have caused him significant hardship. *See id.*

Notwithstanding this hardship, Nathan argues he has endeavored to turn his life around and has established a new company which focuses on the commercial telecommunications industry. *See* Nathan Presentence Investigation Report at 10. Although having experienced some resistance in establishing his new business because of his publicized Indictment, Nathan argues he has persevered and has even assisted the Government in two separate investigations related to the illegal export of military equipment along with Lander. *See id.* at 10–11.

The contention of Nathan that his "extraordinary acceptance of responsibility as evidenced by his conduct since his guilty plea" warrants a downward departure is not persuasive. Nathan has admitted what he did was wrong and that he was fully aware of the impropriety of his actions. *See* Nathan Plea Hearing Transcript at 20. Accordingly, although Nathan may have attempted to aid Customs in its attempt to prevent similar crimes in the future, he is no less culpable for the crimes he committed in order to gain

financially with full knowledge that his actions were wrong. Although there is a legal basis to consider and grant this downward departure, the invitation to do so is rejected.

### D. *Sentencing Issues Applicable to Electrodyne*

#### 1. *Section 8C2.5(b)(4)*

The Electrodyne sentence was upwardly adjusted two points because it was determined Electrodyne had "[fifty] or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense." Section 8C2.5(b)(4); *see* Transcript from Electrodyne Sentencing at 3. This determination was remanded for "findings as to the number of days Electrodyne had [fifty] or more employees in whatever ... [is] determine[d] ... [to be] the relevant time period." *See Electrodyne*, 147 F.3d 250, 1998 WL 304358, at * 7.

In light of remand, the 21 May 1998 Order requested Electrodyne submit "[a] list of the names of all people who have been employed by Electrodyne, including officers/directors, in any capacity and at any point ... during the period covered by the Indictment." *See id.*

■ Electrodyne submitted a summary of personnel (the "Personnel Summary") based upon payroll check register records for the period covered by the Indictment. *See* Personnel Summary. The Personnel Summary indicates personnel records before February 1994 are not available to ascertain start dates. *See id.* Accordingly, the employment information was not complete for fifty-two employees. *See id.* However, it appears from the Personnel Summary that during the period covered by Counts Two and Ten of the Indictment, approximately October 1993 through February 1994, Elec-

---

**105.** Nathan was born on 7 January 1958 in Iran. *See* Nathan Presentence Investigation Report, ¶ 164. In 1975, Nathan emigrated to the United States in an effort to secure an education. *See id.* at ¶ 166. Nathan is now a naturalized citizen of the United States. *See id.* at 2

**106.** After Nathan sold his shares back to Electrodyne, Nathan's brother, a Mr. Cohen, purchased

the assets of Electrodyne and is operating the company under a new name, AdComm Inc. ("AdComm") *See* Nathan Presentence Investigation Report, ¶ 177. AdComm was formed on 15 July 1996 and is a New Jersey corporation. *See* 30 September 1997 Letter attached as Exh. C to Government Sentencing Memorandum at 13.

trodyne did not employ fifty or more employees in any month.[107] *See id.* Accordingly, a two-point adjustment pursuant to Section 8C2.5(b)(4) is not warranted; however, a one-point adjustment is appropriate pursuant to U.S.S.G. § 8C2.5(b)(5)[108] ("Section 8C2.5(b)(5)") because Electrodyne employed ten or more employees during the period covered by Counts Two and Ten.[109]

**107.** From 1992 through 1994, Electrodyne's payroll indicated it at times employed over fifty employees. *See* Electrodyne Presentence Investigation Report at 32. The Government indicates the Defensive Investigative Service ("DIS") records show Electrodyne claimed fifty or more employees on three separate occasions, including 5 August 1992, 28 September 1993 and 11 April 1994. *See* Government Sentencing Memorandum at 1 n. 1; *see also* Electrodyne Presentence Investigation Report at 32. Probation indicates personnel records seized during the execution of the search warrant reveal sixty-three employees were employed by Electrodyne. *See id.* Probation, however, does not list the dates of employment of these employees. Accordingly, a finding as to the number of employees of Electrodyne cannot be made based upon this assertion. Also, the number of employees indicated by the Government is not during the applicable period October 1993 through February 1994.

**108.** Section 8C2.5(b)(5) states:

If the organization had [ten] or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense, add [one] point.

*Id.* Electrodyne concedes a one-point adjustment is appropriate pursuant to Section 8C2.5(b)(5). *See* Second Electrodyne Sentencing Memorandum at 2.

**109.** The Personnel Summary submitted by Electrodyne indicated the following employees worked at Electrodyne during the period of time encompassing Counts Two and Ten of the Indictment, approximately October 1993 to February 1994:

| | October 1993 | November 1993 | December 1993 | January 1994 | February 1994 |
|---|---|---|---|---|---|
| 1) | Amann | Amann | Amann | Amann | Amann |
| 2) | Ananthaswamy | Ananthaswamy | Ananthaswamy | Ananthaswamy | Ananthaswamy |
| 3) | Andes | Andes | Andes | Andes | Andes |
| 4) | Bassett D. | Bassett D. | Bassett D. | Bassett D. | Andreottola |
| 5) | Ferrante | Ferrante | Ferrante | Enders W. | C. |
| 6) | Heller D. | Hanna F. | Garcia G. | Ferrante | Bassett D. |
| 7) | Hickey T. | Heller D. | Heller D. | Heller D. | De Lacruz R. |
| 8) | Hong L. | Hickey T. | Hickey T. | Hickey T. | Deak F. |
| 9) | Laspisa | Hong L. | Hong L. | Hong L. | Esposito D. |
| 10) | Laxamana A. | Laspisa | Laspisa | Laspisa | Ferrante |
| 11) | Lorusso | Laxamana A. | Laxamana A. | Laxamana A. | Heller D. |
| 12) | Ly T. | Lorusso | Lorusso | Lorusso | Jones M. |
| 13) | Maquire | Ly T. | Ly T. | Ly T. | Lander V. |
| 14) | Marchini | Maquire | Maquire | Maquire | Laspisa |
| 15) | Mills M. | Marchini | Marchini | Marchini | Laxamana A. |
| 16) | Minch S. | Mills M. | Mills M. | Mills M. | Laxamana N. |
| 17) | Patel A. | Minch S. | Minch S. | Minch S. | Lorusso |
| 18) | Puccini R. | Patel A. | Patel A. | Patel A. | Ly T. |
| 19) | Pugliiese | Pugliiese | Pugliiese | Patel S. | Lymcz I. |
| 20) | Rudland | Rudland | Rudland | Pereira | Maquire |
| 21) | Seyedzadeh | Seyedzadeh | Seyedzadeh | Pugliiese | Marchini |
| 22) | Steiger K. | Steiger K. | Steiger K. | Rudland | Mueller L. |
| 23) | | | | Seyedzadeh | Musikant S. |
| 24) | | | | Steiger K. | Patel A. |
| 25) | | | | White S. | Patel Sanjay |
| 26) | | | | | Pedace S. |
| 27) | | | | | Perez P. |
| 28) | | | | | Pugliiese |
| 29) | | | | | Rudland |
| 30) | | | | | Salas A. |
| 31) | | | | | Seltzer J. |
| 32) | | | | | Seyedzadeh |
| 33) | | | | | Steiger K. |
| 34) | | | | | Vaca S. |
| 35) | | | | | Walton M. |
| 36) | | | | | Yabut N. |

### 2. *Ability to Pay*

The Government and Electrodyne stipulated in the Electrodyne Plea Agreement any fine imposed should not exceed $140,000 and "should be paid no later than six months after the date of sentencing." *See* Electrodyne Plea Agreement at ¶¶ 4, 5. During the Electrodyne Sentencing, Electrodyne acknowledged this stipulation was not binding upon the court. *See* Transcript from Electrodyne Sentencing at 8. The Electrodyne Plea Agreement also stated the stipulations were not binding upon the sentencing court. *See* Electrodyne Plea Agreement at 4–5. At the Electrodyne Sentencing, a fine of $500,-000 for each of Count Two and Ten was imposed which was to be paid immediately.[110] *See id.* at 10–11.

Electrodyne appealed, *inter alia,* the amount of the fine and the time within which it was to be paid. The Circuit remanded the matter indicating the necessity of findings on the ability of Electrodyne to pay any fine imposed. *See Electrodyne,* 147 F.3d 250, at 254. The Circuit also observed:

A constant problem faced by a district court in establishing fines is that the defendant controls what information flows to

... [P]robation. ... The problem is exacerbated both by the fact that [P]robation officers rarely have training in accounting and by defendant's status as a corporation, which enables defendant to choose to be less than forthcoming because, by definition, a corporation cannot be incarcerated. That is exactly what happened in this case:

At the request of ... [P]robation ..., [Electrodyne] has provided corporate income tax returns for the last three fiscal years. Electrodyne does not have audited financial statements for the past three years; however, provided [sic] a financial statement with the accountant's compilation for the year end [31 December] 1994. A compilation is limited to presenting in the form of financial statements information that is the representation of management. The accountant did not audit or review the accompanying financial statements and, accordingly, does not express an opinion or any other form of assurance on them. Management elected to omit substantially all of the disclosures and the statement of cash flows required by generally accepted accounting principles. If the omitted disclosures and statement of cash flows

Personnel Summary.
As previously indicated, the Personnel Summary failed to list the staring dates of fifty-two employees. Thus, the above table is an approximation of the number of employees working at Electrodyne from October 1993 to February 1994. If the Personnel Summary indicated a termination date and no starting date, the employee was assumed to have only worked during the month of termination. Although at least ten employees were employed by Electrodyne during the period covered by Counts Two and Ten, the actual number employed is likely higher than those indicated above due to the incomplete information provided.

Personnel Summary.
As previously indicated, the Personnel Summary failed to list the staring dates of fifty-two employees. Thus, the above table is an approximation of the number of employees working at Electrodyne from October 1993 to February 1994. If the Personnel Summary indicated a termination date and no starting date, the employee was assumed to have only worked during the month of termination. Although at least ten employees were employed by Electrodyne during the period covered by Counts Two and Ten, the actual number employed is likely higher than those indicated above due to the incomplete information provided.

**110.** At the time of the Electrodyne Plea Hearing, Electrodyne was informed the maximum statutory fine for Count Ten was "the greatest of $10,-

000 or twice the loss or twice the gain caused by the offense." *See* Transcript from Electrodyne Plea Hearing at 11. This information was taken from the Electrodyne Plea Agreement, *see* Electrodyne Plea Agreement at 3, and the Electrodyne Plea Memorandum filed by the Government. *See* Electrodyne Plea Memorandum at 2. The correct statutory fine on Count Ten was the greatest of $500,000 or twice the loss or twice the gain cause by the offense. *See* 18 U.S.C. §§ 3559(a)(4), 3571(c) and (d). The Circuit observed the maximum statutory fine that could be imposed on Count Two was $1,000,000; thus, the possibility existed that a maximum total fine of $1,010,000 could be imposed. *See Electrodyne,* 147 F.3d 250, ——, 1998 WL 304358, at * 2. The Circuit held this error was harmless because Electrodyne was fined $1,000,000 which was within the maximum fine range. *See id.*

were included in the financial statements, they might influence the user's conclusion about [Electrodyne's] financial position, results of operations, and cash flows. Accordingly, these financial statements are not designed for those who are not informed about such matters.

*Id.* (emphasis omitted) (quoting Electrodyne Presentence Investigation Report, ¶ 138).

The Circuit further observed that on remand the production of necessary documents could be ordered so that a basis for a finding as to the ability of Electrodyne to pay a fine could be made. *See Electrodyne*, 147 F.3d 250, at 254. The Circuit also indicated if the negotiated fine of $140,000 is accepted, a detailed finding of the ability of Electrodyne to pay such fine is unnecessary because Electrodyne has acknowledged its ability to pay this amount by signing the Electrodyne Plea Agreement. *See id.* Electrodyne argues the stipulation contained in the Electrodyne Plea Agreement should govern this determination. *See* Second Electrodyne Sentencing Memorandum at 4.

■■■ When imposing a fine, 18 U.S.C. § 3572(a)(1) states a court must consider " 'the defendant's income, ensuring capacity and financial resources' " in determining " 'the amount, time for payment and method of payment.' " *See Electrodyne*, 147 F.3d 250, at 254 (quoting 18 U.S.C. § 3572(a)(1)). A court must make findings concerning the ability of a defendant to pay a fine. *See id.* (quoting *United States v. Seale*, 20 F.3d 1279, 1284 (3d Cir.1994)).

In light of remand and in order for a finding to be made concerning the ability of

Electrodyne to pay a fine, an order, dated 21 May 1998 (the "21 May 1998 Order") required Electrodyne to submit:

Financial documentation including audited and unaudited financial statements, corporate statements including information as to inventory cost, pricing and value, accounts receivable, accounts payable and financial projections, profit/loss statements, balance sheets, annual reports, all bank statements or bank records, including those submitted in connection with an application for a loan, other financing or other transactions, a listing of all assets owned or sold or otherwise transferred, and a listing of all dividends to shareholders and/or directors and/or officers. This documentation is to cover the calendar/fiscal years 1990 to date.

21 May 1998 Order.

In response to the 21 May 1998 Order, Electrodyne submitted a number of documents. Electrodyne also filed a "Notice of Motion for Modification of [the 21 May 1998 Order]" (the "Motion for Modification").[111] The Motion for Modification requested that the 21 May 1998 Order be modified because Electrodyne is unable to submit a number of the requested documents. The Cocoziello Affidavit sets forth the documents Electrodyne was able to provide.[112] The Schneiderman Affidavit [113] not only lists a number of the documents Electrodyne is providing but indicates the documents it cannot provide and explanations why submission of certain information requested in the 21 May 1998 Order is not possible.[114]

The Schneiderman Affidavit states Electrodyne does not have audited annual financial statements for the years between 1990 to

---

**111.** In support of the Motion for Modification, Electrodyne submitted: Affidavit of Sol Schneiderman (the "Schneiderman Aff."); Affidavit of Thomas Catanio (the "Catanio Aff."); Affidavit of J. Barry Cocoziello (the "Cocoziello Aff.").

**112.** Attached to the Cocoziello Affidavit was a listing of the documents Electrodyne was able to provide. *See* Cocoziello Aff., Exh. A.

**113.** From approximately 1988 until present, Schneiderman has been a consultant employed by Electrodyne. *See* Schneiderman Aff., ¶ 1. Schneiderman used to be the Program Manager

of Electrodyne. *See id.* Schneiderman became an officer when Nathan resigned as President of Electrodyne. *See id.* Schneiderman is the only person who presently works full-time for Electrodyne. *See id.* The only other individual who works for Electrodyne is Kimberly Steiger. *See id.* Ms. Steiger is a part time administrator and secretary. *See id.* Schneiderman makes $59,-000 per year and Steiger is paid approximately $2,700 per year. *See id.*

**114.** The Motion for Modification was granted by order, dated 10 August 1998.

the present. *See* Schneiderman Aff., ¶ 8. The Schneiderman Affidavit indicates Electrodyne never had audited statements prepared. *See id.* The Catanio Affidavit explains audited statements are usually requested by a small company, such as Electrodyne, only when investors or lending institutions require them. *See* Catanio Aff., ¶ 2. The Catanio Affidavit indicates the cost of such an audit would range from $8,000 to $12,000 per year. *See id.*

Instead of audited statements, Schneiderman states Electrodyne has "[a] review of statements for 1990 to 1991, compilations for 1994 and 1995, and internally generated annual statements for 1996, 1997, and through [31 May] 1998." Schneiderman Aff., ¶ 8; *see also* Catanio Aff., ¶ 3. Schneiderman also sets forth annual financial statements for 1992 and 1993 have not been located. *See* Schneiderman Aff., — 8. The Catanio Affidavit explains an accountant cannot go back and perform an audit for the years 1990 through 1997 in accordance with generally accepted accounting principles without significant qualifications.[115] *See* Catanio Aff., — 3.

Schneiderman further states financial projections have not been prepared to his knowledge. *See* Schneiderman Aff., ¶ 8. No dividends have been paid to shareholders, directors or officers as reflected on the financial records. *See id.,* ¶ 9.

Schneiderman also states personnel and employment records were seized by law enforcement. *See* Schneiderman Aff., ¶ 11. In response to the 21 May 1998 Order, Electrodyne, thus, prepared the personnel Summary based upon payroll check register records for the period of 1991 through February 1994.[116] *See id.* Schneiderman sets forth no documents have been found providing employment information for March 1990 through July 1991. *See id.*

Schneiderman states Electrodyne has approximately $1,200 in its bank account. *See* Schneiderman Aff., ¶ 10. A bank statement, dated 29 May 1998, (the "29 May 1998 First Union Statement") however, indicates Electrodyne had $25,219.48 in an account at the First Union National Bank. *See* 29 May 1998 First Union Statement.

On or about 25 October 1996, AdComm purchased the majority of physical assets owned by Electrodyne for $215,000. *See* Bill of Sale with an attached listing of the assets of Electrodyne sold to AdComm. Schneiderman represents Electrodyne currently has no physical assets other than some work in process and/or parts which are to be utilized in connection with products manufactured by Electrodyne. *See* Schneiderman Aff., ¶ 9.

There is a balance due on the promissory note executed between AdComm and Electrodyne in connection with AdComm's purchase of Electrodyne's inventory. *See* Schneiderman Aff., ¶ 9. It appears AdComm still owes to Electrodyne $162,000 on the promissory note. *See id.* AdComm is also repaying a security deposit to Electrodyne. *See id.* AdComm owes to Electrodyne $31,486 on the security deposit. *See id.*

By virtue of the Indictment and the Electrodyne Plea Agreement, Electrodyne has been suspended from entering into any new contracts with the United States. *See* Electrodyne Presentence Investigation Report, ¶ 139; Schneiderman Aff., ¶ 2. The State Department also suspended the export privileges of Electrodyne. *See* Electrodyne Presentence Investigation Report, ¶ 139; Schneiderman Aff., ¶ 2. Contracts between Electrodyne and the Government or foreign corporations together comprised ninety percent of Electrodyne's business. *See* Schneiderman Aff., ¶ 2.

Electrodyne was permitted to complete contracts entered into with the Government

---

**115.** The catanio Aff. also states:
While an accounting firm could review financial information for 1990 through 1997, using internal documentation, the report at best expresses limited assurance that there are no material modifications that should be made to the statements in order for them to be in conformity with generally accepted accounting principles. I estimate that it would take approximately three to four months and at a cost estimated to be $40,000 to $50,000.
*Id.,* ¶ 3.

**116.** Electrodyne estimated annual salaries based on the hourly or weekly rates available from the payroll check register records. *See* Schneiderman Aff., ¶ 12.

which had yet to be fully performed. *See* Schneiderman Aff., ¶ 3. From 1996 to date, Electrodyne has continued to work to complete existing contracts with the Government. *See id.* Currently, Electrodyne has three remaining contracts with the Government. *See id.* at ¶ 4. Two of these contracts are with the Defense Supply Center (the "DSC") in Columbus, Ohio and are for proximity switches. *See id.* The remaining contract is with the Navy and is for amplifiers. *See id.*

DSC declared Electrodyne in default on one of the contracts for proximity switches. *See* Schneiderman Aff., ¶ 5. The matter is presently pending before the Armed Services Board of Contracts and Appeals. *See id.* If Electrodyne does not prevail, it will owe the Government $49,458. *See id.* If Electrodyne wins, based upon the progress payments made to Electrodyne, Schneiderman states it "will be a wash." *See id.*

As to the second contract with the DSC, Electrodyne is currently negotiating with the Government concerning modifications in the specifications for the proximity switches which will change the terms of the contract. *See* Schneiderman Aff., ¶ 6. Electrodyne has requested an equitable adjustment of $132,-000 and indicates there is an indication that if the DSC modifies the contract, the contract amount will increase from $173,000 to a larger amount. *See id.*

As indicated, a contract with the Navy is also executory. *See* Schneiderman Aff., ¶ 7. This contract is in the amount of approximately $340,000 and calls for delivery of forty-eight amplifiers. *See id.* Nineteen amplifiers have been delivered to the Navy so far accounting for approximately $88,000 of the contract price. *See id.* The Navy made a $100,000 progress payment to Electrodyne on this contract. *See id.* Electrodyne anticipates delivering an additional $72,000 worth of amplifiers in 1998 and will seek to complete this contract with the Navy. *See id.*

The base fine pursuant to the Guidelines on Count Ten [117] of the Indictment, considering the calculated offense level of seventeen which has not changed on resentencing, is $250,000.[118] *See* Electrodyne Presentence Investigation Report, ¶ 150. On resentencing, however, the culpability score computation (the "Culpability Score") is calculated as four instead of five, as previously determined at the Electrodyne Sentencing.[119] *See* U.S.S.G. § 8C2.6. The Culpability Score is different because it has been determined a one-point adjustment for the number of employees pursuant to Section 8C2.5 is appropriate instead of the previously imposed two-point adjustment. *See supra* pp. 278–79.

Pursuant to U.S.S.G. § 8C2.6 ("Section 8C2.6"), based upon the Culpability Score of four, the minimum multiplier is .80 and the maximum multiplier is 1.80. *See* Section 8C2.6. Given the base fine of $250,000, *see* U.S.S.G. § 8C2.4, the Guideline fine range for Count Ten is $200,000 to $400,000.

---

117. As previously mentioned, Count Ten of the Indictment is covered by Section 8C2.1. *See* Section 8C2.1. Count Two, however, is not. In such instances, U.S.S.G. § 8C2.10 ("Section 8C2.10") is applicable. Section 8C2.10 sets forth:

> For any count .. not covered under [Section] 8C2.1 ... the court should determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572. The court should determine the appropriate fine amount, if any, to be imposed in addition to any fine determined under [U.S.S.G.] § 8C2.8 ... and [U.S.S.G.] § 8C2.9 (Disgorgement).
> *Id.*

118. Because Electrodyne contended the loss occasioned by its conduct totaled $187,255.65, *see* First Electrodyne Sentencing Memorandum at 2, the appropriate adjustment pursuant to Section 2F1.1(b)(1)(H) would be seven instead of nine.

*See id.* at 6. The applicable fine pursuant to U.S.S.G. § 8C2.4(d) would be $125,000 instead of $250,000. *See id.* As indicated, *supra*, this calculation of loss is rejected.

119. The Culpability Score was determined as follows:

| | |
|---|---|
| Starting Culpability Score (U.S.S.G.8C2.5(a)) | 5 |
| Involvement/Tolerance -Pursuant to Section 8C2.5(b)(5) one point is added because Electrodyne has ten or more employees and an individual within substantial authority personnel participated in, condoned or was willfully ignorance of the offense. | 1 |
| Self Reporting/Cooperation/Acceptance of Responsibility | −2 |
| Total Culpability Score | 4 |

■ The ability of Electrodyne to pay a fine has changed since the Electrodyne Sentencing. Presently, Electrodyne appears to be operating with only Schneiderman, who serves as a full time consultant. *See* Schneiderman Aff., ¶ 1. The three Government contracts Electrodyne is attempting to fill appear to be marginally profitable. The financial situation presently facing Electrodyne, however, does not ensure it of the imposition of only a $140,000 fine, as stipulated in the Electrodyne Plea Agreement.[120]

As indicated, the most recent First Union Statement submitted in response to the 21 May 1998 Order indicates Electrodyne has $25,219.48 in an account at the First Union National Bank. *See* 29 May 1998 First Union Statement. Electrodyne also has at most, two employees; only one of these employees, Schneiderman, works full time. *See* Schneiderman Aff., ¶ 1. Also, Electrodyne is completing a contract with the Navy for $340,000. *See* Schneiderman Aff., ¶ 7. In connection with the contract with the DSC, Electrodyne requested an "equitable adjustment" of $132,000. *See id.* at ¶ 6. Schneiderman stated he believed the Air Force would upwardly adjust the price of the contract. Electrodyne did not specify how much of the requested upward adjustment is a result of the changed specifications. *See id.* In light of the request of the 21 May 1998 Order for detailed financial information from Electrodyne and the failure of Electrodyne to indicate the expenses applicable to these contracts, it has been determined the full amounts of both contracts are available to pay any fine imposed. As the Circuit stated, if Electrodyne failed to produce the requested financial documentation "the necessity for the district judge to have a basis in fact for establishing

the amount of fine is reduced." *Electrodyne,* 147 F.3d 250, at 254.

Moreover, AdComm also continues to owe $162,000 on a promissory note issued in connection with the purchase of certain of Electrodyne's assets. *See id.* ¶ 9. Additionally, AdComm presently owes $31,486 in payments to Electrodyne on a security deposit. *See id.* Accordingly, funds totaling approximately $690,705 are or will become available to pay a fine.[121]

Based upon the foregoing, it is determined a fine of $250,000 is appropriate on both Count Ten and Count Two.[122] Electrodyne has the ability to pay such a fine. As mentioned, Electrodyne is owed $193,469 from AdComm. As of 29 May 1998, Electrodyne also had $25,219.48 in an account at the First Union National Bank. *See* 29 May 1998 First Union Statement. Electrodyne is also currently performing on two Government contracts which will further generate more than $472,000 and enable Electrodyne to pay any fine imposed. Moreover, Electrodyne has only two employees, one of which works full-time, and has failed to submit any additional expenses it incurs.

Immediate payment of a fine is required if the organization was operated primarily for a criminal purpose. *See* U.S.S.G. § 8C3.2(a). Immediate payment is also required in all other circumstances unless it is determined the organization is financially unable to make immediate payment or that such payment would serve as an undue burden. *See* Section 8C3.2(b) ("Section 8C3.2(b)"). In such instances when deferred payment is permitted, Section 8C3.2(b) states full payment is to

---

**120.** The Government indicates it takes no position on the ability of Electrodyne to pay the $1,000,000 fine previously imposed in light of the stipulated $140,000 fine in the Electrodyne Plea Agreement. *See* Government Sentencing Memorandum at 1 n. 1.

**121.** The total amount available or which will become available is calculated as follows:

| | |
|---|---|
| $ 25,219.48 | First Union National Bank Account |
| $162,000 | Due on promissory note from AdComm |
| $ 31,486 | Security deposit due from AdComm |

| | |
|---|---|
| $340,000 | Contract with the Navy |
| $132,000 | Amount requested in "equitable adjustment" on contract presently for $173,000 |

**122.** Section 8C2.8 lists a number of factors to be considered when determining the amount of a fine within the applicable Guideline range. *See* U.S.S.G. § 8C2.8 ("Section 8C2.8"). One of these considerations are the factors set forth in 18 U.S.C. § 3572(a) ("Section 3572(a)"). *See* Section 8C2.8(10). Section 3572 indicates, *inter alia,* the income, earning capacity and financial resources of a defendant should be considered. *See* Section 3572(a)(1).

be required "at the earliest possible date, either by requiring payment on a date certain or by establishing an installment schedule." *See id.* In any event, the period provided for payment is not to exceed five years. *See* 18 U.S.C. § 3572(d).

It appears Electrodyne is unable to pay the fine in full immediately. Electrodyne states it has the ability to pay a $140,000 fine, as stipulated to in the Electrodyne Plea Agreement. *See* Second Electrodyne Sentencing Memorandum at 3. This money accordingly should have been set aside. Accordingly, pursuant to Section 8C3.2(b), $140,000 is payable immediately. Payments on the remaining balance of $360,000 are due in $50,000 installments every six months or when money enabling payment is received, whichever is first.

### 3. *Reliance Upon Disputed Matters*

 Rule 32(c)(1) states that as to each disputed matter a court "must made either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." Fed. R.Crim.P. 32(c)(1). Such a finding concerning a disputed fact or an indication the disputed fact will not be relied upon must be expressly made. *See Electrodyne,* 147 F.3d 250, at ——, 1998 WL 304358, at * 5 (citing *United States v. Maurello,* 76 F.3d 1304, 1317 (3d Cir.1996)).

At the Electrodyne Sentencing it was determined "the other objections [raised by Electrodyne] d[id] not affect the [G]uideline." *See* Transcript from Electrodyne Sentencing at 7. During the Electrodyne Sentencing it was also determined the objections raised by Electrodyne other than those going to the number of employees and the amount of loss did not "affect ... [the] determination as to sentencing." *See id.* The Circuit vacated the sentence received by Electrodyne and remanded for resentencing because the judgment order mistakenly had a check in the box which read the court "adopt[ed] the factual findings and [G]uideline application in the [Electrodyne] [P]resentence [Investigation R]eport." *See Electrodyne,* 147 F.3d 250, at ——, 1998 WL 304358, at * 6. The Circuit indicated, *inter alia,* the record was ambiguous as to possible reliance upon disputed matters. *See id.*

To clarify any ambiguity which may remain, reliance upon any disputed issue which was not specifically addressed either during the Electrodyne Sentencing, resentencing or in this Letter–Opinion is disclaimed.

### III. *CONCLUSION*

The Individual Defendants admitted to fraud, a more serious offense, during their plea hearings and, therefore, Section 2F1.1 provides the appropriate base offense level. It has been determined the following Guideline offense level applies to Nathan:

*Guideline Determination as to Nathan*

| | |
|---|---|
| Base Offense Level (Section 2F1.1) | 6 |
| Calculation of Loss (Section 2F1.1(b)(1)(m)) | 9 |
| –Loss exceeded $350,000 but was not more than $500,000 | |
| More than Minimal Planning (Section 2F1.1(b)(2)(A)) | 2 |
| Role in Offense (Section 3B1.1(a)) | 4 |
| –Nathan was an organizer or leader of a criminal activity that was otherwise extensive | |
| Adjusted Offense Level | 21 |
| Acceptance of Responsibility (Section 3E1.1(a)) | –2 |
| Additional Acceptance of Responsibility (Section 3E1.1(b)) | –1 |
| TOTAL OFFENSE LEVEL | 18 |

Accordingly, the total offense level for Nathan is eighteen and the applicable sentencing range is twenty-seven to thirty-three months.[123] As indicated, Application Note One to Section 1B1.2 limits the sentence that

---

**123.** It has been determined the same total offense level, sentencing range and fine would apply if Section 2T3.1 were used as the applicable Guideline for Nathan.

may be imposed to the maximum permitted by the statute of conviction. *See* Application Note One to Section 1B1.2. Nathan was convicted of violating Section 542 which carries a maximum sentence of five years. *See* Section 542. Thus, Nathan can be sentenced anywhere in this Guideline range.

The applicable fine as to Nathan is $6,000 to $60,000. *See* Section 5E1.2(c)(3). Nathan failed to make adequate disclosure to Probation concerning his ability to pay a fine. *See* Nathan Presentence Investigation Report at 37. Nathan agreed he had the ability to pay

a fine at the high end of the Guideline range. *See id.*, ¶ 180. The Government indicates this statement "lacks the requisite specificity, displays a lack of candor and respect for the Court, and raises questions about whether Nathan is truly contrite." *Id.* at 37. Because Nathan has failed to provide Probation with the requested financial information he had failed to demonstrate an inability to pay a fine within the applicable Guideline range.

It has been determined the following Guideline offense level applies to Lander:

*Guideline Determination as to Lander*

| | |
|---|---|
| Base Offense Level (Section 2F1.1) | 6 |
| Calculation of Loss (Section 2F1.1(b)(1)(m)) | 9 |
| –Loss exceeded $350,000 but was not more than $500,000 | |
| More than Minimal Planning (Section 2F1.1(b)(2)(A)) | 2 |
| Adjusted Offense Level | 17 |
| Acceptance of Responsibility (Section 3E1.1(a)) | −2 |
| Additional Acceptance of Responsibility (Section 3E1.1(b)) | −1 |
| TOTAL OFFENSE LEVEL | 14 |

Accordingly, the total offense level for Lander is fourteen and the applicable sentencing range is fifteen to twenty-one months.[124] As indicated, Application Note One to Section 1B1.2 limits the sentence that may be imposed to the maximum permitted by the statute of conviction. *See* Application Note One to Section 1B1.2. Lander was convicted of violating Section 545 which has a maximum sentence of two years. Thus, Lander can be sentenced anywhere in this Guideline range.

The applicable fine as to Lander is $4,000 to $40,000. *See* Section 5E1.2(c)(3). Although at the time the Lander Presentence Investigation Report was completed Lander was not employed, he anticipated earning an annual salary of approximately $50,000 to $80,000. *See* Lander Presentence Investigation Report, ¶ 187. Lander owns a home which is valued at $470,000 with a mortgage balance of $282,637. *see id.* Lander also owns another home which, at the time the Lander Presentence Investigation Report was prepared, was under contract for $104,000. *See id.* Lander is able to pay a fine within the applicable range.

Because it has been determined the financial condition of Electrodyne has changed since the Electrodyne Sentencing, the applicable fine is appropriately set at $250,000 for each of Counts Two and Ten. The total fine, accordingly, totals $500,000. It has been determined Electrodyne is unable to pay the fine in full immediately. Accordingly, pursuant to Section 8C3.2(b), Electrodyne is required to immediately pay $140,000. Thereafter, Electrodyne is to make payments of $50,000 every six months or when money is received enabling the required payment, whichever is first.

---

124. It has been determined if Section 2T3.1 were the applicable Guideline the total offense level would be thirteen. The applicable sentencing range would be twelve to eighteen months. The applicable fine would be $3,000 to $30,000.